18 CV 2977

Sarah H. Concannon
Kevin C. Lombardi (*pro hac vice pending*)
SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC  20549-5977
Telephone:  (202) 551-5361 (Concannon)
Email:  ConcannonS@sec.gov
Telephone:  (202) 551-8753 (Lombardi)
Email:  LombardiK@sec.gov

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,      :
                                         :
                              Plaintiff, :
                                         :      18-CV-              (      )
        – against –                      :
                                         :      FILED UNDER SEAL
LONGFIN CORP.                            :
VENKATA S. MEENAVALLI                    :
AMRO IZZELDEN ALTAHWI a/k/a ANDY         :
   ALTAHAWI                              :
SURESH TAMMINEEDI                        :
DORABABU PENUMARTHI,                     :
                                         :
                             Defendants. :
                                         :
------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF *EX PARTE* EMERGENCY APPLICATION FOR ORDER TO SHOW CAUSE, FOR AN ASSET FREEZE, AND OTHER RELIEF

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................2

STATEMENT OF FACTS .........................................................................................5

   A. Altahawi's Unlawful Distributions Of Longfin Stock In Unregistered Transactions .........7

   B. Penumarthi's Unlawful Distributions Of Longfin Stock In Unregistered Transactions... 10

   C. Tammineedi's Unlawful Distributions Of Longfin Stock In Unregistered Transactions..10

ARGUMENT .........................................................................................................12

I. DEFENDANTS' BROKERAGE ACCOUNTS AND ALTAHAWI'S BANK OF AMERICA
   ACCOUNT SHOULD BE FROZEN TO ENSURE SUFFICIENT ASSETS WILL BE
   AVAILABLE AND WITHIN THE COURT'S JURISDICTION TO SATISFY A
   JUDGMENT .......................................................................................................12

   A. The Burden On The Commission To Obtain An Asset Freeze Is Not Onerous................12

   B. The Commission Has Established A *Prima Facie* Violation Of Section 5 By Each Of The
   Defendants ......................................................................................................13

   C. Defendant's Distributions Of Longfin Securities Were Neither In Registered Transactions
   Nor Exempt.....................................................................................................14

      1. Altahawi's Distributions Were Neither In Registered Transactions Nor Exempt...... 14

         a. Assuming Altahawi Is Not An Affiliate of Longfin, He Cannot Rely On The Safe
            Harbor Under Rule 144 For His Sale Of The Consulting Shares Or
            Affiliate Shares ................................................................................ 16

         b. In the Alternative, If Altahawi Was An Affiliate At The Time Of The Sales, Then
            His Sales Failed To Comply With The Provisions Of Rule 144 .......................... 18

      2. Penumarthi And Tammineedi Are Affiliates Under The Common Control Of Longfin
         And Its CEO, Meenavalli, And Their Distributions Are Not Exempt........................ 18

      3. Longfin And Meenavalli Are Liable Under Section 5 For Altahawi's, Penumarthi's,
         and Tammineedi's Distributions Of Longfin Stock In Unregistered Transactions .... 20

   D. Defendant's Resales Are Not Otherwise Exempt Under Section 4(a)(1) ......................... 22

   E. An Asset Freeze Order Should Enter To Preserve The *Status Quo* And To Alleviate The
   Serious Risk That The Substantial Proceeds Of Defendants' Unlawful Trading Will Be
   Transferred Offshore..........................................................................................24

II. THE COURT SHOULD ENTER AN ORDER REQUIRING DEFENDANTS TO
   REPATRIATE THE PROCEEDS OF THEIR SECURITIES LAW
   VIOLATIONS ....................................................................................................26

III. THE COURT SHOULD ENTER AN ORDER TO SHOW CAUSE WHY A
   PRELIMINARY INJUNCTION SHOULD NOT BE ENTERED.............................. 26

i

**Page**

IV. THE COURT SHOULD ENTER AN ORDER PROHIBITING THE DESTRUCTION
OF DOCUMENTS.................................................................................. 26

V. EXPEDITED DISCOVERY AND ALTERNATIVE MEANS OF SERVICE IS
NECESSARY TO PREPARE FOR THE SHOW CAUSE HEARING REQUESTED
BY THE COMMISSION......................................................................... 27

CONCLUSION   ................................................................................................ 29

## TABLE OF AUTHORITIES

Page

### Cases

*Ackerberg v. Johnson*, 892 F.2d 1328, 1336 (8th Cir. 1989) ..........................................23

*De Beers Consolidated Mines, Ltd. v. United States*, 325 U.S. 212 (1945) ...................25

*FTC. v. Pecan Software Ltd.*, No. 12 Civ. 7186, 2013 WL 4016272
(S.D.N.Y. Aug. 7, 2013) .........................................28

*Geiger v. SEC*, 363 F.3d 481 (D.C. Cir. 2004) ..........................................2

*In the Matter of Oklahoma-Texas Trust*, 2 S.E.C. 764 (1937) ..........................................23

*In re GLG Life Tech Corp. Securities Litigation*, 287 F.R.D. 262 (S.D.N.Y. 2012) ...........28

*Lewisohn Copper Corp.*, 38 S.E.C. 226 (1958) ..........................................20, 23

*Madu, Edozie & Madu, PC. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106 (S.D.N.Y. 2010) .....27

*R.A Holman v. SEC*, 366 F.2d 446 (2d Cir. 1966) ..........................................20, 23

*Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007 (9th Cir. 2002) ..........................28

*SEC v. Am. Board of Trade, Inc.*, 645 F. Supp. 1047 (S.D.N.Y. 1986) ..........................25

*SEC v. Aragon Capital Advisors, LLC*, No. 07 Civ. 919(FM), 2011 WL 3278642
(S.D.N.Y. July 26, 2011) ..........................................26

*SEC v. Babikian*, No. 14 Civ. 1740, 2014 WL 2069348 (S.D.N.Y. Apr. 21, 2014) ....................27

*SEC v. Byers*, No. 08 Civ. 7104, 2009 WL 33434 (S.D.N.Y. Jan. 7, 2009)..................................12

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) ..........................................12, 13, 14

*SEC v. Cavanagh*, 1 F. Supp. 2d 337 (S.D.N.Y. 1998). ..........................................13, 14

*SEC v. Cavanagh*, 445 F.3d 105 (2d Cir. N.Y. 2006) ..........................................22

*SEC v. Chinese Consol. Benev. Ass'n*, 120 F.2d 739 (2nd Cir. 1940) ..........................21, 22

*SEC v. ConnectAJet.com, Inc.*, No. 09-CV- 1743, 2011 U.S. Dist. LEXIS 130215
(N.D. Tex. Nov. 9, 2011) ..........................................23

*SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d. 402 (S.D.N.Y. 2001) ..........................24

*SEC v. Illarramendi*, No 11-civ-78, 2011 WL 2457734 (D. Conn. June 16, 2011) ..................26

*SEC v. Kern*, 425 F3d 143 (2d Cir 2005) ..........................................20, 23

*SEC v M&A West*, 538 F3d 1043 (9th Cir. 2008) ..........................................20

*SEC v. Maillard*, No. 13 Civ. 5299, 2014 WL 1660024 (S.D.N.Y. April 23, 2014)....................12

*SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082 (2d Cir.1972) ..........................14

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953)..........................................2, 13

**Page**

*SEC v. Softpoint, Inc.*, 958 F. Supp. 846 (S.D.N.Y. 1997) ...........................................21

*SEC v. Sonja Anticevic*, No. 05 Civ. 6991, 2005 WL 1939946 (S.D.N.Y. Aug. 5, 2005) .....25, 27

*SEC v. Tecumseh Holding Corp.*, No. 03 Civ. 5490(SAS), 2009 WL 4975263
(S.D.N.Y. Dec. 22, 2009) ............................................................................................22

