UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
SECURITIES AND EXCHANGE COMMISSION,    :      18cv2977 (DLC)
                                       :
                         Plaintiff,    :      OPINION AND ORDER
                                       :
             -v-                       :
                                       :
LONGFIN CORP., VENKATA S. MEENAVALLI,  :
AMRO IZZELDEN ALTAHWI a/k/a ANDY       :
ALTAHAWI, SURESH TAMMINEEDI, and       :
DORABABU PENUMARTHI,                   :
                         Defendants.   :
                                       :
-------------------------------------- X

APPEARANCES:

For the plaintiff:
Kevin C. Lombardi
Sarah H. Concannon
Stephan Jacob Schlegelmilch
Securities and Exchange Commission
100 F Street NE
Washington, District of Columbia 20549

For defendant Longfin Corp.:
Jay K. Musoff
John A. Piskora
Cheng Linna Chen
Loeb & Loeb LLP
345 Park Avenue
New York, New York 10154

For defendants Venkata S. Meenavalli, Andy Altahawi, Suresh
Tammineedi, and Dorababu Penumarthi:
Robert Gerard Heim
Meyers & Heim LLP
444 Madison Avenue, 30th Floor
New York, New York 10022

DENISE COTE, District Judge:

    The Securities and Exchange Commission ("SEC") has shown

that it is likely to succeed on the merits of its claims that

defendants Andy Altahawi, Suresh Tammineedi, and Dorababu
Penumarthi sold unregistered securities in violation of Section
5 of the Securities Act of 1933 ("Securities Act") between
December 15, 2017 and March 28, 2018.  The SEC has shown that it
is likely to prove at trial that these defendants participated
in an unregistered, illegal public offering of the stock of
Longfin Corp. ("Longfin").  Accordingly, the SEC's motion for a
preliminary injunction is granted.

On April 4, 2018, a court order froze the proceeds of these
defendants' sales of Longfin shares, among other things.  The
SEC has sought a preliminary injunction to extend that freeze
pending trial.  On April 19, this case was reassigned to this
Court.  The preliminary injunction motion became fully submitted
on April 23.  The SEC has submitted three declarations attaching
numerous exhibits in support of its motion.  The three
defendants whose assets have been frozen submitted declarations
and supporting exhibits, as well as declarations from defendant
Venkata Meenavalli, the CEO and founder of Longfin, and non-
party Philip Magri, an attorney retained by defendant Altahawi
with respect to his sales of certain Longfin shares.  Having
considered this evidence, this Opinion constitutes the Court's
findings of fact and conclusions of law.[1]

_____

[1] The parties have agreed that the declarations and documents
submitted in support of and in opposition to the preliminary
injunction motion shall provide the evidentiary record on which

# I.  STATUORY FRAMEWORK FOR REGULATION A+ OFFERINGS

Longfin first received SEC approval to publicly offer its shares on June 16, 2017, and engaged in a public offering after that date.  This public offering took place pursuant to provisions in the Jumpstarting Our Business Startups Act of 2012 ("JOBS Act"), which amended our nation's securities laws.  Pub. L. No. 112-106, 126 Stat. 306.  Before describing the events at issue here, the pertinent statutory framework created by the JOBS Act will be outlined.  A more detailed description of the relevant legal standards follows the findings of fact.

The JOBS Act was designed in part to permit early-stage companies to raise capital from public offerings with less expense than normally accompanies initial public offerings ("IPOs").  Title IV of the JOBS Act directed the SEC to create an exemption from the registration requirements of Section 5 of the Securities Act for companies to publicly sell shares in an offering of securities in an amount up to $50 million with fewer requirements than those applicable generally to companies undertaking an IPO.  126 Stat. 306, 324 (codified at 15 U.S.C. § 77c).  It provides in relevant part that:

> The Commission shall by rule or regulation add a
> class of securities to the securities exempted
> pursuant to this section in accordance with the
> following terms and conditions:

---

this motion shall be resolved.  They have waived their rights to examine the declarants and any objections to the admissibility of the documents for purposes of this hearing.

(A) The aggregate offering amount of all
securities offered and sold within the prior
12-month period in reliance on the exemption
added in accordance with this paragraph
shall not exceed $50,000,000.

(B) The securities may be offered and sold
publicly.

(C) The securities shall not be restricted
securities within the meaning of the Federal
securities laws and the regulations
promulgated thereunder.

. . .

(E) The issuer may solicit interest in the
offering prior to filing any offering
statement, on such terms and conditions as
the Commission may prescribe in the public
interest or for the protection of investors.

. . .

(G) Such other terms, conditions, or
requirements as the Commission may determine
necessary in the public interest and for the
protection of investors . . . .

Id. (emphasis supplied).

The SEC promulgated amendments to its Regulation A to

provide for such offerings.[2]  The amended regulation is now

commonly referred to as "Regulation A+."  Amendments for Small

and Additional Issues Exemptions Under the Securities Act

---

[2] Prior to the amendments, Regulation A exempted offerings of
certain securities, but the maximum amount that could be raised
was much lower.  See 1 Louis Loss, Joel Seligman, & Troy
Paredes, Fundamentals of Securities Regulation 536 (6th ed.
2011) ("Fundamentals of Securities Regulation").

(Regulation A), Securities Act Release Nos. 33-9741, 34-74578, 39-2501, 80 Fed. Reg. 21,806 (Apr. 20, 2015) ("Regulation A+ SEC Release"). Under Regulation A+, there are two tiers of offerings: "Tier 1," for offerings under $20 million, and "Tier 2," for offerings under $50 million. Id. at 21,807. The SEC requires that, for both tiers, an offering circular be provided to prospective investors. 17 C.F.R. § 230.251. In addition, an offering statement must be reviewed by the SEC, and "qualified" by their staff.[3] Id. Once the offering is qualified, the company, or "issuer," may sell shares to the public. Id.

Regulation A+ also streamlines the path to register shares that will be traded on public exchanges for Tier 2 offerings. To register a class of securities under Section 12 of the Exchange Act of 1934 ("Exchange Act") pursuant to Regulation A+ for a Tier 2 offering, the company need only file a short form registration statement ("Form 8-A") concurrently with the filing and qualification of other forms a company is required to file under Regulation A. 17 C.F.R. § 249.208a. Once a Form 8-A is effective, the company becomes subject to the Exchange Act reporting obligations required of all companies that trade on the public stock exchanges, and ceases to have duties to file

---

[3] A Tier 1 offering generally must also be approved by state securities regulators. Regulation A+ preempts state securities laws for Tier 2 offerings. See generally Lindeen v. S.E.C., 825 F.3d 646, 652 (D.C. Cir. 2016) (citing 17 C.F.R. § 230.256).

the financial reports otherwise required under Regulation A+.
See Regulation A+ SEC Release, 80 Fed. Reg. at 21,852-53; 17
C.F.R. § 230.257.[4]

## II.  **FINDINGS OF FACT**

Longfin's founder Meenavalli describes Longfin as an
"independent financial technology company that specializes in
trade commodity solutions."  Longfin was incorporated on
February 1, 2017 in Delaware, with Meenavalli, who is a citizen
of India and a resident of the Republic of Singapore, as its
CEO.  Longfin is now headquartered in New York City.  According
to Meenavalli, since its founding, Longfin has earned revenue
from the sale of physical commodities and by providing services
to customers that use its trading platform.  Longfin represented
to the SEC in 2017 that, as of February 28, 2017, it had total
assets of $298,861 and liabilities of $293,827, with most of the
assets consisting of trade receivables.

Altahawi Consulting Agreement

The day Longfin was incorporated it entered into a
consulting agreement ("Agreement") with Altahawi's company

---

[4] The relevant statute provides that "[e]very issuer of a
security registered pursuant [Section 12 of the Exchange Act]
shall file with the [SEC], in accordance with such rules and
regulations as the Commission may prescribe . . . such
information and documents . . . as the [SEC] shall require."  15
U.S.C. § 78m; see 17 C.F.R. § 240.13a-1 et seq.

Adamson Brothers Corp.[5]  Meenavalli had met Altahawi in late
2016.  Altahawi is a United States citizen and resides in
Florida.  Altahawi explains that he has over twenty-four years'
experience in the securities industry.

According to the Agreement, Altahawi specializes in "Reg
'A' drafting and filings" and will assist Longfin "to initiate a
"Reg 'A+' tier II Direct Public Offering ('DPO')."[6]  Altahawi
agreed to assist Longfin "for the sole purpose of filing Reg 'A'
tier II qualification statement with the SEC."  He agreed to
draft an offering "for up to $50 million."  The term of the
Agreement was set at twelve months.

For Altahawi's services, Longfin agreed to pay Altahawi
$65,000 and stock in four components:

> a. $25,000 deposit at signing this agreement
>    in order to cover legal, Reg "A"
>    qualification statement, drafting and
>    managing the SEC process; and
> b. The company shall pay $25,000 in 60 days
>    of signing this agreement to cover the
>    above; and
> c. The remaining balance of $15,000 post the
>    SEC qualification.
> d. The company will pay the consultant 3%
>    equality [sic] of the company's
>    outstanding shares pre-offering covering
>    the above.