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990)...........................................12, 27

*SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412 (S.D.N.Y. 2007) ......................14

*SEC v. Universal Major. Indus.*, 546 F.2d 1044 (2d Cir. 1976)..................................13

*SEC v. Well Advantage Ltd.*, No. 12-CV-5786, Docket Nos. 15, 35
(S.D.N.Y. Aug. 6 & 22, 2012) ....................................................................................25

*Smith v. SEC*, 653 F.3d 121 (2d Cir. 2011)...........................................................12

*United States v. Lebanese Canadian Bank*, 285 F.R.D. 262 (S.D.N.Y. 2012) ..............28

                                                                                    **Page**

*Van Dyke v. Coburn Enter., Inc.*, 873 F.2d 1094 (8th Cir. 1989) ....................................2


**SEC Releases**

Notice of Adoption of Rule 144, 1933 Act Release No. 33-5223, Fed. Sec. L. Rep. (CCH)
P78,487 (Jan. 11, 1972) ...........................................................................................22


**Statutes and Rules**

Federal Rules of Civil Procedure

    Fed. R. Civ. P. 4(f) ............................................................................................28

    Fed. R. Civ. P. 4(f)(3) .......................................................................................27

    Fed. R. Civ. P. 65(b)(2) ....................................................................................26

Securities Act of 1933

    15 U.S.C. § 77b(a)(11) ......................................................................................23

    17 C.F.R. § 230.144(b)(1)(i) ............................................................................17

    17 C.F.R. § 230.144(b)(1)(ii) .....................................................................16, 17

    17 C.F.R. § 230.144(b)(2) ............................................................................18, 19

    17 C.F.R. § 230.144(c)(1) .................................................................................18

    17 C.F.R. § 230.144(c)(2) .................................................................................19

    17 C.F.R. § 230.144(d)(ii) .................................................................................18

    17 C.F.R. § 230.144(d)(1)(ii) ............................................................................17

Securities Exchange Act of 1934

    17 C.F.R. § 240.13a-13(a) .................................................................................16

    17 C.F.R. § 240.15c2-11 ...................................................................................19

Plaintiff United States Securities and Exchange Commission (the "Commission") respectfully requests that the Court grant its *Ex Parte* Emergency Application for an Order to Show Cause, for an Asset Freeze, and Other Relief ("Application") against Defendants Longfin Corporation ("Longfin"), Amro Izzelden Altahwi (a/k/a "Andy Altahawi," and hereinafter "Altahawi"), Venkata S. Meenavalli ("Meenavalli"), Dorababu Penumarthi ("Penumarthi"), and Suresh Tammineedi ("Tammineedi") (collectively, "Defendants").  This emergency action concerns over $27 million in illegal profits by Defendants in connection with their sales of Longfin securities in unregistered transactions in circumvention and violation of Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act").

Defendants are engaged in ongoing distributions of Longfin stock in unregistered transactions for the benefit of company insiders and affiliates at the expense of public investors. The Commission seeks relief by order to show cause, rather than by notice of motion, because it believes that immediate and irreparable injury, loss, and damage will result if written or oral notice is provided to any of Defendants or their attorneys prior to entry of a temporary restraining order.  The Commission makes this emergency application primarily to prevent Defendants Altahawi, Penumarthi, and Tammineedi from transferring approximately $27 million to foreign accounts or otherwise dissipating the proceeds of their unlawful sales of shares of Longfin stock.

The Commission seeks an order (i) temporarily freezing the assets in Defendants Altahawi's, Penumarthi's, and Tammineedi's brokerage accounts and Altahawi's Bank of America account; (ii) stopping payment on two checks and freezing those assets; (iii) ordering Defendants to provide an accounting of all proceeds received by them from sales of Longfin stock in unregistered transactions; (iv) authorizing expedited discovery and service by alternate

1

means; (v) repatriating proceeds received by Defendants from sales of LFIN stock in unregistered transactions; and (vi) for other relief.  Freezing the assets in Altahawi's, Penumarthi, and Tammineedi's brokerage accounts and authorizing the other relief requested herein will maintain the *status quo*, permit the Commission to conduct expedited discovery, and preserve the Commission's ability to recover disgorgement, prejudgment interest, and civil penalties after the Commission has had an opportunity to demonstrate Defendants' violations.

## PRELIMINARY STATEMENT

Section 5's registration requirements are the cornerstone of the Securities Act.  *Van Dyke v. Coburn Enter., Inc.*, 873 F.2d 1094, 1097 (8th Cir. 1989).  The purpose of Section 5 is "to protect investors by promoting *full disclosure* of information thought necessary to make informed investment decisions." *Id.* (emphasis added); *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953); *Geiger v. SEC*, 363 F.3d 481, 484 (D.C. Cir. 2004).  In blatant disregard of Section 5 registration's requirements, Longfin, its Chairman and CEO, Meenavalli, its former corporate secretary and director, Altahawi, and insiders and affiliates Penumarthi and Tammineedi have distributed tens of millions of dollars of Longfin stock to the public in unregistered transactions, lining their own pockets at the expense of Longfin's public investors and in violation of the federal securities laws.

Longfin is a purported finance and technology company, which went public in December 2017 under Regulation A+, a "mini IPO" statute under the Securities Act and Jumpstart Our Business Startups Act ("JOBS Act"), under which it qualified a Tier 2 offering to sell 10 million shares of Class A common stock for $5.00 per share.  Longfin sold very few shares in its Regulation A+ offering—selling 1.14 million shares, or approximately 2.5% of the 76 million shares outstanding.  Within days of its IPO and listing on The Nasdaq Stock Market, LLC

("Nasdaq") under the ticker symbol "LFIN," Longfin announced that it had acquired Ziddu.com, a purported blockchain technology company owned by Longfin's CEO and Chairman, Meenavalli. Longfin announced its acquisition of Ziddu.com shortly after its Nasdaq listing, causing its stock price and trading volume to sky-rocket—closing at $22.01 per share on December 15, 2017, more than four times the prior day's closing price of $5.39 (and its Regulation A+ offering price of $5.00 per share). On December 18, 2018—the second trading day after the announcement—Longfin's stock price reached an intra-day high of $142.82 before closing at $72.38, giving Longfin a market capitalization of over $3 billion.

Meanwhile, Meenavalli arranged for insiders and affiliates Altahawi, Penumarthi, and Tammineedi to receive millions of shares of Longfin restricted stock in private issuer transactions, which they then distributed to the public market in unregistered transactions, in violation of Sections 5(a) and 5(c) of the Securities Act. Defendants profited handsomely. Altahawi acquired over 2 million shares of Longfin—over 60% of its public float—directly from the issuer at low or no cost purportedly in exchange for services rendered as an outside consultant. Following the Ziddu.com announcement, Altahawi sold over 475,000 of those shares for a profit of over $25 million. Penumarthi and Tammineedi acquired 40,000 and 30,000 shares of Longfin, respectively, directly from the issuer or its affiliates. They sold these shares into the public market shortly after the Ziddu.com announcement—after holding them for a very short period of time—for profits of approximately $2.88 million.

Defendants' distributions of Longfin stock in unregistered transactions violate Sections 5(a) and 5(c) of the Securities Act. Altahawi, Longfin's corporate secretary and director, sold into a market that he was instrumental in creating and that lacked adequate information about the company, because Longfin did not file its Form 10-Q quarterly public filing, which was required

to be filed in January 2018.  Penumarthi and Tammineedi, colleagues, insiders, and close associates of Meenavalli and Longfin, sold after holding their Longfin shares only briefly, evidencing that far from acquiring these securities with investment intent, they acquired the shares with an intent to distribute to the public.  And Meenavalli, Longfin's CEO and Chairman, set the wheels in motion by distributing this stock to Altahawi, Penumarthi, and Tammineedi and taking affirmative steps to facilitate their ultimate sales.  While creating the illusion that Longfin securities were dispersed through the hands of independent public investors, Longfin, its affiliates, and Defendants participated in an indirect public offering and sold securities into the public markets in unlawful unregistered transactions.