---

[5] The parties agree that Altahawi and his company Adamson
Brothers are one and the same for the purpose of this motion.

[6] A Direct Public Offering ("DPO") is similar to an IPO but in a
DPO a company generally does not have a firm underwriting
commitment to fully sell out the offering.

Accordingly, Altahawi's services pursuant to the Agreement required him to "draft" and manage the SEC process for a Regulation A offering worth up to $50 million, including the duty to file a Tier 2 qualification statement with the SEC.

In a filing with the SEC made on March 10, 2017, Longfin disclosed the existence of the Agreement, and described it in the following terms.

> The company has entered into an agreement with Mr. Andy Altahawi/Adamson Brothers for the provision of filing Reg A tier 2 and structuring for which Adamson Brothers <u>will charge 3%</u> of the issued shares post shares swap[7] <u>after the successful completion of fund raising</u>. Mr. Altahawi is not affiliated with the company or its officers and directors in any way.

(Emphasis supplied.)

<u>Announcement of Intent to Engage in IPO</u>

On March 10, 2017, Longfin made a Form 1-A filing with the SEC indicating its intent to offer up to 20 million shares of its common stock on a "best efforts" basis. With each share priced at $2.50 per share, it intended to raise a maximum of $50 million for Longfin. The filings explained that the sale of shares would commence two days after the Offering Statement filed with the SEC "is qualified." It warned that there was currently no trading market for Longfin's common stock and that its securities were speculative and carried "significant" risks.

---

[7] The reference to the share swap is a reference to an acquisition of a Singaporean company described below.

It explained that as of February 28, it had 7.5 million shares outstanding.

In that same filing, Longfin announced that it had entered into an agreement to acquire a Singaporean company, Stampede Tradex Pte Ltd. ("Stampede Tradex"), through a "share swap." Longfin was to issue 100 million shares of its common stock to shareholders of Stampede Tradex in exchange for 100% of Stampede Tradex's stock, making Stampede Tradex a subsidiary of Longfin. The SEC filing explained that Stampede Tradex had been operating since 2014, and had experienced a "significant" growth in its business. Longfin added that its "core business plan" was to utilize Stampede Tradex's technology, strategy, infrastructure and its business model, which was employed in the Asia Pacific region, for markets in the Americas, Europe, and Africa. The filing described Stampede Tradex as 55% owned by Stampede Capital Limited and 45% owned by Meenavalli.[8]

Attached to the filing was an independent auditor's report for Longfin for the month of February. The auditor was identified as AJSH & Co. LLP of New Delhi, India.

In a May 23, 2017 filing with the SEC, Longfin indicated that its offering would be for up to 10 million shares at $5 per share. It also indicated that the share swap arrangement had

---

[8] Longfin's April 2, 2018 Form 10-K later reported that Stampede Capital Limited, in turn, was 17.11% controlled by Meenavalli and his wife.

changed, such that Longfin would issue 50 million shares to Stampede Tradex's shareholders for 100% ownership in Stampede Tradex. The May 23 filing indicated that, after the share swap, the Longfin founders would hold 7.5 million shares, the Stampede Tradex shareholders would hold 50 million shares, and an additional 10 million shares would be held by the public, assuming that the IPO sold out.

<u>SEC Qualification of Longfin's Offering</u>

On June 16, 2017, the SEC qualified Longfin's Regulation A+ offering. The SEC authorized Longfin to begin selling up to 10 million shares to the public at a price of up to $5 per share. Therefore, if Longfin had completely sold out its offering, it would have raised $50 million, the maximum permissible under Tier 2 of Regulation A+.

The share swap arrangement with Stampede Tradex closed three days later, on June 19, 2017. After the share swap arrangement, Longfin had 67,500,000 total shares outstanding.

<u>Altahawi Becomes Longfin's Secretary</u>

In June 2017, Longfin asked Altahawi to become its corporate secretary, and Altahawi accepted. Altahawi was issued a company e-mail address and began signing corporate resolutions on behalf of Longfin. In a July 6 Offering Circular, Longfin disclosed that "Mr. Altahawi became an affiliated [sic] with the company and he is being considered to be part of our management

team." On July 15, Altahawi, as corporate secretary, signed the certificate of adoption of the bylaws of Longfin. An August PowerPoint presentation listed Altahawi as a director of Longfin and point of contact for the company. On September 14, as corporate secretary, Altahawi signed a corporate resolution transferring 3% of Longfin's stock to himself, amounting to just over 2 million shares of Longfin, "for the professional services rendered to the company since inception" (the "Consulting Shares"). The resolution authorized Longfin's transfer agent, Colonial Stock Transfer Co., Inc. ("Colonial Transfer"), to issue the shares to Altahawi "as compensation for his professional services." The resolution was also signed by Meenavalli and Longfin's CFO Krishanu Singhal. Altahawi was identified as well in the resolution as a member of Longfin's board of advisors.

Although Altahawi has submitted in opposition to this motion a resignation letter bearing the date September 1, 2017, which indicates that he resigned as corporate secretary as of September 1, 2017, that resignation letter was not effective.[9] As just described, Altahawi continued to act officially as

---

[9] In opposition to this motion Altahawi misdescribes the resignation letter as a document indicating that he resigned as of September 30. The resignation letter explicitly states that the resignation is effective as of "September 1st," not September 30.

Longfin's secretary for some time after September 1.

The Issuance of Longfin Shares Begins

According to the control log and escrow account records for Longfin, shares began to be issued to individual purchasers in small increments on September 1, 2017, with another batch issued in even smaller increments on October 16, 2017.[10] NASDAQ initial listing requirements generally require approximately 300 individual holders of shares, as well as 1 million total publicly held shares.[11]

On September 15, Longfin disclosed that it had engaged Network 1 Financial Securities, Inc. ("Network 1") as lead underwriter for its DPO. As Longfin reported to the SEC, on September 25, it also agreed with Altahawi that Longfin would be listed on www.ipoflow.com, a website owned by Adamson Brothers, for "no additional compensation." Although Longfin had been authorized by the SEC in July to sell up to 10 million shares, between September 1 and December 11, 2017, Longfin claims to have issued only 1.14 million shares through its Regulation A+ DPO, and to have raised approximately $5.7 million.

---

[10] The control log shows that on September 1, 2017, 36 shareholders were issued shares for a total of 31,775 shares, or less than 1,000 shares apiece on average. Between October 16 and December 6, 2017, 225 purchasers bought a total of 35,950 shares, which is an average of less than 200 shares each.

[11] See NASDAQ, Initial Listing Guide 10, https://listingcenter. nasdaq.com/assets/initialguide.pdf (December 2017).

<u>The December 6 Shares</u>

After a series of amendments to its SEC filings, but without disclosing any new financial information since February 2017, on November 22, 2017, Longfin registered its securities on a Form 8-A pursuant to Section 12(b) of the Exchange Act. The Form 8-A became effective on November 24, 2017. With that registration in place, Longfin became eligible for listing on a public stock exchange.

On December 4, 2017, Altahawi sent an e-mail with a subject line of "RE: Longfin – Shareholders List" to Colonial Transfer, asking it to share Longfin's current shareholder list with Network 1. Colonial Transfer responded by including not only the shareholder list, but also the records of payments received for those shares. It states:

> Here are the issuances from each of the 3 closings from the offering. In addition, I've included the escrow reconciliation printout showing all the deposits that were received along with the remittances to Longfin.

Network 1 then responded: "Perfect. Thank you. Can you also send me a shareholders list as of today for NASDAQ."

On December 6, Altahawi sent the last e-mails in the record from the Longfin email address issued to him as secretary of Longfin. These emails were sent in the December 4 e-mail thread, with Altahawi writing that "I need to submit 24 subscriptions we need to issue the shares for as of today

please." Shortly thereafter, Altahawi attached subscription agreements, first from eleven individuals, and then another thirteen. Longfin's share control log reflects that the twenty-four individuals were issued 409,360 shares of Longfin that same day (the "December 6 Shares"). The control log shows that each of these issuances have an "R" notation, indicating that the issuance was of restricted shares. There is no evidence in the record that any payment was received by Longfin or Colonial Transfer for these 409,360 shares. The December 6 Shares are included in the 1.14 million shares Longfin claims to have issued through its DPO.

Two of the individuals who were issued shares on December 6 without any record of payment were defendants Penumarthi and Tammineedi. Penumarthi has known Meenavalli since childhood, having grown up with him in India. Penumarthi now resides in Dorset, United Kingdom. Penumarthi entered into a consulting arrangement with Longfin on July 1, 2017, which he asserts ended on September 30, 2017. Penumarthi's Facebook page stated that he was the Head of Operations for Longfin's United Kingdom operations. Penumarthi now states in his declaration that "[w]hile I was acting as a consultant, I referenced my role on my Facebook page inaccurately. In fact, I have never been the 'Head of Operations' of Longfin Corp." His subscription agreement is dated September 2, 2017. Penumarthi was issued

14

40,000 shares of restricted Longfin stock on December 6. Colonial Transfer has no record that Penumarthi paid for these shares. Penumarthi's subscription agreement required payment to the escrow account maintained by Colonial Transfer for Longfin.