At least $27 million in proceeds from Defendants' illegal distributions are within the jurisdiction of tis Court.  Altahawi has accounts at Merrill Lynch, Pierce, Fenner & Smith Inc. ("Altahawi's ML Account"), Interactive Brokers ("Altahawi's IB Account"), and Bank of America.  Penumarthi has accounts at Interactive Brokers ("Penumarthi's IB Account") and Western International ("Penumarthi's WI Account").  Tammineedi also has an account at Interactive Brokers ("Tammineedi's IB Account").  In addition, Western International's clearing firm, Pershing LLC, has issued two checks containing proceeds of Defendants' illegal distributions, which have not yet been cashed.

Defendants have close ties abroad and foreign bank accounts and have the ability to move assets quickly outside of the United States.  During the last week of March, Altahawi attempted to transfer most of his assets from his Merrill Lynch brokerage account to his account at Bank of America, a potential precursor to further movements and dissipation of the funds.  Both Penumarthi and Tammineedi already have wired significant assets to foreign bank accounts.  Absent an immediate *ex parte* asset freeze, Defendants will likely transfer any remaining

proceeds and assets beyond the reach of the Commission or a U.S. court.

The Complaint alleges a *prima facie* case that Defendants violated Sections 5(a) and 5(c) of the Securities Act by engaging in offers and sales of unregistered securities through interstate means. Once the Commission has established a *prima facie* case of a Section 5 violation, the burden of proof shifts to the Defendants to show that an exemption or safe harbor from registration was available at the time of the offer or sale of the security. As discussed below, Defendants will not be able to meet their burden of proving that an exemption or safe harbor from registration is available to them.

Accordingly, the Commission respectfully requests that this Court grant this Application and enter an order to show cause and enter an order: (i) temporarily freezing the assets in Defendants Altahawi's, Penumarthi's, and Tammineedi's brokerage accounts and Altahawi's Bank of America account; (ii) stopping payment on two Pershing checks and freezing those assets; (iii) ordering Defendants to provide an accounting of all proceeds received by them from sales of Longfin stock in unregistered transactions; (iv) authorizing expedited discovery and service by alternate means; (v) repatriating proceeds received by Defendants from sales of LFIN stock in unregistered transactions; and (vi) for other relief.

## STATEMENT OF FACTS[1]

Longfin and Meenavalli set in motion distributions of millions of shares of Longfin stock to the public market in unregistered transactions by providing Altahawi, Penumarthi, and Tammineedi with unrestricted shares of Longfin, at low or no cost and outside the mechanisms specified in the subscription agreements signed by Meenavalli. Altahawi, Penumarthi, and

---

[1] *See* Declaration of Robert W. Nesbitt in support of the Commission's Application and Exhibits cited therein. In addition to this memorandum of law and the Nesbitt Declaration, filed herewith are the Commission's Complaint; [Proposed] Order to Show Cause and Temporary Restraining Order Freezing Assets and Granting Other Relief; and the Local Civil Rule 6.1(d) and Federal Rule of Civil Procedure 65(b)(1)(B) Declaration of Sarah Heaton Concannon.

Tammineedi then sold those shares to the public market in unregistered transactions, in violation of the federal securities laws.

### *Defendants*

Longfin Corp. is a Delaware corporation, headquartered in New York, New York.  In June 2017, Longfin qualified for an initial public offering ("IPO"), taking advantage of the streamlined procedures of Regulation A+ and the JOBS Act.  In December 2017, Longfin went public, offering 10 million shares of Class A common stock to the public at an offering price of $5.00 per share.  On December 13, 2017, Longfin's Class A shares started trading on Nasdaq under stock symbol "LFIN," opening at $6.65 per share and closing at $5.17 per share, on a volume of 297,367 shares.

Within one day of going public and becoming listed on Nasdaq, Longfin announced that, days before, it had acquired Ziddu.com, a purported blockchain company specializing in microfinance, from Meridian Enterprises Pte. Ltd., an entity 92%-owned by Meenavalli, Longfin's CEO and controlling shareholder.  At no time during the Regulation A+ process did Longfin disclose its intention to acquire Ziddu.com to Commission staff or the public.  The announcement of the Ziddu.com acquisition caused a dramatic market reaction.  Longfin's stock price increased from $5.39 (on December 14, the day of the Ziddu.com acquisition announcement) to $22.01 (on December 15, a day on which more than 15 million shares of Longfin traded).  Longfin stock traded in the $40s and $50s for the remainder of December 2017 and January 2018.  The price later declined, recently closing at $17.26 on March 29, 2018.

Meenavalli founded Longfin and serves as its Chairman and CEO.  Meenavalli individually controls over 20% of Longfin's Class A listed shares and over 50% of Longfin's total voting equity.  Meenavalli also owns and controls Stampede Capital Limited, the largest

holder of Longfin's Class A stock.  Altahawi is believed to be a dual citizen of the United States

and Egypt and owns a residence in Sunny Isles Beach, Florida, but is currently believed to be in

Dubai, United Arab Emirates.  Through his company, Adamson Brothers Corp., Altahawi was

purportedly retained by Longfin for consulting work.  Penumarthi is believed to be a United

Kingdom citizen and resident of India.  Penumarthi is affiliated with Meenavalli through

Smartahead Solutions Ltd., a U.K. based entity, for which Penumarthi and Meenavalli serve as

directors.  Penumarthi's Facebook page also identifies him as the head of Longfin's United

Kingdom operations.  Tammineedi is an Indian citizen residing in India.  Tammineedi is

affiliated with Meenavalli through several entities, including as a director of Stampede Capital.

In addition, Tammineedi and Meenavalli have served as directors of several other entities

together.

### *Unlawful Distributions of Longfin Securities by Company Insiders and Affiliates*

**A.   Altahawi's Unlawful Distributions of Longfin Stock in Unregistered
      Transactions**

Longfin has made a variety of conflicting statements about Altahawi's association with

the company.  One statement that has been consistent, however, is that Altahawi and his

company, Adamson Brothers, would be paid 3% of the issued shares for providing advice and

guidance to Longfin during the IPO.  Pursuant to this purported arrangement, on September 14,

2017, Longfin issued 2,025,000 of its Class A Common Stock to Altahawi.  In the Certificate of

Corporate Resolution authorizing the issuance of shares to Altahawi (which Altahawi signed in

his capacity as Longfin's corporate secretary), Altahawi is listed as Longfin's corporate secretary

and a member of its board of advisers.  The Resolution states that the shares were provided to

Altahawi "for professional services to the company since inception" and authorized Longfin's

transfer agent to issue the shares "pursuant to the Offering to 'Andy Altahawi' as compensation

for his professional services." In other words, Altahawi received over 2 million shares—or over 60% of Longfin's public float—for providing so-called "services" related to qualifying Longfin's Class A common shares to be publicly sold and listed on Nasdaq.

The following is a summary of key evidence obtained to date of Altahawi's status as an affiliate and control person of Longfin:

- Longfin's CEO stated in an email dated June 20, 2017 to the company's transfer agent, copying Altahawi at a Longfin email address, that "Andy – is sending the signed resolutions as secretary" in connection with shares issuances to Meenavalli and Stampede Capital. The CFO and Meenavalli participated in these discussions and knew Altahawi was acting on behalf of the company.

- Altahawi signed Longfin's certificate of adoption of bylaws as Longfin's corporate secretary on July 15, 2017.

- In several June emails, Altahawi, on behalf of Longfin, communicated with the transfer agent about the company's bylaws, articles of incorporation and share swap and bonus agreements.