Tammineedi is a director of Stampede Capital Limited, a company that Meenavalli founded and that is Longfin's largest shareholder. Stampede Capital Limited owns well over 10% of Longfin's shares, and Meenavalli himself has a substantial interest in Stampede Capital Limited.[12] Tammineedi and Meenavalli are frequent business colleagues and close associates. Tammineedi resides in Telangana, India. His subscription agreement to purchase Longfin shares is dated September 25, 2017. Tammineedi was issued 30,000 shares of restricted Longfin stock on December 6. As is true for Penumarthi, Colonial Transfer has no record that Tammineedi paid for those shares. Tammineedi's subscription agreement also required payment to the escrow account maintained by Colonial Transfer for Longfin.

Listing on NASDAQ

On December 13, 2017, Longfin was listed on the NASDAQ stock exchange. The stock began trading at between $5-7/share.

---

[12] As noted above, Meenavalli and his wife own 17.11% of Stampede Capital Limited.

## Tammineedi Buys Shares on the Open Market

On December 13 and 14, Tammineedi purchased 67,000 shares of Longfin on NASDAQ through a company called "Source Media" (the "Source Media Shares"), at an average price of approximately $5.50/share.  Tammineedi is the sole officer and owner of Source Media.

## Longfin's Acquisition of Ziddu.com

On December 15, 2017, two days after public trading began, Longfin announced that on December 11, it had acquired "Ziddu.com," an entity at least 92%-owned by Meenavalli. Longfin had not disclosed to the SEC during the Regulation A+ process that it intended to make this acquisition.  Longfin publicly represented that Ziddu.com had expertise in blockchain and cryptocurrency technology.  It stated that Ziddu.com was

> a Blockchain technology empowered solutions provider that offers Microfinance Lending against Collateralized Warehouse Receipts in the form of Warehouse Coins to small and medium enterprises (SMEs), processors, manufacturers, importers and exporters using crypto currencies across continents.

Longfin's stock price and trading volume sky-rocketed.  That day, December 15, Longfin's stock closed at $22.01/share, more than four times the previous day's closing price.  On December 18, 2017, Longfin's stock price reached a high of $142.82/share before closing at $72.38/share, which valued Longfin at over $3 billion.  Over the next few months, Longfin shares generally

traded in the $40-$60/share range.  Longfin later advised the SEC that Ziddu.com had no revenue historically and its carrying value was zero.

Altahawi's Continued Actions on Behalf of Longfin

On December 18, 2017, Altahawi sent an e-mail to Colonial Transfer directing the issuance of 2.5 million Longfin shares to the entities owning Ziddu.com.  Colonial Transfer promptly issued the shares.  There is no indication that Altahawi did not have the authority to act in this manner on behalf of the company.

In late December 2017 and in January 2018, Altahawi had discussions with the SEC's staff on behalf of Longfin.  The topics of these conversations included whether it would be possible for Longfin to increase the size of its offering, and seeking guidance on Longfin's Form 8-A.

Altahawi Acquires the Private Transaction Shares

On January 12, 2018, Altahawi acquired 121,000 shares of Longfin through purchases from ten of the twenty-four individuals who acquired shares on December 6 (the "Private Transaction Shares").  These shares were purportedly acquired at $30/share, but no payment records appear in this record.  $30 is approximately $10/share below their then-market price.  Each of the ten individuals who transferred their shares to Altahawi apparently signed the same piece of paper.  Counsel have

represented that these ten individuals live in India.  Altahawi
then began selling the Private Transaction Shares on the NASDAQ
in January and February 2018.

<u>Tammineedi and Penumarthi Sell Shares</u>

Tammineedi sold the Source Media Shares over the NASDAQ
between December 15, 2017 and February 6, 2018 for approximately
$2.7 million in profits.  Between March 21, 2018 and March 28,
2018, Tammineedi sold 2,200 of his December 6 Shares on the
NASDAQ of Longfin for $127,535 in proceeds.

On January 23, 2018, Penumarthi sold 4,000 shares of his
December 6 Shares over the NASDAQ for $168,495.  Penumarthi
later bought and sold open market shares.  On a net basis he
sold approximately 36,000 shares, some of which included the
December 6 Shares, and made an additional $2 million on those
trades.

<u>Altahawi Sells the Consulting Shares</u>

In preparation for his sale of the Consulting Shares,
Altahawi engaged Magri Law LLC on February 16, 2018, "to review
my acquisition of the Consulting Shares."  According to Phillip
Magri, he reviewed three documents that Altahawi provided to
him:  (1) Altahawi's representation letter, dated March 5, 2018;
(2) the Agreement Altahawi signed with Longfin; and (3)
Amendment No. 9 to Longfin's Form 1-A, filed on November 3,
2017.  In his letter, Altahawi states that "I am not now an

affiliate of the issuer as defined under Rule 144(a)(1) and have not been an affiliate during the preceding three months." He also asserts that the Consulting Shares "are fully paid for and a minimum of . . . One (1) Year in accordance with paragraph (d) of Rule 144." Amendment No. 9 states that Longfin has

> entered into an agreement with Adamson Brothers Corp. in February 2017 pursuant to which Mr. Altahawi has provided the Company [Longfin] with legal and business development advisory services to the Company since inception and in connection with this offering in consideration for $65,000 and an aggregate amount of 2,025,000 unregistered shares of Class A Common Stock (representing 3% of the outstanding shares common stock pre-offering).

Magri's opinion letter stated that "we have assumed and not verified . . . the accuracy as to the factual matters of each document we have reviewed." The letter opined "that the offer and sale of the [Consulting] Shares by [Altahawi] in the manner contemplated . . . does not require registration under the Securities Act." After Altahawi forwarded the letter to Colonial Transfer, and Meenavalli sent an email to Colonial Transfer "confirming" that Altahawi acquired the Consulting Shares on February 1, 2017, it removed the restrictive legend[13] on the shares. On March 14, 2018, six months to the day after

---

[13] Securities subject to holding periods under Rule 144 are generally marked with legends denoting them as "restricted" or "control" securities, to prevent them from being sold until the relevant holding period has passed.

Altahawi was issued the shares, which was September 14, 2017, Altahawi began selling the Consulting Shares.

By March 23, 2018, Altahawi had sold 475,751 shares of Longfin over the NASDAQ and received $25.5 million in proceeds from the sales. This represents nearly 5 times the amount Longfin had raised through the DPO Altahawi was hired to conduct. At times, Altahawi held over 60% of the publicly trading shares of Longfin.

Longfin's Stock Price Collapses and Trading is Halted.

In late March and early April 2018, Longfin's price fell to under $10/share, before climbing back up to approximately $28/share. NASDAQ then suspended trading in the stock. On April 2, 2018, Longfin filed a 10-K report, the first time it had filed either a 10-Q or a 10-K. In the 10-K report, Longfin represented that it was delinquent in its reporting obligations under the securities laws of the United States.

III. **PROCEDURAL HISTORY**

The complaint in this action, filed on April 4, 2018, asserts that defendants Longfin, Meenavalli, Altahawi, Penumarthi, and Tammineedi sold securities of Longfin in violation of the registration requirements of the Securities Act. Pending the resolution of this case on the merits, the SEC seeks a preliminary injunction to continue to freeze assets arising out defendants Altahawi, Tammineedi, and Penumarthi's

unregistered sales of securities in Longfin.

On April 4, 2018, a judge of this Court issued a temporary restraining order (the "TRO") which, _inter alia_, froze certain accounts associated with these three defendants containing the proceeds of their sales of Longfin securities. The TRO also set out an expedited discovery schedule and briefing schedule on the motion for preliminary injunction. By its own terms, the TRO provided that it would remain in effect pending the adjudication of the SEC's motion for a preliminary injunction.

The TRO has been extended with respect to defendants Altahawi, Tammineedi, and Penumarthi. The TRO was vacated as to defendants Longfin and Meenavalli after the SEC determined that neither had assets subject to the freeze order.

All parties have appeared, and both sides have submitted briefs and declarations in support of their positions. The Court held oral argument on the preliminary injunction motion on April 20, and a conference on April 30.

IV.  **CONCLUSIONS OF LAW**

The SEC has sought a preliminary injunction in the form of an asset freeze. To obtain an extension of the asset freeze pending trial, the SEC must show a likelihood of success at trial on the merits of its claims. S.E.C. v. Cavanagh, 155 F.3d 129, 132 (2d Cir. 1998) ("Cavanagh II"). Because an asset freeze will preserve the status quo and is less burdensome than

the issuance of an order restraining future conduct, for instance, the SEC need not prove the remaining elements of the ordinary test for issuance of a preliminary injunction.  <u>S.E.C. v. Unifund SAL</u>, 910 F.2d 1028, 1039 (2d Cir. 1990).