- A roadshow PowerPoint presentation dated August 2017 listed Altahawi as a director of Longfin and as a point of contact for the company, having a company email address of andy@longfincorp.com.

- A shareholder list as of December 21, 2017 maintained by Longfin's transfer agent listed Altahawi's address as Longfin's corporate address, and his shares were marked as "RC" indicating that they were restricted control as of the date of the September 14, 2017 issuance.

- Longfin's initial address of "205 D Chubb Ave, Suite 240, Lyndhurst, NJ 07071" was the same address as the offices of Adamson Brothers, a firm that lists Altahawi as its President.

- As reflected in an email from Altahawi to Longfin's transfer agent, dated December 18, 2017, three days after the Ziddu.com acquisition (and after Longfin advised Commission staff that Altahawi was no longer affiliated with the company), Altahawi directed the transfer agent to issue Longfin shares to the parties involved in the Ziddu transaction. The transfer agent's response copied cfo@longfin.com and chairman@longfin.com, and neither of these recipients suggested that Altahawi lacked the authority to issue instructions on behalf of Longfin.

- Altahawi was issued approximately 64% of Longfin's public float for the services he purportedly rendered to the company. He subsequently sold some of those shares for $25

8

million. (In contrast, in its IPO, Longfin only sold a *total* of approximately $5.7 of
stock).

- As reflected in emails, on December 26, 2017, Altahawi responded on behalf of Longfin
  regarding executing lockup agreements that would prevent company executives for
  trading for a specific lockup period related to the Regulation A+ offering.

- Altahawi communicated with the Commission on behalf of Longfin in connection with
  the IPO.

- Sarah Altahawi, the daughter of Altahawi, served as the Associate Vice President of
  Longfin.

On March 14, 2018, Altahawi transferred the 2,025,000 shares that he received from

Longfin into his Merrill Lynch and Interactive Brokers accounts. The transfer took place exactly

six months to the day from when Altahawi received the shares from Longfin on September 14,

2017. Altahawi transferred the majority of the shares into his Merrill Lynch account. In addition

to the over 2 million shares he received for so-called services, Altahawi also acquired 121,000

shares from ten shareholders, at least one of whom appears to be a Longfin affiliate.[2] These ten

shareholders—in a coordinated fashion—transferred shares that they had earlier acquired on

December 6, 2017 to Altahawi following the Ziddu.com announcement. Altahawi began

transferring the 121,000 shares into his brokerage accounts on February 7, 2018, and started

selling them the same day.

In total, between February 8, 2018 and March 23, 2018, Altahawi sold **475,751** shares of

Longfin in the public market and obtained **$25,572,341.22** in net illegal proceeds in his Merrill

Lynch brokerage account—a remarkable sum of money in purported compensation for services

as an outside consultant to a Regulation A+ offering that sold just 1.14 million shares at $5.00

each. At least $18 million, and possibly more than $22 million, of these ill-gotten gains remain

in Altahawi's ML Account, together with **1,549,249** Longfin shares.

---

[2] One of these individuals was an executive director of Stampede Capital, the majority owner of Longfin,
at the time he acquired the shares transferred to Altahawi.

Between March 21, 2018 and March 29, 2018 Altahawi bought 34,676 LFIN shares for $1,975,388.14 and sold 60,352 LFIN shares for $3,425,029.24 in his account at Interactive Brokers.  As of March 31, 2018, Altahawi's Interactive Brokers account holds **95,324** Longfin shares and **$1,448,000.10** in net proceeds.

**B.**     **Penumarthi's Unlawful Distributions of Longfin Stock in Unregistered Transactions**

Penumarthi is a colleague and close associate of Meenavalli, and a Longfin insider and affiliate.  Both Penumarthi and Meenavalli are directors of Smartahead Solutions Ltd., and Penumarthi's Facebook page identifies him as the head of Longfin's United Kingdom operations.

On January 12, 2018, Penumarthi deposited 39,800 Longfin shares into his account at Western International.  On January 23, 2018, Penumarthi sold 4,000 of these shares for illegal net proceeds of **$169,495.62**.  Western International's clearing firm, Pershing LLC, issued a check on March 1, 2018 in Penumarthi's name for the full amount of $169,495.62.  According to Pershing, as of April 2, 2018, this check had not been deposited.

Penumarthi acquired 40,000 Longfin shares directly from Longfin on December 6, 2017.  The subscription agreement between Penumarthi and Longfin, signed by Meenavalli, expressly provided that payments for the shares should be wired into an escrow account maintained by the company's escrow agent, Colonial.  But the transfer agent's escrow account, does not reflect *any* payment by Penumarthi for these shares.  Despite the lack of payment, Longfin directed its transfer agent to issue shares to Penumarthi.  On January 24, 2018, Penumarthi deposited 2,500 shares of Longfin into his Interactive Brokers account, and on February 1, 2018, Penumarthi deposited an additional 33,300 shares of Longfin into this account, for a total of 35,800 shares deposited.  Between February 9, 2018 and March 27, 2018, Penumarthi bought 110,731 shares of

Longfin for $5,755,245.53 and sold 146,331 shares for $7,799,211.10.  As of March 31, 2018, Penumarthi's IB Account holds **200** Longfin shares and **$1,354,602.39** in illegal net proceeds.

### C.   Tammineedi's Unlawful Distributions of Longfin Stock in Unregistered Transactions

Until February 2018, Tammineedi served as a director of Stampede Capital, Longfin's largest shareholder and another company founded and controlled by Longfin's CEO, Meenavalli. Tammineedi and Meenavalli also have served together as directors of several related entities, including Kling Enterprises India Ltd. and SpaceNet Enterprises India Ltd.

Tammineedi acquired 30,000 shares from Longfin on December 6, 2017 (the same day that Penumarthi acquired shares).  Longfin appears to have issued shares to Tammineedi outside the mechanisms specified in the subscription agreement.  The subscription agreement between Tammineedi and Longfin, signed by Meenavalli, expressly provided that payments for the shares should be wired into an escrow account maintained by the company's escrow agent, Colonial. But the transfer agent's escrow account, does not reflect *any* payment by Tammineedi for these shares.  Despite the lack of payment, Longfin directed its transfer agent to issue shares to Tammineedi.

On January 31, 2018, Tammineedi deposited 30,000 shares of Longfin into his Interactive Brokers account.  Between March 21, 2018 and March 28, 2018, Tammineedi sold 2,200 shares of Longfin for $127,334.  As of March 31, 2018, Tammineedi's IB Account holds **27,800** shares of Longfin and **$127,309.80** in illegal net proceeds.

Tammineedi also purchased additional Longfin securities through a nominee account under the name Source Media Limited.  On December 13 and 14, 2017, Source Media bought 67,000 shares of Longfin.  The account sold these shares between December 15, 2017 and February 6, 2018 and obtained approximately $2.7 million in illegal profit.  Although, on

11

information and belief, the majority of these funds were then wired to a foreign bank account in Singapore, Pershing issued a check in the amount of **$113,481.36** in the name of Tammineedi's company, Source Media Limited, on December 29, 2017.

## ARGUMENT

To preserve the *status quo* and prevent Defendants from transferring assets in their U.S. accounts overseas and/or dissipating the assets, this Court should order Defendants to show cause why the Court should not enter an asset freeze and other relief.