The SEC's case is brought under Section 5 of the Securities Act, ch. 38, 48 Stat. 74 (codified as amended at 15 U.S.C. §§ 77a-77aa (2012)).  Section 5 of the Securities Act provides, in pertinent part:

> <u>Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly</u>--
>
> (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails <u>to sell such security through the use or medium of any prospectus or otherwise</u>; or
>
> (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

15 U.S.C. § 77e(a) (emphasis supplied).

The SEC must satisfy three elements to prove a prima facie case of a violation of Section 5: "first, that no registration statement was in effect as to the securities; second, that the defendant sold or offered to sell these securities; third, that there was a use of interstate transportation, or communication, or of the mails in connection with the sale or offer of sale." <u>S.E.C. v. Cavanagh</u>, 1 F. Supp. 2d 337, 361 (S.D.N.Y.) ("<u>Cavanagh</u>

I"), aff'd, 155 F.3d 129 (2d Cir. 1998).

If a prima facie violation of Section 5 has been shown, the burden shifts to the defendant to show their entitlement to an exemption from Section 5.  S.E.C. v. Cavanagh, 445 F.3d 105, 111 n.13 (2d Cir. 2006) ("Cavanagh III").  Among the exemptions from the registration requirement is an exemption found in Section 4(a)(1)[14] of the Securities Act, which exempts "transactions by any person other than an issuer, underwriter, or dealer."  15 U.S.C. § 77d(a)(1).  As relevant here, an underwriter is defined as

> any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking.

Id. § 77b(a)(11).  For the purpose of the definition of an underwriter, an "issuer" is additionally defined to include "any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer."[15]  Id.  Thus, a transaction is exempt from

_____

[14] As part of the JOBS Act, the prior Section 4(1) of the Securities Act was renumbered to Section 4(a)(1).  See JOBS Act, 126 Stat. at 314.  The substance of the provision was not modified.

[15] An issuer is defined, with certain exceptions not applicable here, as "every person who issues or proposes to issue any security."  15 U.S.C. § 77b(4).

Section 5's requirements if it is a trade by an ordinary investor rather than by an issuer, underwriter, or dealer.  <u>See</u> <u>Cavanagh I</u>, 1 F. Supp. 2d at 361.

In connection with the status of underwriter, the SEC has provided a safe harbor.  If a seller of securities demonstrates compliance with SEC Rule 144, then that seller is not deemed an underwriter with respect to those securities.  <u>See</u> 17 C.F.R. § 230.144.  Specifically, Rule 144 provides that, if certain conditions are met, "any person . . . who sells . . . securities of the issuer . . . shall be deemed not to be an underwriter of those securities within the meaning of section 2(a)(11) of the [Securities] Act."  <u>Id.</u>  Thus, a demonstration of compliance with Rule 144 conclusively establishes that a person is not an underwriter for purposes of Section 4(a)(1), and therefore, if not an issuer or a dealer, permits a person to claim an exemption from Section 5.

Under Rule 144, shares acquired directly from an issuer not involving any public offering are "restricted" securities. Restricted securities may nonetheless be sold under Rule 144's safe harbor if the seller complies with its conditions.  Rule 144, as described below, also implicitly creates a second category of securities known as "control" securities, for securities held by "affiliates" of the issuer.  These securities are not necessarily "restricted" securities, but nonetheless are

subject to limitations on their resale.

Rule 144 is not the exclusive method by which a person can demonstrate entitlement to a Section 4(a)(1) exemption. S.E.C. v. Kern, 425 F.3d 143, 148 (2d Cir. 2005). But, a person claiming an entitlement to a Section 4(a)(1) exemption outside the contours of Rule 144 faces a "substantial burden of proof." Cavanagh III, 445 F.3d at 114 (citation omitted).

A second exemption to Section 5's prohibitions at issue here is the Regulation A+ exemption, codified at Section 3(b) of the Securities Act. As explained at the beginning of this Opinion, the SEC was directed to create an exemption to Section 5's registration requirement for public offerings of securities under $50 million. JOBS Act, 126 Stat at 324 (codified at 15 U.S.C. § 77c(b)(2)). Regulation A+, promulgated under the JOBS Act, provides that "[a] public offer or sale of eligible securities . . . pursuant to Regulation A shall be exempt under section 3(b) from the registration requirements of the Securities Act of 1933." 17 C.F.R. § 230.501. It further provides that any securities acquired in a Regulation A+ offering "shall not be restricted securities within the meaning of the Federal securities laws and the regulations promulgated thereunder." 15 U.S.C. § 77c(b)(2)(C). There are numerous requirements for compliance with Regulation A+. 17 C.F.R. § 230.501 et seq. If those requirements are met, shares sold in a

Regulation A+ offering are not generally subject to resale restrictions under federal law.[16]  1 Hazen, <u>Law of Securities Regulation</u> § 4:43 (Oct. 2017).  Even if those requirements are met, however, resale may remain restricted if the securities are deemed "control" securities under the terms of Rule 144.

If a violation of Section 5 is found, and there is no exemption available, the SEC's available remedies include disgorgement.  <u>Cavanagh III</u>, 445 F.3d at 116-20 (2d Cir. 2006).  Disgorgement in securities cases generally reaches the profits of a Section 5 violation.  <u>See</u> <u>S.E.C. v. First Jersey Sec.</u>, 101 F.3d 1450, 1474-75 (2d Cir. 1996); <u>Unifund SAL</u>, 910 F.2d at 1041-42.

## A.  Section 5 Violation

The SEC has carried its burden of showing a likelihood of success of proving at trial that the three defendants violated Section 5 in selling their shares.  There are four sets of shares at issue here.  Altahawi acquired and sold the Consulting Shares and the Private Transaction Shares.  Tammineedi and Penumarthi acquired and sold December 6 Shares.  And Tammineedi acquired and sold the Source Media shares.  With respect to each of these four sets of shares, the SEC has shown that it is likely to succeed on the merits of its claim that the sales of

---

[16] State law Blue Sky provisions, however, may still apply to resale of some Regulation A+ shares.  <u>See</u> Regulation A+ SEC Release, 80 Fed. Reg. at 21,859-63.

these shares were unregistered transactions in violation of Section 5.

There was no Securities Act registration in place for any Longfin shares.[17]  It is undisputed that the four sets of shares were sold; indeed, it is the proceeds of those sales that have been frozen.  It is also not disputed that the instrumentalities of interstate commerce were used in connection with the transactions at issue here.  Accordingly, with one exception, the burden shifts to each of the defendants to prove an exemption from Section 5's requirements.[18]

**B.  Altahawi's Consulting Shares**

Altahawi relies on two exemptions to defend his sales of the Consulting Shares and win recovery of his frozen assets.  In each instance, Altahawi contends that he has met his burden to show that he was not an underwriter in connection with the sales of the Consulting Shares.  First, Altahawi relies on the Rule 144 safe harbor, and alternatively, he relies on Section 4(a)(1) itself.  The analysis for each of these exemptions differs

---

[17] The November 22, 2017 registration statement was pursuant to the Exchange Act, not the Securities Act.  The requirements for registration under each statute differ, and registration under one does not suffice under the other.  See 1 Fundamentals of Securities Regulation 625-26.

[18] This Opinion assumes without deciding that the SEC bears the burden of showing that Tammineedi was an affiliate of Longfin at the time Source Media acquired Longfin shares over the NASDAQ.

depending on whether Altahawi was a Longfin affiliate at the time he acquired the Consulting Shares or for a relevant period of time thereafter.  Accordingly, this Opinion will first address his status as an affiliate.  Then it will turn to the Rule 144 exemption, followed by the Section 4(a)(1) analysis.

1.    Altahawi's Status as an Affiliate

Altahawi was an affiliate of Longfin throughout the time relevant to his sales of the Consulting Shares in March 2018.[19] Under Rule 144, an affiliate is a "person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." 17 C.F.R. § 230.144(a)(1).

> While Rule 144 fails to define "control," Rule 405 of Regulation C establishes a definition of "affiliate" identical to that of Rule 144 and defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person whether through the ownership of voting securities, by contract, or otherwise."

Kern, 425 F.3d at 149; see also Rothstein v. Am. Int'l Grp., Inc., 837 F.3d 195, 206 (2d Cir. 2016) (dicta).  The "determination [of control] is a question of fact which depends upon the totality of the circumstances including an appraisal of the influence upon management and policies of a corporation by

---

[19] Because the burden of proving entitlement to an exemption falls on Altahawi, he bears the burden as well of proving he was not an affiliate.  The conclusion reached herein, however, would not be altered even if the SEC bore the burden.

the person involved." United States v. Corr, 543 F.2d 1042,
1050 (2d Cir. 1976).  "Control may rest with a group of persons,
such as the members of the corporation's management (both
directors and officers) and their families . . . or a number of
business associates." Fundamentals of Securities Regulation at
620.  In this context, the test for control is sometimes framed
as "a question of fact in each case whether that person has
enough influence within the group to be able to obtain the
issuer's signature on a registration statement." Id. at 620-21.
Under Rule 144, a person qualifies as an "affiliate" if they
were a control person within 90 days of the date of their sale
of shares.  17 C.F.R. § 230.144(a).