I.    **DEFENDANTS' BROKERAGE ACCOUNTS AND ALTAHAWI'S BANK OF AMERICA ACCOUNT SHOULD BE FROZEN TO ENSURE SUFFICIENT ASSETS WILL BE AVAILABLE AND WITHIN THE COURT'S JURISDICTION TO SATISFY A JUDGMENT**

A.    **The Burden On The Commission To Obtain An Asset Freeze Is Not Onerous**

In this emergency action, the Commission seeks an immediate asset freeze of Defendants' brokerage accounts and Altahawi's Bank of America account. The Commission also seeks to stop payment on two Pershing checks and freeze these assets. Such relief turns, in part, on the showing of at least an inference that Defendants have violated the securities laws. *See, e.g., Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011); *SEC v. Cavanagh*, 155 F.3d 129, 132, 135 (2d Cir. 1998). "An asset freeze is a provisional remedy, the purpose of which is to ensure that, in the event the SEC obtains a judgment, money will be available to satisfy that judgment." *SEC v. Byers*, No. 08 Civ. 7104, 2009 WL 33434, at *2 (S.D.N.Y. Jan. 7, 2009). To obtain an asset freeze, the Commission "must show either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws." *Smith*, 653 F.3d at 128 (quotation omitted). As the United States Court of Appeals for the Second Circuit emphasized in *SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990), "the Commission should be able to preserve its opportunity to collect funds that may yet be ordered disgorged." *Id.* at 1041.

This is a lesser showing than is required to obtain a preliminary injunction against future violations of the securities laws. *Id.*; *see also Byers*, 2009 WL 33434, at *2 ("[T]he SEC's burden of proof on an asset freeze is not as onerous as its burden would be for an injunction.").

On making the required showing, the SEC is entitled to a freeze of assets "sufficient to preserve its disgorgement remedy as well as assets necessary to pay civil monetary penalties." *SEC v. Maillard*, No. 13 Civ. 5299, 2014 WL 1660024, at *4 (S.D.N.Y. Apr. 23, 2014). Section 20(d)(2) of the Securities Act authorizes a civil penalty up to the amount of the pecuniary gain to the defendant as a result of the violation. 15 U.S.C. § 77t(d)(2).

**B.     The Commission Has Established a *Prima Facie* Violation of Section 5 By Each of the Defendants**

Section 5(a) of the Securities Act prohibits the sale of securities in interstate commerce unless pursuant to an effective registration statement. In addition, Section 5(c) of the Securities Act makes it unlawful to offer to sell securities, through the use or medium of a prospectus or otherwise, unless a registration statement has been filed as to such security. A *prima facie* Section 5 violation requires proof of three elements: first, that no registration statement was filed or in effect as to the securities sold; second, that the defendant sold or offered to sell these securities; and third, that there was a use of interstate means in connection with the offer or sale. *See SEC v. Cavanagh*, 1 F. Supp. 2d 337, 361 (S.D.N.Y. 1998), *aff'd*, 155 F.3d 129 (2d Cir. 1998). Once the Commission has established a *prima facie* case, the burden of proof shifts to the defendant to show that an exemption or safe harbor from registration was available for the offer or sale of the security. *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953). "Scienter is not an element of a section 5 violation, the defendants bear the burden of proving that an exemption applies." *See id.*; *SEC v. Universal Major. Indus.*, 546 F.2d 1044, 1047 (2d Cir. 1976).

"A registration statement permits an issuer, or other persons, to make only the offers and

sales described in the registration statement." *SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998). "The Securities Act sets forth the types of information that must be included in a registration statement. For example, information about the issuer's financial condition, the identity and background of management, and the price and amount of securities to be offered must be included in the registration statement." *Cavanagh*, 1 F. Supp. 2d at 360 (citing 15 U.S.C. §§ 77g and 77aa; *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1098 (2d Cir. 1972) (discussing information to be included in a registration statement and prospectus delivered to prospective purchasers).

None of Defendants' sales of Longfin stock were pursuant to a registration statement and Longfin and Meenavalli, as the issuer, facilitated Defendants' acquisitions and distributions of Longfin stock in unregistered transactions. Thus, there is a *prima facie* case that Defendants violated Sections 5(a) and 5(c), unless they can prove that their transactions were exempt. For the reasons described below, the evidence adduced to date is sufficient to create a fair inference that Defendants will not be able to meet their burden of proof.

C.    **Defendants' Distributions of Longfin Securities Were Neither In Registered Transactions Nor Exempt**

1.    **Altahawi's Distributions Were Neither In Registered Transactions Nor Exempt**

"Registration of a security is 'transaction-specific,' in that the requirement of registration applies to each act of offering or sale; proper registration of a security at one stage does not necessarily suffice to register subsequent offers or sales of that security." *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007); *see also SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998) (registration of a security is transaction-specific).

Altahawi's March 2018 sales of a portion of the 2,025,000 shares he received pursuant to an agreement with Longfin (the "Consulting Shares") were not made pursuant to a registration

statement.  Altahawi obtained the Consulting Shares from Longfin pursuant to a September 17, 2017 corporate resolution purportedly as compensation "for the professional services rendered to the company since inception."  Although Altahawi received these securities purportedly as compensation for, among other things, his role in structuring the company's Regulation A+ offering, the sale of these securities by Longfin to him were not exempt under Regulation A+.  The Regulation A+ offering covers only the sale of Class A common shares to be sold for $5.00 per share, which Altahawi did not pay.  Altahawi therefore cannot argue that he received unrestricted shares in an exempt offering pursuant to Regulation A+.

Altahawi's sales of a portion of the 121,000 shares he received from affiliates of Longfin (the "Affiliate Shares") between February 8, 2018 and March 23, 2018 likewise were not made pursuant to a registration statement.  Although Altahawi may try to argue that he received unrestricted securities from the sellers of these shares because they received them in the Regulation A+ exempt offering, some, if not all, of the individuals transferring the shares were likely affiliates of the issuer.

Since Altahawi received his shares directly from an issuer or an affiliate of the issuer, both the Consulting Shares and the Affiliate Shares were restricted in his hands under Rule 144(a)(3) [17 C.F.R. § 230.144(a)(3)].  For his resales to be exempt, Altahawi therefore would have to rely on the Securities Act Section 4(a)(1) exemption for sales not involving an issuer, underwriter, or dealer.  Section 2(a)(11) defines an underwriter as someone who has purchased from an issuer, or an affiliate of the issuer, with a view to distribution.  Rule 144 provides a non-exclusive safe harbor from being deemed an underwriter.  But, as explained below, Altahawi's sales of both the Consulting Shares and the Affiliate Shares fail to comply with all of the relevant requirements of Rule 144 and, as a result, he cannot rely on the exemption under Section 4(a)(1),

because his transactions involved an underwriter and thus violated Section 5.

> **a.  Assuming Altahawi Is Not An Affiliate Of Longfin, He Cannot Rely On The Safe Harbor Under Rule 144 For His Sale Of The Consulting Shares Or Affiliate Shares**

The Commission believes that Altahawi was an affiliate of Longfin at the time of the sales.  Even assuming Altahawi were not an affiliate, however, Rule 144 requires that, for companies with a reporting obligation for at least 90 days prior to the sale, there must be adequate current public information with respect to the issuer at the time of the sales, unless the seller holds the stock for at least a year before selling (Rule 144(b)(1)(i)).  Altahawi cannot establish that, at the time of his sales of the Consulting Shares in March 2018, there was adequate current public information, or that one year had elapsed since he acquired the securities from the company.

For at least 90 days before Altahawi's sales of the Consulting Shares, Longfin was subject to the reporting requirements of Section 13(a) of the Exchange Act.  Its reporting obligation began November 24, 2017, when it voluntarily registered its securities under Section 12(b) of the Exchange Act in order to trade on Nasdaq.  Under the reporting requirements of the Exchange Act, Longfin's Form 10-Q for the quarter ended September 30, 2017 was required to be filed by January 8, 2018.  To date, it has not been filed.[3]  As a result, Longfin was a delinquent filer from January 9, 2018 until the time Altahawi sold his shares.  Importantly, until the belated filing of its Form 10-K on April 2, 2018, Longfin had not filed *any* financial statements since its purported entry into a new line of business in December 2017 with its acquisition of Ziddu.com.  Public investors who bought securities sold by Altahawi thus lacked all the important information that a registration statement would have provided.