Altahawi was a Longfin affiliate through at least March
2018.  Altahawi designed and managed the DPO for Longfin,
creating a public market for Longfin's shares that had never
existed before, and then dominated that market.

Altahawi was Longfin's secretary until, at the very least,
September 2017.  As secretary he signed the resolutions adopting
Longfin's corporate bylaws, and transferred 3% of its shares to
himself.  He marketed the DPO on his website, ipoflow.com, and
represented Longfin in its critical discussions in December 2017
with the NASDAQ exchange to get Longfin registered on that
exchange.  Altahawi managed the unusual distributions of Longfin
shares on December 6, 2017, only to acquire a substantial

portion of those shares for himself in even more unusual circumstances less than a month later for below market value. Altahawi communicated with the SEC staff in late December through early February 2018 on behalf of Longfin, seeking guidance on matters such as increasing the size of Longfin's offering and Longfin's Form 8-A, and gave instructions to Colonial Transfer on behalf of Longfin in December 2017. Finally, in March 2018, once he arranged for the removal of the restrictive legend from his shares, Altahawi dominated the public marketplace for shares of Longfin. He controlled approximately 60% of the public "float." Keeping in mind the remedial purpose of the Securities Act, see In re Lehman Bros. Mortgage-Backed Securities Litigation, 650 F.3d 167, 180 (2d Cir. 2011), and Altahawi's influence on and domination of the market for Longfin shares, the evidence at trial will likely establish that Altahawi was an affiliate of Longfin at the time of his sales of the Consulting Shares in March of 2018, and certainly within 90 days of those sales.

Altahawi contends principally that he was not an affiliate within 90 days of March 14, 2018, because he was not an officer, director, or 10% shareholder of Longfin within the 90 days period prior to March 14, 2018. These three attributes are hallmarks of an affiliate status. See Securities Act Release No. 7391, Revision of Rule 144, Rule 145, and Form 144, 1997 WL

70601 at *4-5 (Feb. 20, 1997) ("Many practitioners . . . use [these] criteria as a guide.").  Assuming each of those assertions is so, his personal management of the entire DPO process and his control of the public float in Longfin shares gave him an equivalent degree of control to qualify as an affiliate.  The affiliate test is fact-specific, and in these circumstances, Altahawi is likely to be found an affiliate.

    2.    Rule 144's Requirements for Selling Restricted and Control Shares

Rule 144 provides two distinct sets of requirements for selling "restricted" or "control" shares.  Each of these categories also has different requirements, depending on whether the seller is an affiliate or a non-affiliate.  Application of the requirements for the sale of restricted stock will be sufficient to analyze Altahawi's sale of his Consulting Shares; the requirements for the sale of control shares impacts the analysis of Altahawi's sale of the Private Transaction Shares.

Pursuant to Rule 144, restricted securities include "[s]ecurities acquired directly or indirectly from the issuer, or from an affiliate of the issuer, in a transaction or chain of transactions not involving any public offering."  17 C.F.R. § 230.144(a)(3).  Control securities, by contrast, arise from the definition of an affiliate in Rule 144.  Rule 144(b)(2) provides that:

    Any affiliate of the issuer, or any person who

was an affiliate at any time during the 90 days immediately before the sale, who sells restricted securities, <u>or any person who sells</u> restricted or <u>any other securities for the account of an affiliate of the issuer of such securities</u>, <u>or any person who sells</u> restricted or <u>any other securities for the account of a person who was an affiliate at any time during the 90 days immediately before the sale</u>, shall be deemed not to be an underwriter of those securities within the meaning of section 2(a)(11) of the Act if all of the conditions of this section are met.

17 C.F.R. § 230.144(b)(2) (emphasis supplied).

Thus, Rule 144 provides limitations on the sale of two classes of securities held by affiliates (and those who were affiliates within the 90 days before their sale of securities): an affiliate's sale of restricted securities, and the affiliate's sale of "any other securities" that are sold for them. These "any other securities" are generally referred to as "control" securities. <u>See</u> Securities and Exchange Commission, <u>Rule 144: Selling Restricted and Control Securities</u>, https://www.sec.gov/reportspubs/investor-publications/investorpubsrule144htm.html (Jan. 16, 2013).

Rule 144 sets out five general conditions for affiliates to sell restricted or control securities: the filing of current public information by the issuer (Rule 144(c)), a holding period for the seller, but only for restricted securities (Rule 144(d)), a limitation on the amount of securities sold (Rule 144(e)), requirements on the manner of sale (Rule 144(f) and (g)), and notice to the SEC (Rule 144(h)). 17 C.F.R. § 230.144.

If the applicable conditions are met, an affiliate can sell both restricted and control securities and "shall be deemed not to be an underwriter of those securities." 17 C.F.R. § 230.144(b)(2).

For a non-affiliate, Rule 144 imposes two limitations on the sale of restricted stock that are of importance here: a reporting requirement for the issuer and a holding period for the seller. Rule 144 provides that, for a company that is a reporting company under the Exchange Act and has been a reporting company for the 90 days immediately before the sale of shares at issue, the person "who sells restricted securities of the issuer for his or her own account shall be deemed not to be an underwriter . . . if the conditions of [current public information] and [the holding period] are met." 17 C.F.R. § 230.144(b)(1)(i).

The sale of restricted stock by a non-affiliate does not run afoul of the law, however, if the stock has been held for one year. The rule provides that the current public information requirement

> shall not apply to restricted securities sold for the account of a person who is not an affiliate of the issuer at the time of the sale and has not been an affiliate during the preceding three months, provided a period of one year has elapsed since the later of the date the securities were acquired from the issuer or from an affiliate of the issuer.

Id. 17 C.F.R. § 230.144(b)(1)(ii).

The holding period, however, can be as short as six months

for both an affiliate and a non-affiliate if the issuer is a reporting company.  Rule 144(d) provides that

> if the issuer of the securities is, and has been for a period of at least 90 days immediately before the sale, subject to the reporting requirements . . . of the Exchange Act, a minimum of six months must elapse between the later of the date of the acquisition of the securities from the issuer, or from an affiliate of the issuer, and any resale of such securities.

17 C.F.R. § 230.144(d).

Thus, the length of seller's holding period depends on whether the issuer is a reporting company.  If it is a reporting company for the previous 90 days, then the holding period is six months.  Otherwise, it is one year.  In either case the holding period begins to run from the payment of full consideration. Rule 144(d) provides that "if an acquirer takes the securities by purchase, the holding period shall not begin until the full purchase price or other consideration is paid or given by the person acquiring the securities from the issuer."  17 C.F.R. § 230.144(d)(1)(iii).

### 3.  Longfin's Reporting Requirement

Where a company has registered its shares under the Exchange Act, such as those that have registered their shares under Section 12(b) of the Exchange Act (as did Longfin on November 22, 2017), and when it has been a reporting company for 90 days, it must file all required Exchange Act reports to be in compliance with Rule 144(c).  The "current public information"

requirement under Rule 144(c) provides as follows:

> (c) Current public information.  Adequate current
> public information with respect to the issuer of
> the securities must be available.  Such
> information will be deemed to be available only
> if the applicable condition set forth in this
> paragraph is met:
>
> > (1) Reporting issuers.  The issuer is, and
> > has been for a period of at least 90 days
> > immediately before the sale, subject to the
> > reporting requirements of section 13 or
> > 15(d) of the Exchange Act and has:
> >
> > > (i) Filed all required reports under
> > > section 13 or 15(d) of the Exchange
> > > Act, as applicable, during the 12
> > > months preceding such sale (or for such
> > > shorter period that the issuer was
> > > required to file such reports), other
> > > than Form 8-K reports (§ 249.308 of
> > > this chapter);
> >
> > . . .
> >
> > (2) Non-reporting issuers.  If the issuer is
> > not subject to the reporting requirements of
> > section 13 or 15(d) of the Exchange Act,
> > there is publicly available the information
> > concerning the issuer specified in
> > paragraphs (a)(5)(i) to (xiv), inclusive,
> > and paragraph (a)(5)(xvi) of § 240.15c2-11
> > of this chapter, or, if the issuer is an
> > insurance company, the information specified
> > in section 12(g)(2)(G)(i) of the Exchange
> > Act (15 U.S.C. 78l(g)(2)(G)(i)).

17 C.F.R. § 230.144(c) (emphasis supplied).

When Longfin submitted its Form 8-A on November 22, 2017,

and that form became effective on November 24, it registered its

shares pursuant to Section 12(b) of the Exchange Act.  By March

14, 2018, the first day the Consulting Shares were sold, Longfin

had been a reporting company for the immediately preceding 90 days.  Accordingly, the applicable current public information requirement of Rule 144 required that Longfin be up-to-date on its obligations to file periodic reports with the SEC.