---

[3] *See* Rule 13a-13(a).  Longfin's Form 10-K for the fiscal year ended December 31, 2017 was filed on April 2, 2018.

Because, at the time of Altahawi's sales, there was not adequate current public information available about the company, Altahawi could only qualify for the safe harbor for non-affiliate sales if he held his Consulting Shares for a year after acquiring them from the issuer before selling. *See* Rule 144(b)(1)(i). He did not do so. Although Altahawi may argue that his one-year holding period began to run as early as February 2017, when he may have begun performing services pursuant to a purported agreement between Altahawi and the company, the Commission believes that this argument is unlikely to prevail. To date, the Commission has not seen a copy of the purported February 2017 agreement, but based on Longfin's June 2017 disclosure in its original Form 1-A (which ties Altahawi's receipt of shares to a "successful qualification"),[4] the earliest possible date that Altahawi could have acquired the stock was at the qualification of the original Form 1-A, which occurred on June 16, 2017. Altahawi's sales of the Consulting Shares were less than a year from that date.

Altahawi's sales of the Affiliate Shares occurred both before and after Longfin had a reporting obligation for 90 days. For the sale of the shares that occurred after Longfin had a reporting obligation for 90 days, Altahawi's sales of his Affiliate Shares violated Section 5 for the same reasons as his sales of the Consulting Shares.

For the sale of the Affiliate shares that occurred prior to Longfin having had a reporting obligation for 90 days, to be eligible for the exemption, Altahawi must have held those shares for one year prior to sale, which he did not do. *See* Rules 144(b)(1)(ii); Rule 144(d)(1)(ii).

---

[4] In its Form 10-K for the fiscal year ended December 31, 2017, the company states that "Additionally, the Company paid $65,000 in cash and issued 2,025,000 shares of its Class A Common Stock valued at $4.2 million to a third-party marketing platform owned by Adamson Brothers Corp., an entity of which Mr. Andy Altahawi has voting and dispositive control, in exchange for services in connection with the Public Offering. Such amounts were recorded against the net proceeds from the Public Offering." The Form 10-K states that the Public Offering was completed in December 2017.

b.   **In The Alternative, If Altahawi Was An Affiliate At The Time Of The Sales, Then His Sales Failed To Comply With The Provisions Of Rule 144**

In the alternative, the evidence supports a finding that Altahawi was an affiliate of the company at the time of all of his sales. Specifically, based on the facts summarized above, the totality of the evidence supports the conclusion that Altahawi was instrumental to Longfin's Regulation A+ offering, the company's disclosures, and its distributions of stock into the market. If Altahawi *was* an affiliate at the time of the public sales of the Consulting Shares (or had been within 90 days prior to sale), then Rule 144 is unavailable, because there was not adequate current public information, irrespective of how long Altahawi held his securities before selling. *See* Rule 144(b)(2); Rule 144(c)(1). Based on evidence available to the Commission to date, it also appears that Altahawi's sales did not comply with the volume limits for affiliate sales. Finally, Altahawi did not file any Forms 144 related to the sales that would have disclosed to the public that an affiliate was selling stock.

Altahawi's sales of the Affiliate Shares occurred both before and after Longfin had a reporting obligation for 90 days. For the sale of the shares that occurred after Longfin had a reporting obligation for 90 days, Altahawi's sales of his Affiliate Shares violated Section 5 for the same reasons as his sales of the Consulting Shares.

For the sales of the Affiliate shares that occurred prior to Longfin having had a reporting obligation for 90 days, Altahawi had a one year holding period which he did not meet. *See* Rule 144(b)(2) and Rule 144(d)(ii). Altahawi also did not file any Form 144 related to the sales.

2.   **Penumarthi And Tammineedi Are Affiliates Under The Common Control Of Longfin And Its CEO, Meenavalli, And Their Distributions Are Not Exempt**

Penumarthi and Tammineedi purported to acquire their securities on December 6, 2017

pursuant to subscription agreements signed by Meenavalli, but, as reflected in the escrow agent records, there is no evidence that the account received payment for the share issuance. As a result, the transfers by Longfin to Penumarthi and Tammineedi were not pursuant to the Regulation A+ exempt offering. They received shares pursuant to a private transaction with the issuer, and the shares received were restricted. In addition, Tammineedi, through his company Source Media, acquired Longfin shares on the open market, but (as described below), these shares likewise were restricted.

Penumarthi and Tammineedi are affiliates of the issuer, because they are under the common control of Longfin and Meenavalli. In addition to being a business colleague and close associate of Meenavalli's, Tammineedi is a director of Stampede, which owns approximately 26% of Longfin's stock and is its majority shareholder, giving Tammineedi the ability to exercise control over Longfin. Both Penumarthi and Meenavalli are directors of Smartahead Solutions Ltd., and Penumarthi's Facebook page identifies him as the head of Longfin's United Kingdom operations. Thus, Penumarthi likewise has the ability to exercise control over Longfin's operations. Accordingly, even if Tammineedi and Penumarthi could successfully argue they received unrestricted shares in the Regulation A+ offering or by purchasing on the open market, by virtue of their affiliation with the company, they held control shares and had to comply with all of the relevant provisions of Rule 144, including the requirement that there be adequate current public information available about the issuer. *See* Rule 144(b)(2); Rule 144(c)(2). Since, at the time of their sales in December 2017 and January 2018, Longfin had not had a reporting obligation for at least 90 days, there must be publicly available the information concerning the issuer specified in paragraphs (a)(5)(i) to (xiv) inclusive and (xvi) of Exchange Act Rule 15c2-11. Because Longfin's most recent balance sheet and profit and loss and retained

earnings statement as required by Rule 15c2-11(xii) for the quarter ended September 30, 2017 was not publicly available, Penumarthi's and Tammineedi's sales did not meet the safe harbor of Rule 144 and they cannot rely on Section 4(a)(1) for their sales, as the transaction involved an underwriter.[5]

### 3. Longfin And Meenavalli Are Liable Under Section 5 For Altahawi's, Penumarthi's, And Tammineedi's Distributions Of Longfin Stock In Unregistered Transactions

Longfin cannot rely on an exemption under Section 4(a)(2), Regulation D, or Section 4(a)(5) for its sale of the Consulting Shares to Altahawi. Longfin's conduct is simply part of a chain of transactions viewed as a single distribution of shares to the public. A distribution "comprises 'the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public.'" *R.A Holman v. SEC*, 366 F.2d 446, 449 (2d Cir. 1966) (quoting *Lewisohn Copper Corp.*, 38 S.E.C. 226, 234 (1958)) (finding that the Regulation A exemption was not available and permanently suspending the exemption). Courts have agreed with this type of argument concluding that a distribution to the public in violation of Section 5 can be viewed as a single actual transaction with multiple stages. *See SEC v. Kern*, 425 F3d 143, 152 (2d Cir 2005) (a shell factory case in which various transactions were viewed as part of one distribution); *SEC v M&A West*, 538 F3d 1043, 1052-53 (9th Cir. 2008) (defendant was in the business of assisting private companies to become public by locating public shell companies for reverse merger transactions and preparing paperwork). Additionally, under Rule 502(d) of Regulation D, an issuer must exercise reasonable care to ensure that the purchasers of the securities are not underwriters within the meaning of Section

---

[5] If this Court grants the expedited discovery sought by the Commission, then it may shed further light on whether Penumarthi and Tammineedi were the sole beneficiaries of their resale proceeds, or whether Meenavalli or Longfin also benefited from those sales, either personally or through Meenavalli's interlocking entities under shared control.