One of those obligations is provided by Rule 13a-13, codified at 17 C.F.R. § 240.13a-13.  The rule provides that:

> Except as provided in paragraphs (b) and (c) of this section, <u>every issuer that has securities registered pursuant to section 12 of the Act and is required to file annual reports pursuant to section 13 of the Act,</u> and has filed or intends to file such reports on Form 10-K [], <u>shall file a quarterly report on Form 10-Q []</u> within the period specified in General Instruction A.1. to that form for each of the first three quarters of each fiscal year of the issuer, <u>commencing with the first fiscal quarter</u> following the most recent fiscal year for which full financial statements were included in the registration statement, or, if the registration statement included financial statements for an interim period subsequent to the most recent fiscal year end meeting the requirements of Article 10 of Regulation S-X and Rule 8-03 of Regulation S-X for smaller reporting companies, for the first fiscal quarter subsequent to the quarter reported upon in the registration statement.  <u>The first quarterly report of the issuer shall be filed either within 45 days after the effective date of the registration statement</u> or on or before the date on which such report would have been required to be filed if the issuer has been required to file reports on Form 10-Q as of its last fiscal quarter, whichever is later.

17 C.F.R. § 240.13a-13(a) (emphasis supplied).  Therefore, after a company registers its securities, it generally has 45 days to file a 10-Q.

Rule 13a-13 unambiguously required Longfin to file a 10-Q within 45 days after it registered its securities under Section 12(b) on the Exchange Act on November 24, 2017. Thus, Longfin had a duty to file a 10-Q by January 8, 2018, which it did not do.[20]

Indeed, Longfin had a duty to file 10-Qs for each of its first three quarters within 45 days after its Exchange Act registration, which it also did not do. Although the regulation does not precisely address a situation where the issuer does not have at least one full fiscal year of financial statements included in the registration statement, the natural reading of the regulation is that the issuer is required to update its financial information for each quarter since the inception of the company. The only time Longfin provided the market with its financial statements was with its offering statements and circulars, which included financial information for the month of February 2017.

Even if the regulation were ambiguous on this point, the SEC has provided persuasive guidance leading to the same conclusion. The SEC has interpreted Rule 13a-13 in the context of Regulation A+ both in guidance documents and in its

---

[20] Pursuant to Rule 13a-13, if the market already had information from the immediately preceding fiscal quarter, the 10-Q may be filed later. Longfin did not have such information publicly available.

submission to this Court.  A "court must defer to an agency's 'interpretation of its own regulations unless that interpretation is plainly erroneous or inconsistent with the regulation.'"  S.E.C. v. Alpine Sec. Corp., No. 17cv4179(DLC), ---- F. Supp. 3d ---, 2018 WL 1633818, at *8-9 (S.D.N.Y. Mar. 30, 2018) (quoting Nat. Res. Def. Council v. EPA, 808 F.3d 556, 569 (2d Cir. 2015)).  "This is true even if the agency's interpretation of its regulation was not promulgated through formal procedures prescribed by the APA, but, for example, is advanced in a legal brief."  Id. (citing Talk Am., Inc. v. Mich. Bell. Tel. Co., 554 U.S. 50, 59 (2011)).  If the regulation is unambiguous, however, "the clear meaning of the regulation controls and may not be overridden by an inconsistent agency interpretation."  Id.

In Question 182.23, as part of its Compliance and Disclosure Interpretations, the SEC posed the question:

> An issuer registers a class of securities
> pursuant to the Exchange Act on a Form 8-A
> concurrently with (i.e., within 5 days after) the
> qualification of a Form 1-A (Offering Statement).
> The issuer's qualified Form 1-A did not contain
> financial statements for one or more quarterly
> periods that followed the most recent annual or
> semiannual period for which financial statements
> were included in the Form 1-A and that were
> completed prior to effectiveness of the Form 8-A.
> When is the issuer required to file quarterly
> reports for these quarterly periods?

Securities and Exchange Commission, Compliance and Disclosure Interpretations: Securities Act Rules,

https://www.sec.gov/divisions/corpfin/guidance/securitiesactrule
s-interps.htm. (Nov. 6, 2017).  It answered:

> Exchange Act Rule 13a-13 requires the issuer to
> file a quarterly report on Form 10-Q for the first
> fiscal quarter following the most recent annual
> or interim period for which financial statements
> were included in the registration statement.
> This report must be filed within 45 days of the
> effective date of the registration statement or
> on or by the required due date of the Form 10-Q
> (as if the issuer already had been required to
> file Forms 10-Q), whichever is later.  Where the
> issuer's qualified Form 1-A did not contain
> financial statements for one or more quarterly
> periods that followed the most recent annual or
> semiannual period for which financial statements
> were included in the Form 1-A and that were
> completed prior to effectiveness of the Form 8-A,
> the staff would not object if the issuer files a
> Form 10-Q for the completed quarterly period, or
> two Forms 10-Q if financial statements for more
> than one quarterly period were not included in
> the Form 1-A, within 45 days after effectiveness
> of the Form 8-A.
>
> For example, a calendar year-end issuer registers
> a class of securities pursuant to the Exchange
> Act on August 10, 2018, concurrent with the
> qualification of a Form 1-A that includes
> financial statements for the fiscal year ended
> December 31, 2017, but no financial statements
> for the two most recently completed quarterly
> periods in 2018.  The staff would not object if
> that issuer files its Forms 10-Q for the first and
> second fiscal quarters of 2018 on or before
> September 24, 2018.  Unlike the Regulation A
> issuer, a calendar year-end issuer that registers
> a class of securities pursuant to the Exchange
> Act on August 10, 2018, concurrent with the
> effectiveness of a Form S-1, would have been
> required to include financial statements for the
> first fiscal quarter of 2018 in its registration
> statement and would be required to file its Form
> 10-Q for its second fiscal quarter on or before

September 24, 2018.

Id. (emphasis supplied).

This guidance is an entirely reasonable interpretation of Rule 13a-13. The SEC's interpretation in Question 182.23 is also consistent with the position it advances before this Court. Accordingly, to the extent there is any ambiguity in Rule 13a-13, this Court defers to the SEC's interpretation of its own regulation.

### 4. Application to Consulting Shares

Altahawi's Consulting Shares were restricted shares under the terms of Rule 144(a). They were acquired directly from Longfin, and outside any public offering.[21] As restricted securities, they could not be sold unless Longfin was in compliance with its "current public information" reporting requirements. It is undisputed that Longfin did not file the necessary Exchange Act reports, including its 10-Q within 45 days of the November 24 registration of its shares under the Exchange Act. Indeed, Longfin did not begin to comply with its Exchange Act reporting requirements until it filed a 10-K report on April 2, 2018. Because the SEC has shown that Longfin did not file the required reports, it is unnecessary to address the

---

[21] Altahawi's Consulting Shares are also likely "control" shares. Since their sale failed to meet the requirements for the sale of restricted shares, however, it is unnecessary to consider this alternate analysis.

other requirements for selling restricted shares that apply to the sale of the Consulting Shares.

Altahawi's arguments for why Longfin was in compliance with its reporting obligations are without merit. First, Altahawi contends that financial statements need not be included in a registration statement for a Regulation A+ offering. But, Rule 13a-13 does not tie its filing requirements to any requirement or lack of a requirement that financial data be included in the registration statement. Rule 13a-13 provides that, to the extent financial statements are not included in the registration statement, the company must report updated financial information on a quarterly basis.

Second, Altahawi claims that he had conversations with an SEC attorney in January and February 2018 in which he was advised that Longfin was in compliance with its reporting obligations[22] and was never advised that Longfin was out of compliance with those obligations. The SEC also apparently issued a comment letter to Longfin dated February 27, 2018,[23] in which the SEC did not mention that Longfin was out of compliance with its periodic reporting obligations.

Altahawi's argument is essentially one for equitable

---

[22] The SEC attorney denies having the conversation as Altahawi describes it.

[23] The letter has not been submitted as part of the record on this motion.

estoppel.  But, "estoppel cannot be asserted against the Government 'on the basis of . . . oral advice.'"  S.E.C. v. KPMG LLP, No. 03cv671(DLC), 2003 WL 21976733, at *4 (S.D.N.Y. Aug. 20, 2003) (quoting Heckler v. Cmty. Health Servs. of Crawford Cty., Inc., 467 U.S. 51 (1984)).  Nor does a failure to raise a violation in a comment letter bar the SEC from asserting a violation now.  See Rojas-Reyes v. I.N.S., 235 F.3d 115, 126 (2d Cir. 2000).

In sum, Altahawi sold restricted shares when Longfin was not in compliance with the current public information requirement.  It is also undisputed that Altahawi did not file the required notice to the SEC for an affiliate's sale of shares pursuant to Rule 144(h).[24]  Accordingly, the SEC has shown that it is likely to prove that Altahawi did not comply with Rule 144's requirements for an affiliate or a non-affiliate's sale of restricted shares.