2(a)(11) of the Act, which can include placing restrictive legends on the stock certificates or issuing stop transfer restrictions to the transfer agent. Since Longfin did not take these precautionary steps or otherwise exercise reasonable care in the sale of the Consulting Shares to Altahawi, it cannot rely on Regulation D or correspondingly any other exemption for the public distribution.

Meenavalli is also liable for Altahawi's unregistered sales of the Consulting Shares. Meenavalli, in his capacity as CEO and chairman of Longfin, signed the Longfin corporate resolution in which the company sold the 2,025,000 Consulting Shares to Altahawi. Thereafter, Meenavalli and Longfin failed to file the required 1934 Act reports to keep the company's public information current. Longfin had a very limited public float, and Meenavalli provided Altahawi with the majority of the public float—more than 60%. In December 2017, Meenavalli stated that the rapid rise in Longfin's stock price and its resultant market capitalization were "not justified." But, by keeping the public float low, and providing Altahawi with the lion's share of that float (which he then resold into the market), Meenavalli and Longfin facilitated Altahawi's unregistered sales. Those sales are not exempt under Section 4(a)(1). Meenavalli participated in those sales and is therefore liable. *See SEC v. Chinese Consol. Benev. Ass'n*, 120 F.2d 739, 741 (2nd Cir. 1940) (stating that Section 5 broadly prohibits sales of securities irrespective of the character of the person making them, and that the Section 4(1) exemption does not protect those who are engaged in the steps necessary to distribute securities); *see also SEC v. Softpoint, Inc.*, 958 F. Supp. 846, 859-60 (S.D.N.Y. 1997) ("The prohibitions of Section 5 ... sweep[] broadly to encompass 'any person' who participates in the offer or sale of an unregistered, non-exempt security."). "Liability does not require that the defendant actually passed title of the security. Any person who 'engaged in steps necessary to the distribution' of the unregistered security is

liable under Section 5." *SEC v. Tecumseh Holding Corp.*, No. 03 Civ. 5490(SAS), 2009 WL 4975263, at *3 (S.D.N.Y. Dec. 22, 2009) (*quoting Chinese Consolidated Benevolent Ass'n*, 120 F.2d at 741).

### D.    Defendants' Resales Are Not Otherwise Exempt Under Section 4(a)(1)

Although Defendants may invoke the Section 4(a)(1) exemption independent of any compliance with Rule 144, they cannot carry their burden.  "While conduct can satisfy Section 4(1) without meeting the requirements of Rule 144 (which is a nonexclusive safe harbor provision) ... sellers seeking a Section 4(1) exemption outside Rule 144 face a difficult standard." *SEC v. Cavanagh*, 445 F.3d 105, 114 (2d Cir. 2006).  "As the SEC Release announcing Rule 144's adoption warned, 'persons who offer or sell restricted securities without complying with Rule 144 are hereby put on notice by the Commission that in view of the broad remedial purposes of the Act and of public policy which strongly supports registration, they will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales and that such persons and the brokers and other persons who participate in the transactions do so at their risk.'"  *Id.* (citing Notice of Adoption of Rule 144, 1933 Act Release No. 33-5223, Fed. Sec. L. Rep. (CCH) P78, 487, at 81,050 (Jan. 11, 1972)).

The evidence supports a finding that Defendants were underwriters and affiliates.  A party is an underwriter under Section 2(a)(11) if he purchases shares "from an issuer with a view" to distribute them to the public or if he sells shares "for an issuer in connection with[] the distribution of any security." 15 U.S.C. § 77b(a)(11).  "Issuer" for purposes of the underwriter definition includes affiliates.  Courts have defined the term "distribution" as used in Securities Act Section 2(a)(11) as the entire process by which securities from an issuer are dispersed and come to the hands of the investing public, thus, the term "distribution" is equivalent to a "public

offering." *See In the Matter of Oklahoma-Texas Trust*, 2 S.E.C. 764 (1937), *aff'd*, 100 F.2d 888 (10th Cir. 1939).  The Commission has described a distribution as continuing throughout "the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public." *SEC v. Kern*, 425 F.3d at 152-53; *see also R. A. Holman & Co. v. SEC*, 366 F.2d at 449 ("'Distribution' comprises 'the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public.'") (quoting *Lewisohn Copper Corp.*, 38 S.E.C. 226, 234 (1958)).  In determining whether there was a "view to distribute" shares at the time of acquisition, "Courts frequently employ an objective two-year holding period rule of thumb to determine whether a seller acquired shares with a view to distribution." *SEC v. ConnectAJet.com, Inc.*, No. 09-CV- 1743, 2011 U.S. Dist. LEXIS 130215, at *16-17, (N.D. Tex. Nov. 9, 2011); *see also, e.g., Ackerberg v. Johnson*, 892 F.2d 1328, 1336 (8th Cir. 1989).

Longfin sold very few shares in its Regulation A+ exempt offering—1.14 million shares, about 2.5% of the approximately 76 million shares outstanding.  Altahawi acquired more than 2 million shares—over 60%—directly from the issuer or its affiliates, in private transactions. Tammineedi and Penumarthi obtained 30,100 and 40,000 shares, respectively, in December 2017.  Tammineedi and Penumarthi held their securities for a very short time before reselling into the market, evidencing their acquisition with the intent to distribute, making them underwriters.  And Altahawi resold his securities into a market that he was instrumental in creating and that lacked adequate information about Longfin because the company was delinquent in its required reports.  He also failed to hold the securities for at least a year.  These facts demonstrate that he acquired with the intent to distribute in violation of Section 5.

E.    **An Asset Freeze Order Should Be Entered To Preserve The *Status Quo* And To Alleviate The Serious Risk That The Substantial Proceeds Of Defendants' Unlawful Trading Will Be Transferred Offshore**

An asset freeze is particularly appropriate here in light of the clear risk that, absent an asset freeze, ill-gotten assets will be moved beyond the jurisdiction of this Court or otherwise dissipated. Altahawi, Penumarthi, and Tammineedi all have close ties abroad and maintain foreign bank accounts. Although Altahawi has a residence in Florida, he is believed to be a citizen of both the United States and Egypt and to currently be in Dubai, United Arab Emirates. Penumarthi and Tammineedi are citizens of the United Kingdom and India, respectively, and reside in India. Meenavalli's citizenship and current residence are unknown, but the Commission understands that he is currently abroad, and, to date, counsel to Longfin has been unwilling to provide further information regarding his location.

In addition, Defendants have a demonstrated capacity to transfer funds beyond the jurisdiction of the Court. For example, at the end of March 2018, Altahawi attempted to transfer $18.1 million from his Merrill Lynch brokerage account to his Bank of America account. In addition, as recently as March 27 and 29, 2018, $400,000 was wired out of Penumarthi's IB Account to National Westminster Bank PL in the United Kingdom, and, on April 3, 2018, Penumarthi attempted to wire an additional $200,000. Additional ill-gotten gains appear to have been transferred by Tammineedi to United Overseas Bank, which is believed to be based in Singapore.

Under these circumstances, an asset freeze is warranted to preserve the *status quo*. *See, e.g.*, *SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d. 402, 420 (S.D.N.Y. 2001) (defendant's "status as a citizen and resident of Mexico with accounts at Mexican banks raises a danger that the funds would be dissipated or transferred beyond this Court's jurisdiction if his account did not remain frozen" ) (citing *De Beers Consolidated Mines, Ltd. v. United States*, 325 U.S. 212,

215-16 (1945) (holding, in antitrust action, that "sequestration of [defendants'] property is the only means of enforcing this Court's orders or decree against said foreign corporate defendants. The principal business of said defendants is carried on in foreign countries and they could quickly withdraw their assets from the United States and so prevent enforcement of any order or decree which this Court may render.")); *SEC v. Sonja Anticevic*, No. 05 Civ. 6991, 2005 WL 1939946, at **2-4 (S.D.N.Y. Aug. 5, 2005) (freezing the assets of a foreign citizen to avoid dissipation of assets); *SEC v. Well Advantage Ltd.*, No. 12-CV-5786, Docket Nos. 15, 35 (S.D.N.Y. Aug. 6 & 22, 2012) (freezing the assets of a foreign citizen to avoid dissipation of assets); *SEC v. Am. Board of Trade, Inc.*, 645 F. Supp. 1047, 1051 (S.D.N.Y. 1986) (entering an order freezing all assets of unregistered commercial paper program which had been found to be unlawful).