5.  One-Year Waiting Period

Altahawi makes one additional argument in support of the legality of his sales of the Consulting Shares.  As described above, a non-affiliate may sell shares acquired more than one year earlier, even if the issuer is out of compliance with its

---

[24] Rule 144(h) generally requires notice to the SEC on SEC Form 144 when an affiliate sells shares.  Altahawi has not filed any Form 144 with respect to his sales of the Consulting Shares, or any other sales of Longfin shares.

current public information duties.  17 C.F.R. § 230.144(b).  As
explained above, it is likely that the trier of fact at trial
will conclude that Altahawi was an affiliate of Longfin.  But,
even if Altahawi were not an affiliate, he did not comply with
the one-year holding period before selling his Consulting
Shares.  Altahawi contends he acquired his Longfin shares when
he entered into his Agreement with Longfin on February 1, 2017,
which is more than one year before he began to sell the
Consulting Shares.

A person acquires shares by purchase for the purposes of
Rule 144 only when the "full purchase price or other
consideration is paid or given by the person acquiring the
securities from the issuer."  17 C.F.R. § 230.144(d)(3).  A
person who works for an issuer in exchange for stock
compensation is a purchaser of securities.  See generally Yoder
v. Orthomolecular Nutrition Inst., Inc., 751 F.2d 555, 558 (2d
Cir. 1985); Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175
(2d Cir. 1993) ("Employment contracts promising shares as
compensation are generally considered securities
transactions.").

Applying the full-purchase-price principle, Altahawi did
not acquire the Consulting Shares until June 16, 2017, at the
earliest.  This conclusion is compelled by the terms of the
Agreement itself, as well as by the statements Longfin made to

the SEC.  Altahawi was retained as a consultant to obtain
qualification for Longfin's DPO, among other tasks, which
occurred on June 16, 2017.

Altahawi, in support of a February 1, 2017 acquisition
date, points to statements made by Meenavalli to Longfin's stock
transfer agent on March 6, 2018 to the effect that Altahawi's
shares were fully earned by February 1, 2017.  These statements
do not override the terms of the Agreement, which in any event
was an integrated contract.  Meenavalli's statement is also
inconsistent with the nature of the transaction.  It would make
no sense for Longfin to enter into an arrangement whereby
Altahawi had fully earned the Consulting Shares on February 1,
2017, even if he chose not to perform any future services for
the company.  Accordingly, the earliest possible date on which
Altahawi could prove that he acquired his shares was June 16,
2017.

Because Altahawi did not acquire the Consulting Shares
until, at the very earliest, June 16, 2017, he did not hold the
shares at least one year before he sold them in March 2018.
Under Rule 144, in order to sell the Consulting Shares as a non-
affiliate in less than a year after acquisition, Longfin would
have had to be in compliance with its Exchange Act reporting
requirements.  As discussed above, it was not.  The SEC is
likely to show, therefore, that Altahawi's sales of the

44

Consulting Shares did not comply with Rule 144 even if he is deemed to be a non-affiliate.

　　　　6.　Section 4(a)(1) Analysis

Altahawi contends that even if he does not qualify for Rule 144's safe harbor, his sales of the Consulting Shares are exempt under Section 4(a)(1) itself.  But, as explained above, it is likely that Altahawi will be found at trial to have been an affiliate of Longfin for Rule 144 purposes.  If so, he will be deemed an "issuer" for the purpose of the definition of an underwriter under Section 2(a)(11).  Kern, 425 F.3d at 152.  As an issuer, he would be unable to take advantage of the Section 4(a)(1) exemption outside of the Rule 144 safe harbor.  See Cavanagh III, 445 F.3d at 111 & n.12 (citing Cavanagh II, 155 F.3d at 134).

Even if Altahawi were not an affiliate, however, his sales would not be exempt under Section 4(a)(1).  Section 4(a)(1) exempts sales from Section 5's prohibition when the sales are from persons other than an issuer, underwriter, or dealer in securities.  As already noted, Altahawi has a substantial burden to prove that sales that fall outside Rule 144's safe harbor are nonetheless entitled to an exemption under Section 4(a)(1) of the Securities Act.  Cavanagh III, 445 F.3d at 115.

Section 2 of the Securities Act sets forth the definitions of the key terms of the statute.  These definitions create three

categories of individuals who qualify as underwriters: (1) persons who purchase from an "issuer" with a view to distribution; (2) persons who offer or sell for an "issuer" in connection with the distribution of a security; and (3) persons who participate directly or indirectly in those tasks. See Alameda Cty. Emps.' Ret. Ass'n v. Ebbers (In re WorldCom Sec. Litig.), 308 F. Supp. 2d. 338, 344 (S.D.N.Y. 2004); see generally In re Lehman Bros., 650 F.3d at 176-77 (2d Cir. 2011). The SEC contends Altahawi acted as an underwriter in selling his Consulting Shares.[25]

Altahawi has failed to carry his burden to show that has was not a statutory underwriter. In determining whether a person acquired shares with a view to distribution, courts look to objective evidence, such as the length of time the shares were held and whether there has been an unforeseeable change in circumstances of the holder. See S.E.C. v. Boock, No. 09cv8261(DLC), 2011 WL 3792819, at *19 (S.D.N.Y. Aug. 25, 2011); see also Kern, 425 F.3d at 153 (collecting cases); Ackerberg v. Johnson, 892 F.2d 1328, 1336 (8th Cir. 1989) ("[T]he courts have considered the more objective criterion of whether the securities have come to rest. That is, the courts look to whether the security holder has held the securities long enough

---

[25] The SEC does not contend that Altahawi is a "dealer" or an "issuer" within the meaning of Section 4(a)(1).

to negate any inference that his intention at the time of acquisition was to distribute them to the public.").

There is abundant evidence that Altahawi always intended to sell the Consulting Shares and not to hold them as an investment.  First, there was no effective public market for the Longfin shares until December 2017, when trading began on the NASDAQ.  Thus, he had no market for his shares until that date.  Altahawi began to sell the Consulting Shares not long thereafter, on a date in March which was six months to the day after he had arranged for the shares to be issued to him.  Because the Rule 144(d) six-month holding period expired on that day, this strongly indicates that Altahawi intended from the time he received them to distribute his shares rather than invest in them.[26]  And, Altahawi's business is apparently to act as a consultant for Regulation A+ offerings, earning his income from that work.  He has not asserted that his business is to become a long-term investor in the companies for which he consults.  Finally, Altahawi worked in February 2018 to have the restricted designation removed from the Consulting Shares.  He hired a lawyer, obtained an opinion letter, and arranged for Meenavalli to confirm to Colonial Transfer that the shares were

---

[26] To recap, the six month holding period under Rule 144(d) is available to affiliates and to non-affiliates.  But, to take advantage of that shorter holding period (in contrast to a one-year holding period), the issuer must be in compliance with its Exchange Act reporting requirements.

fully earned as of the date the Agreement was executed, which was February 1, 2017.

Notably, in his declaration, Altahawi never claims that he took the shares of Longfin with an investment purpose. Nor does he attempt to set out any change of circumstance that required a speedier than originally contemplated sale, a circumstance that might entitle him to an exemption under the statute. Although subjective statements of intent, standing alone, would likely not suffice to meet his burden to show his intent to acquire for an investment purpose, the absence of any attempt to make that showing confirms that Altahawi will likely be found at trial to be an underwriter under Section 5, even if not found to be an affiliate of Longfin. The proceeds from the sales of the Consulting Shares will therefore remain frozen.

### C. Altahawi's Private Transaction Shares

The next tranche of assets the SEC seeks to freeze are assets derived from Altahawi's sale of his Private Transaction Shares. The Private Transaction Shares were among the shares purportedly issued by Longfin to twenty-four individuals on December 6, 2017. Altahawi asserts that he acquired 121,000 of those December 6 Shares from ten individuals on January 12, 2018. He sold them in January and February 2018 over the NASDAQ. Like the Consulting Shares, these shares were not sold pursuant to a Securities Act registration statement, and

therefore, the SEC has carried its initial burden of showing a violation of Section 5.  Altahawi contends that the shares were purchased pursuant to the Regulation A+ offering, and thus that the shares were not restricted securities.[27]  Whether or not Altahawi is found to be an affiliate, Altahawi's sale of these shares likely violated the securities laws.

In the first instance, because Altahawi is likely to be deemed an affiliate, even if the shares were originally acquired pursuant to the Regulation A+ offering, when they came into Altahawi's possession they became "control" securities under Rule 144.  As such, in order to resell the shares pursuant to Rule 144's safe harbor, among other things, Longfin had to be current in its Exchange Act filings and Altahawi had to provide appropriate notice to the SEC.  Neither requirement was met.

Because Altahawi sold at least some of the Private Transaction Shares before 90 days had expired since Longfin became an Exchange Act reporting company on November 22, 2017, the "current public information" requirement under Rule 144 differs somewhat from the analysis just conducted with respect to the Consulting Shares.  As described above, the 90-day period called for by Rule 144(c)(1) ended on February 22, 2018.

Rule 144 precludes the sale of control shares in an issuer

---

[27] Altahawi relies on the Rule 144 exemption to protect the proceeds from the sale of the Private Transaction Shares.  He does not rely more generally on Section 4(a)(1).

that is required to file Exchange Act reports until 90 days following registration.[28]  Accordingly, as to any sales of the Private Transaction Shares that occurred before February 22, 2018, there was no "current public information."  For the sales which took place after February 22, 2018, for the reasons described in the discussion of Altahawi's sales of the Consulting Shares, Longfin was delinquent in its reporting obligations.  Accordingly, the current public information requirement would not be satisfied as to these sales either.