The Commission has a compelling interest in bringing civil actions to enforce the securities laws and collect on any obtained judgment.  The asset freeze sought is narrowly tailored to accounts to which the Commission can trace proceeds of the alleged violations of the securities laws, and will ensure that any future judgment of this Court for disgorgement, prejudgment interest, and monetary penalties is not rendered meaningless.  Given Defendants' ability to remove assets outside of the Court' s jurisdiction, there is significant risk that, absent a freeze, Defendants will move their funds offshore or otherwise dissipate them, denying the Commission the ability to obtain effective relief on behalf of U.S. investors.

## II.    THE COURT SHOULD ENTER AN ORDER REQUIRING DEFENDANTS TO REPATRIATE THE PROCEEDS OF THEIR SECURITIES LAW VIOLATIONS

The Commission also seeks a repatriation order requiring Defendants to transfer to the registry of this Court an amount equal to the ill-gotten gains they realized from their violations of Sections 5(a) and 5(c) of the Securities Act.  As discussed above, Defendants Altahawi,

Penumarthi, and Tammineedi all have substantial ties abroad and maintain foreign bank accounts and have demonstrated a willingness to move and dissipate assets.  Repatriation of assets located abroad—including, but not limited to, assets located at National Westminster Bank PL in the United Kingdom and United Overseas Bank in Singapore—is appropriate, because they may represent proceeds from unlawful distributions of Longfin stock in unregistered transactions, and Defendants do not appear to have assets in the United States sufficient to satisfy the Commission's claims for disgorgement and civil penalties.  *See, e.g., SEC v. Aragon Capital Advisors, LLC*, No. 07 Civ. 919(FM), 2011 WL 3278642, at *10 (S.D.N.Y. July 26, 2011); *SEC v. Illarramendi*, No 11-civ-78, 2011 WL 2457734, at *7 (D. Conn. June 16, 2011).

## III.    THE COURT SHOULD ENTER AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE ENTERED

The continuation of any relief obtained pursuant to this motion, and the consequent preservation of the *status quo*, is dependent on the Court's entry of a preliminary injunction within fourteen days.  Fed. R. Civ. P. 65(b)(2).  Accordingly, the Commission requests that the Court enter an order requiring Defendants to show cause why a preliminary injunction imposing the same relief as set forth in the temporary restraining order should not be entered.

## IV.    THE COURT SHOULD ENTER AN ORDER PROHIBITING THE DESTRUCTION OF DOCUMENTS

To protect all documents and tangible things necessary to establish a complete record in this matter, the Commission seeks an order prohibiting the destruction of documents or tangible things.  Such orders are routinely granted to protect the integrity of the litigation.  *See, e.g., SEC v. Unifund SAL*, 910 F.2d 1028, 1040, n.11 (2d Cir. 1990).  Good faith preservation of documents cannot be assumed when several of the Defendants are currently abroad and are in control of documents and information relevant to this case.

26

V.    **EXPEDITED DISCOVERY AND ALTERNATIVE MEANS OF SERVICE IS NECESSARY TO PREPARE FOR THE SHOW CAUSE HEARING REQUESTED BY THE COMMISSION**

The Commission also requests that the Court set this matter for a hearing on an order to show cause prior to the expiration of the requested asset freeze.  To allow it to prepare for that hearing, the Commission requests that the Court order expedited discovery.  *See Sonja Anticevic*, 2005 WL 1939946 at **3-4 (ordering expedited discovery in connection with an asset freeze and order to show cause to a foreign defendant).

The Commission also requests that the Court permit alternative means of service, specifically, service by email, on Defendants Altahawi, Meenavalli, Penumarthi, and Tammineedi.  Alternative service by email on foreign citizens and individuals in a foreign country is appropriate when the Commission obtains an order to show cause and an asset freeze.  *See* Fed. R. Civ. P. 4(f)(3) (permitting service on an individual in a foreign country "by other means not prohibited by international agreement, as the court orders"); *see also SEC v. Babikian*, No. 14 Civ. 1740, 2014 WL 2069348, at *1 (S.D.N.Y. Apr. 21, 2014) (granting order to show cause, asset freeze, and service by e-mail on foreign citizen for alleged securities laws violations).  It is well established in this District that "[s]ervice of process under Rule 4(f)(3) is neither a last resort nor extraordinary relief.  It is merely one means among several which enables service of process on an international defendant." *Madu, Edozie & Madu, PC. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 115 (S.D.N.Y. 2010) (citation omitted).  "The decision of whether to order service of process under Rule 4(f)(3) is 'committed to the sound discretion of the district court.'" *United States v. Lebanese Canadian Bank*, 285 F.R.D. 262, 266 (S.D.N.Y. 2012) (quoting *Madu*, 265 F.R.D. at 115).  Further, a "plaintiff is not required to attempt service through the other provisions of Rule 4(f) before the Court may order service pursuant to Rule 4(f)(3)." *FTC. v. Pecan Software Ltd.*, No. 12 Civ. 7186, 2013 WL 4016272,

*4 (S.D.N.Y. Aug. 7, 2013).

In addition, the United Kingdom, of which Penumarthi is a citizen, and India, where both Penumarthi and Tammineedi are believed to reside, are signatories to the Hague Convention on Service Abroad.[6]  Alternative service is appropriate where traditional service under the Hague Convention would take numerous months.  *In re GLG Life Tech Corp. Securities Litigation*, 287 F.R.D. 262, 266-67 (S.D.N.Y. 2012) ("Courts have frequently cited delays in service under the Hague Convention as supporting an order of alternative service under Rule 4(f)(3).") (citing cases); *see also Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1015 (9th Cir. 2002) ("[T]he advisory notes [to Rule 4] suggest that in cases of 'urgency,' Rule 4(f)(3) may allow the district court to order a 'special method of service,' even if other methods remain incomplete or unattempted.").

The delays in service under the Hague Convention here would unduly burden the parties' ability to address the requested show cause order and the Commission's request for preliminary relief.

The core consideration under Rule 4(f) is whether service is "reasonably calculated to give notice" to Defendants.  Fed. R. Civ. P. 4(f).  Service by email is reasonably calculated to reach Defendants Altahawi, Penumarthi, and Tammineedi because they included email addresses with their brokerage account applications and communicate regularly with their broker-dealers by email.  Service by email is reasonably calculated to reach Defendant Meenavalli because he used email in communications with the Commission's staff.

## CONCLUSION

For the foregoing reasons, the Commission requests that this Application be granted.

---

[6] United Arab Emirates is not a member of the Hague Convention.

Dated:  April 4, 2018                          Respectfully submitted,


                                               Sarah H. Concannon, SDNY Bar Code #SC9111
                                               Tel:  (202) 551-5361
                                               Email:  ConcannonS@sec.gov
                                               Kevin C. Lombardi (*pending pro hac vice*)
                                               Tel:  (202) 551-8753
                                               Email:  LombardiK@sec.gov
                                               SECURITIES AND EXCHANGE COMMISSION
                                               100 F Street, NE
                                               Washington, DC  20549-5977
                                               Facsimile:  (202) 772-9282

Of counsel:

Anita B. Bandy
Ernesto G. Amparo
Adam B. Gottlieb
SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC  20549-5977