Even if Altahawi is not found at trial to be an affiliate, however, Altahawi is unlikely to show that the Private Transaction Shares were acquired through a Regulation A+ offering.  Accordingly, the Private Transaction Shares would have been restricted shares, for which at least two provisions of Rule 144 were not complied with:  the current public information requirement and the holding period, as already described.

Meenavalli claims that each of the ten individuals from whom Altahawi acquired the Private Transaction Shares had themselves purchased their shares from Longfin through its Regulation A+ offering and paid Longfin directly for those

---

[28] In any event, because the last publicly available financial information for Longfin was from February 28, 2017, the requirements applicable to non-reporting issuers would not have been satisfied either.  17 C.F.R. § 230.144(c)(2).

shares.  But, there is no documentation to show that Longfin received any payment for those shares.[29]  Moreover, the notation on the control log reflects that these shares were restricted, suggesting that these shares were not acquired pursuant to the Regulation A+ offering.  The circumstantial evidence suggests that the December 6 Shares were issued as part of a calculated effort designed by Altahawi to obtain a listing on the NASDAQ and were not bona fide sales by Longfin.  As reflected in e-mails, the twenty-four individuals' subscription agreements were packaged together, apparently in connection with providing a shareholder list to the NASDAQ.

Altahawi has also not explained how he managed to purchase these shares from ten separate individuals living in India by obtaining their signatures on the same piece of paper, much less why they agreed to sell the shares at below-market value.  Nor has Altahawi provided documentation to confirm he paid even this below-market price for the shares.[30]  At bottom, the burden is on Altahawi to produce evidence showing that the ten individuals purchased their shares pursuant to the Regulation A+ offering,

---

[29] At oral argument, defense counsel proffered a different explanation:  that the shares were purchased for the ten individuals through an entity called Stampede Capital.  No documentation has been submitted showing that Stampede Capital directly paid Longfin for the shares either.

[30] Altahawi contends he paid $30 per share, at a time when Longfin was trading at over $40 per share on the NASDAQ.

which he has failed to do.

Because Altahawi is unlikely to show that the Private Transaction Shares were acquired in the Regulation A+ offering, they were obtained directly from the issuer outside of any public offering, and thereby were restricted shares under Rule 144.[31]  When Altahawi acquired the shares from the ten individuals, they remained restricted under Rule 144.  See 17 C.F.R. § 230.144(a)(3)(i).  As restricted shares, Altahawi's sales of the shares needed to comply with the current public information requirement and the applicable holding period.  The shares were not held for even six months, and the current public information requirement was not satisfied for the reasons described above.  Accordingly, Altahawi is unlikely to establish that his sales of the Private Transaction Shares complied with Rule 144, even if he is a non-affiliate.

## D.  Tammineedi and Penumarthi

There are two sets of shares at issue with respect to defendants Tammineedi and Penumarthi.  Both acquired and sold December 6 Shares, and Tammineedi sold shares purchased through the Source Media account.  The SEC has frozen proceeds from the sales of both sets of shares.

---

[31] In the alternative, the SEC contends that some of the Private Transaction Shares were acquired from affiliates of Longfin, thus making the securities restricted as acquired from an affiliate outside a public offering.  17 C.F.R. § 230.144(a)(3)(i).

### 1. The December 6 Shares

The SEC has established that it is likely to succeed in showing that Tammineedi and Penumarthi sold unregistered shares in violation of Section 5 of the Securities Act when they sold shares they acquired on December 6, 2017. Again, there was no Securities Act registration filed by Longfin and the other elements of a Section 5 violation are likewise undisputed.

Tammineedi and Penumarthi have not shown that their sales of Longfin shares in December 2017 and January 2018 were protected by Rule 144's safe harbor, or that they are entitled to an exemption under Section 4(a)(1) of the Securities Act. There is strong evidence that their December 6 Shares were acquired directly from the issuer outside the Regulation A+ offering. There is no documentary evidence that either defendant paid for their December 6 Shares. Their subscription arrangements were apparently driven by the desire to provide the NASDAQ with a shareholder list and thereby meet the NASDAQ's listing requirements. Their shares are in fact marked on the control log as restricted shares.

Tammineedi and Penumarthi's explanations for how they paid for their shares are unlikely to be found credible. Penumarthi claims that he became aware Longfin was contemplating an IPO, and purchased 40,100 shares pursuant to two subscription agreements. He then says that he

paid Longfin Corp. for the shares by transferring
from my personal funds borrowed from Adarsh
Global Pvt Limited and paid to Stampede
Enterprises Limited on August 18, 2017. Stampede
confirmed to me that my funds are received by
Longfin Corp, Bank on September 1, 2017. I have
filled my subscription form and applied on
September 2, 2017. And received my shares on
December 6, 2017.

Penumarthi has not produced any documentation supporting these
claims.

Similarly, Tammineedi claims that he purchased his shares
with funds transferred to him from Kling Enterprises Limited and
that he used those funds to pay Stampede Enterprises Limited in
March 2017. He then claims that Stampede was to remit the money
on his behalf after the DPO qualification. He also says that
Stampede Enterprises Limited confirmed to him that they remitted
the funds to Longfin on July 18, 2017. Again, he has produced
no documentation to that effect.

Moreover, both of these defendants purchased at least a
small number of shares from Longfin in the normal course, with
their payments recorded in the Colonial Transfer records,
without resort to the roundabout method they purportedly used to
acquire the December 6 Shares marked as restricted.
Accordingly, it is likely that the trial will establish that
both Tammineedi and Penumarthi acquired the shares outside the
Regulation A+ offering, and that their shares were restricted
shares under Rule 144.

As restricted shares, under Rule 144, Penumarthi and Tammineedi were required to hold the December 6 Shares for a minimum period of one year, as described above. Because the December 6 Shares were clearly not held the required one-year period, the sales were not protected by Rule 144.

The SEC also contends that both Tammineedi and Penumarthi are affiliates of Longfin. A finding that they were affiliates would provide additional grounds for freezing the proceeds of their sales of the December 6 Shares. The record for this hearing provides strong support for finding that each of them was an affiliate of Longfin.

Tammineedi is a director of Stampede Capital Limited, a company that Meenavalli founded and that is Longfin's largest shareholder. Stampede Capital Limited owns well over 10% of Longfin's shares, and Meenavalli himself has a substantial interest in Stampede Capital Limited.[32] Tammineedi and Meenavalli are frequent business colleagues and close associates.

Penumarthi acknowledges that he has worked as a consultant for Longfin. He has identified himself as well as a Director of Longfin's UK operations.[33] Penumarthi grew up with Meenavalli

---

[32] Meenavalli, the CEO of Longfin, owns 17.11% of Stampede Capital Limited with his wife.

[33] In opposition to this motion, Penumarthi claims his statement was "inaccurate.

and appears to have been a previous business partner of his.

Finally, Penumarthi and Tammineedi do not attempt to demonstrate compliance with Section 4(a)(1) of the Securities Act beyond their claim of compliance with Rule 144. Given the minimal length of time between their acquisition of the December 6 Shares and their resale of those shares, they would not be able to establish that the shares were not acquired with a view to distribution. Accordingly, the proceeds of their sales of the December 6 Shares will remain frozen.

### 2. The Source Media Shares

The SEC is also likely to establish that Tammineedi was ineligible to sell the shares he purchased through his company, Source Media, shortly before the Ziddu.com announcement. The analysis turns on whether Tammineedi was an affiliate of Longfin. It is undisputed that the shares were acquired on the public market by Tammineedi, and sold thereafter. Based on the facts outlined above, the SEC is likely to show that Tammineedi was an affiliate of Longfin at the time he purchased the shares.[34]

Although the Source Media Shares were acquired on the

---

[34] While a defendant who sells shares acquired from an issuer bears the burden to show that those sales are protected by Rule 144 or Section 4(a)(1), this Opinion assumes without deciding that the SEC bears the burden of showing that a defendant who acquires shares on the open market that were issued in a Regulation A+ offering was an affiliate of the issuer at the time of the open market purchase.

public market, once an affiliate of Longfin acquired them, they became control shares under Rule 144.  As control shares, in order to make a sale of these shares legal, Longfin had to have "current public information" filed with the SEC and Tammineedi had to provide notice to the SEC.  For the reasons described above, there was no current public information filed, and it is undisputed that Tammineedi did not provide the required notice to SEC.  And, as an affiliate, Tammineedi is ineligible for the Section 4(a)(1) exemption.  Therefore, the proceeds from the sale of the Source Media Shares will remain frozen.

## CONCLUSION

The SEC's April 4, 2018 motion for a preliminary injunction is granted with respect to defendants Altahawi, Tammineedi, and Penumarthi.  The temporary restraining order, as modified by the April 23 Order, shall continue in effect until further Order of the Court.

SO ORDERED:

Dated:    New York, New York
          May 1, 2018

                              _____
                                      DENISE COTE
                              United States District Judge