Sarah H. Concannon
Kevin C. Lombardi
**SECURITIES AND EXCHANGE COMMISSION**
**100 F Street, N.E.**
**Washington, DC  20549-5977**
**Telephone:  (202) 551-5361 (Concannon)**
**Email:  concannons@sec.gov**
**Telephone:  (202) 551-8753 (Lombardi)**
**Email:  lombardik@sec.gov**

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,   :
    :
    :
                       **Plaintiff,**   :
    :   **FIRST AMENDED**
    :   **COMPLAINT**
          **– against –**   :
    :   **No. 1:18-cv-02977-DLC**
**LONGFIN CORP.,**   :
**VENKATA S. MEENAVALLI,**   :
**ANDY ALTAHAWI,**   :   **JURY TRIAL DEMANDED**
**SURESH TAMMINEEDI, and**   :
**DORABABU PENUMARTHI,**   :
    :
                  **Defendants.**   :
-------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission (the "SEC" or the "Commission"), for its

First Amended Complaint against Defendants Longfin Corp. ("Longfin") and Venkata S.

Meenavalli ("Meenavalli") (collectively, the "Longfin Defendants"), and Defendants Andy

Altahawi (a/k/a Amro Izzelden Altahwi) ("Altahawi"), Suresh Tammineedi ("Tammineedi"),

and Dorababu Penumarthi ("Penumarthi") (collectively, the "Individual Defendants") (and,

together with the Longfin Defendants, "Defendants"), alleges as follows:

## SUMMARY

1.     This action concerns Defendants' unlawful distributions to the public of over

$33 million of Longfin stock in unregistered transactions between December 2017 and

March 2018 in violation of Section 5 of the Securities Act of 1933 ("Securities Act") [*15 U.S.C.*
*§ 77e*], which prohibits such unregistered sales unless a specific exemption applies under the
federal securities laws.  No exemption applied to Defendants' unlawful distributions.

2.      The Individual Defendants—affiliates of Longfin—unlawfully sold over 645,000
shares of Longfin to the public in unregistered and non-exempt transactions, profiting by tens of
millions of dollars, in violation of Section 5.  At all relevant times, and as alleged below, the
Individual Defendants were underwriters of Longfin Class A common shares and did not satisfy
the conditions stated in SEC Rule 144 [*17 C.F.R. § 230.144*] with respect to their sales of
Longfin securities that are the subject of this Complaint.

3.      The Longfin Defendants participated, directly and indirectly, in the Individual
Defendants' unlawful distributions by, among other misconduct, issuing over two million shares
of Longfin stock to the Individual Defendants through backchannels and taking specific
affirmative steps to cause Longfin's transfer agent to cause Longfin's transfer agent to issue
unrestricted shares to the Individual Defendants, enabling the Individual Defendants to sell their
shares to the public.  The Longfin Defendants also pursued listing on The Nasdaq Stock Market,
LLC ("NASDAQ"), timing their disclosures (and non-disclosures) to NASDAQ so as to ensure
that there was a public market for the Individual Defendants' shares.

4.      On September 15, 2017, the Longfin Defendants issued 2,025,000 Class A
common shares to Altahawi in consideration of purported legal and business consulting services
he had performed for the company (the "Consulting Shares").  The Consulting Shares were
restricted securities that could not be resold, except under limited circumstances.

5.      In December 2017, Longfin, at the direction of Meenavalli, completed a Tier 2
offering under SEC Regulation A [*Regulation A —Conditional Small Issues Exemption,*

*17 C.F.R. §§ 230.251 – 263*][1] for up to 10,000,000 of Longfin's Class A shares at a price of $5

per share.  Longfin publicly reported that it issued a total of 1,140,989 shares under the

Regulation A offering, which was first qualified in June 2017.  Longfin has never registered the

offer or sale of any security to the public under the Securities Act.

6.      On December 6, 2017, at Meenavalli's direction, Longfin issued 409,360 shares

(the "December 6 Shares") to 24 individuals (the "December 6 Shareholders") outside of

Longfin's Regulation A offering.  Although Longfin's exemption from registration under

Regulation A was limited to sales of Class A common stock at a price of $5 per share, none of

the December 6 Shareholders purchased shares in Longfin's Regulation A offering at a price of

$5 per share.  Consequently, the shares that they received were restricted.

7.      Tammineedi and Penumarthi received 30,000 and 40,000 shares of Longfin,

respectively, as part of the December 6 issuance.  Like the other December 6 Shareholders,

Tammineedi and Penumarthi received these shares outside the Regulation A offering and despite

the fact that they did not transfer funds to Longfin's escrow agent, as required by their

subscription agreements.

8.      One week later, on December 13 and 14, 2017, Tammineedi purchased an

additional 67,000 shares in the public market through his wholly-owned entity, Source Media

Limited.

9.      Between January 31, 2018 and March 6, 2018, Altahawi acquired 121,000

additional restricted shares of Longfin from ten of the December 6 Shareholders (the "Private

Transaction Shares").  Altahawi's agreements with the ten shareholders were purportedly

---

[1]      Regulation A is a set of rules that allow issuers to publicly sell securities under procedures that are less burdensome than those that otherwise would apply for transactions required to be registered under Section 5. Longfin's exemption from registration under Regulation A was limited to sales of Class A common stock at a price of $5 per share.

memorialized in a single stock purchase agreement,[2] dated January 12, 2018, even though the ten individuals from whom Altahawi purchased were located in multiple locations.  Altahawi agreed to purchase the 121,000 shares at a price of $30 per share, well below the market price for Longfin shares on January 12.

10.     On December 13, 2017, as a result of the Longfin Defendants efforts, Longfin's Class A shares began trading on NASDAQ.  In connection with its voluntary NASDAQ listing, Longfin was required to register its shares pursuant to Section 12(b) of the Securities Exchange Act of 1934 ("Exchange Act") [*15 U.S.C. § 78l(b)*].  Longfin's Section 12(b) registration required the company to comply with the periodic reporting requirements of the Exchange Act, including the requirement to file quarterly reports on Form 10-Q under Exchange Act Rule 13a-13 [*17 C.F.R. § 240.13a-13*].  Having registered its securities under Section 12(b) of the Exchange Act, Longfin was required, on or before January 8, 2018, to file a quarterly report with the Commission for the quarter ended September 30, 2017.  The Form 10-Q for September 30, 2017 remained delinquent from January 9, 2018 until May 4, 2018, when Longfin filed it with the Commission.

11.     Between February 8, 2018 and March 23, 2018, Altahawi sold 475,751 shares of Longfin in the public market, comprised of portions of the Consulting Shares and the 121,000 additional shares he acquired from the December 6 Shareholders.  No registration statement was filed or in effect for these sales, and no Securities Act exemption applied to them.  Altahawi reaped profits of over $25.5 million from these sales.

---

[2]     The parties previously have submitted two different versions of the January 12, 2018 Stock Purchase Agreement to the Court, attached as Exhibit G to the Declaration of Andy Altahawi in Opposition to Plaintiff's Motion for a Preliminary Injunction  [Dkt. No. 34-7] (showing agreement by 11 shareholders to transfer 131,000 shares) and Exhibit 47 to the Declaration of Robert W. Nesbitt in Support of the Commission's Application for an Order Freezing Assets  [Dkt. No. 43-8] (showing agreement by nine shareholders to transfer 110,000 shares). The transfer agent's records (which are not identical to either stock purchase agreement) show that Altahawi received 121,000 shares from ten of the December 6 Shareholders.

12.     Between March 21, 2018 and March 29, 2018, Altahawi sold an additional 60,352 shares of Longfin in the public market in unregistered transactions, profiting by $3.4 million.  No registration statement was filed or in effect for these sales, and no exemption from registration applied to Altahawi's transactions.

13.     Between December 2017 and March 2018, Tammineedi sold approximately 69,200 shares of Longfin—comprised of the shares Tammineedi received from Longfin in the December 6 issuance and the shares purchased by Tammineedi's company, Source Media, in the public market—to the public in unregistered transactions, making a profit of over $2.8 million in two of his brokerage accounts.  No registration statement for these sales had been filed or was effective, and no exemption from registration applied to Tammineedi's transactions.

14.     On January 23, 2018, Penumarthi sold 4,000 of the 40,000 shares that he had received from Longfin in the December 6 issuance, realizing profits of $169,495.  Penumarthi later sold the remaining shares of Longfin stock received in the December 6 issuance, profiting by an additional $1.3 million.  No registration statement for these sales had been filed or was effective, and no exemption from registration applied to Penumarthi's transactions.

15.     The Longfin Defendants facilitated and participated in each of the Individual Defendants' unlawful distributions of Longfin stock in unregistered transactions by the following acts or failures to act:

> (a)     Authorizing the issuance of 2,025,000 shares of Longfin to Altahawi;
>
> (b)     Issuing over 400,000 shares of Longfin stock to the December 6 Shareholders, including Tammineedi and Penumarthi, outside the Regulation A offering and without requiring proof of payment to Longfin's transfer agent;

(c)     Informing Longfin's transfer agent that Longfin had sold shares to the December 6 Shareholders, including Tammineedi and Penumarthi, in its Regulation A offering;

(d)     Waiving the requirement for a Medallion Signature Guarantee or originally signed documents, enabling Longfin's transfer agent to issue the Private Transaction Shares to Altahawi;

(e)     Representing to Longfin's transfer agent that Altahawi had fully earned the Consulting Shares on February 1, 2017 and instructing the transfer agent to lift the restrictive legend;

(f)     Informing Longfin's underwriter that seven of the December 6 Shareholders, including Tammineedi and Penumarthi, had paid for their shares;

(g)     Failing to timely file Longfin's quarterly and annual reports; and

(h)     Timing key disclosures (and non-disclosures) to NASDAQ during Longfin's pursuit of NASDAQ listing—including concerning Longfin's acquisition of a purported "blockchain-empowered solutions provider" in a related-party transaction, the resignations of two senior Longfin officers, the number of Longfin's shareholders and whether those shareholders had a prior relationship with Longfin, and the number of shares sold in Longfin's Regulation A offering—creating a public market for the Individual Defendants' restricted shares.

16.     This action seeks injunctive and monetary relief against the Defendants for their unlawful distributions of Longfin stock in unregistered transactions.

17.     By engaging in the unlawful conduct described in this Amended Complaint, Defendants violated and, unless restrained and enjoined, will continue to violate Section 5 of the Securities Act.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [*15 U.S.C. §§ 77t(b) and 77v(a)*].

19.     Venue in this district is proper under Section 22(a) of the Securities Act [*15 U.S.C. § 77v(a)*] because the Defendants transacted business and offers or sales of securities described herein took place within the Southern District of New York.  Longfin's principal place of business is in the City of New York.  Between December 13, 2017 and May 3, 2018 (when Longfin announced its intention to voluntarily delist its Class A common stock from NASDAQ), Longfin's shares were listed on NASDAQ, which is located within this district.

20.     Defendants made use of the means or instruments of transportation or communication in interstate commerce or of the mails in connection with the transactions, acts, practices, and offers and sales of securities described in this Complaint.

## DEFENDANTS

21.     **Longfin Corp.** ("Longfin") is a Delaware corporation headquartered in New York, New York.  Longfin's Class A common stock was previously registered with the Commission pursuant to Section 12(b) of the Securities Exchange Act of 1934 [*15 U.S.C. § 78l*]. Between December 13, 2017 and its voluntary delisting from NASDAQ, Longfin's Class A common stock traded on NASDAQ under the symbol "LFIN."  On May 24, 2018, Longfin's Class A common began trading over the counter.

22.     **Venkata S. Meenavalli** ("Meenavalli") founded Longfin and is its Chairman and Chief Executive Officer.  Meenavalli individually controls over 20% of Longfin's Class A shares

and over 50% of Longfin's total voting equity.  Meenavalli and his wife own approximately 17% of the voting stock of Stampede Capital Limited, a publicly listed company in India that owns approximately 27.6% of the voting stock of Longfin.  Meenavalli is the Chairman and founder of Stampede Capital Limited.

23.     **Andy Altahawi** (a/k/a Amro Izzelden Altahwi) ("Altahawi"), age 54, is or was a resident of Sunny Isles Beach, Florida.  He is the president of Adamson Brothers Corp. ("Adamson Brothers"), which operates ipoflow.com, a website purporting to be "a leading equity Reg A+ offerings platform opening up the IPO access to everyone."  Altahawi has previously been associated with a number of broker-dealers registered with the SEC.

24.     **Suresh Tammineedi** ("Tammineedi"), age 48, is a citizen of India residing in Hyderabad, India.  Tammineedi is affiliated with Meenavalli through several entities, including as a director of Stampede Capital Limited (which owns approximately 27.6% of the outstanding shares of Longfin), and (until February 2018) as a director of Longfin's subsidiary, Longcom India Pte. Ltd. (formerly known as Longhash Commodity Trading Pte. Ltd.).  Tammineedi and Meenavalli have been involved as directors of several other entities, including Kling Enterprises India Ltd. and SpaceNet Enterprises India Ltd.

25.     **Dorababu Penumarthi** ("Penumarthi"), age 42, is a citizen and resident of the United Kingdom.  Penumarthi is affiliated with Meenavalli through Smartahead Solutions Limited, a United Kingdom-based entity, for which Penumarthi and Meenavalli served together as directors until Meenavalli resigned in June 2013.  Penumarthi is currently the sole director at Smartahead Solutions.  He previously has identified himself on his Facebook page as the head of Longfin's United Kingdom operations.

**OTHER RELEVANT ENTITIES**

26.     **Stampede Capital Limited** ("Stampede") is a publicly listed company in India. According to Longfin's April 2, 2018 Form 10-K filed with the Commission, Stampede is 17.11%-owned by Meenavalli and his wife.  Stampede is one of the largest shareholders of Longfin with ownership of 27.5 million shares, representing approximately 27.6% of Longfin's total shares outstanding.

27.     **Stampede Tradex Pte. Ltd.** ("Stampede Tradex") was incorporated in the Republic of Singapore and became a subsidiary of Longfin on June 19, 2017 after an acquisition by Longfin.  Stampede Tradex subsequently changed its name to Longfin Tradex Pte. Ltd.

28.     **Meridian Enterprises Pte. Limited** ("Meridian") is a Singapore private company, which is 95% owned by Meenavalli.  On December 11, 2017, Longfin issued 2,500,000 shares of its Class A Common Stock in connection with the purchase of the website Ziddu.com from Meridian.

29.     **Source Media Limited** ("Source Media") is a British Virgin Islands company owned entirely by Tammineedi.

30.     **Spacenet Enterprises India** ("Spacenet") is a publicly listed company in India. Meenavalli and his wife each own over 6% of Spacenet's outstanding equity shares. Tammineedi served as a Director of Spacenet until March 24, 2017.

31.     **Smartahead Solutions Ltd.** ("Smartahead") is a United Kingdom company owned entirely by Penumarthi.  Meridian was the majority shareholder of Smartahead until January 12, 2017, when it transferred all of its shares to Penumarthi.

32.     **Adamson Brothers Corp.** ("Adamson Brothers") is a Florida corporation incorporated in April 2016.  When formed, both Altahawi and his daughter were identified as directors of Adamson Brothers.

## BACKGROUND ON SECTION 5

33.     Under Section 5 of the Securities Act, a company (an "issuer") or any other person selling stock may only do so if it (1) registers the transaction pursuant to a valid registration statement that applies to that specific offering of stock; or (2) sells the stock in a transaction that is exempt from the registration requirements of Section 5.  Section 5 applies to both the issuer and its "affiliates," generally persons or entities that the issuer controls, control the issuer, or are under common control with the issuer.

34.     To prevent an issuer and its affiliates from circumventing the registration requirements, stock acquired by affiliates directly from the issuer or indirectly through another affiliate is restricted.  To evidence this, the stock certificate usually carries a restrictive legend that prohibits the stock from being further sold to the public unless and until the registration requirements of Section 5 are met or the sale is otherwise exempt.  A "transfer agent," a person with specific responsibilities under the Exchange Act, which include issuing securities to bona fide shareholders at the direction of the issuer, may remove the restrictive legend when presented with evidence that the stock is no longer restricted.  Once the stock is no longer restricted, it may be sold to the public on a national securities exchange or by another means permitted under the federal securities laws.

35.     Section 4(a)(1) of the Securities Act [*15 U.S.C. § 77d(a)(1)*] provides an exemption from registration for transactions "by any person other than an issuer, underwriter, or dealer."  An "underwriter," as defined in Section 2(a)(11) of the Securities Act [*15 U.S.C. § 77b(a)(11)*], includes any person who (1) purchases a security from an issuer with a view to distribution of the security or (2) who directly or indirectly participates in that distribution.

36.     SEC Rule 144 [*17 C.F.R. § 230.144*] provides a safe harbor for the sale of securities under the Section 4(a)(1) exemption.  A person who satisfies Rule 144's applicable

requirements is deemed not to be an "underwriter" in determining whether the Section 4(a)(1)

exemption for the sale otherwise applies.  Rule 144 contains different rules for affiliates and non-

affiliates of the issuer.

> (a)     If a person is an affiliate of the issuer or was an affiliate of the issuer
>
> within the previous 90 days, then the person must not sell securities of the
>
> issuer, whether or not those securities are restricted, if the issuer (1) has
>
> been subject to periodic reporting requirements under Section 13 or 15(d)
>
> of the Exchange Act [*15 U.S.C. §§ 78m, 78o(d)*] for at least 90 days
>
> immediately before the sale; and (2) is non-compliant with those
>
> requirements at the time of sale.  Moreover, if the issuer has <u>not</u> been
>
> subject to periodic reporting requirements for at least 90 days before the
>
> sale, then the person must not sell securities of the issuer, whether or not
>
> they are restricted, unless there is certain public information available
>
> about the issuer, including, but not limited to, the issuer's most recent
>
> balance sheet, profit and loss, and retained earnings statements and similar
>
> information for the prior two fiscal years of the issuer's existence.
>
> (b)     If a person is <u>not</u> an affiliate of the issuer, the issuer has been subject to
>
> periodic reporting requirements for at least 90 days before the sale, and the
>
> issuer is not compliant with those requirements, then the person must not
>
> sell restricted securities of an issuer unless at least one year has passed
>
> since the person acquired the securities from the issuer or an affiliate.  A
>
> one-year holding period also applies to restricted securities held by such

person if the issuer has not been subject to periodic reporting requirements for at least 90 days before the sale.

37.    SEC Regulation A is another exemption from Section 5 registration that applies to certain qualifying issuers.  On March 25, 2015, the Commission amended Regulation A pursuant to Section 401 of the Jumpstart Our Business Startups (JOBS) Act of 2012 [*15 U.S.C. § 77c(b)(2)-(5)*].  Section 401 directed the SEC to adopt rules expanding the previous Regulation A by, among other things, exempting public offerings of up to $50 million annually (Regulation A, as amended, is commonly known as "Regulation A+" or "Reg A+").

38.    Under Regulation A, issuers must comply with different regulatory requirements depending on whether the offering is a Tier 1 offering for up to $20 million in proceeds or a Tier 2 offering for up to $50 million.  In either case, no sale of a security may occur under Regulation A until (1) the issuer has filed an offering statement on Form 1-A with the Commission and (2) the Commission has issued a notice of qualification.  Assuming all requirements of Regulation A are satisfied, purchasers in the Reg A offering acquire unrestricted securities.

## STATEMENT OF FACTS

### *Meenavalli Incorporates Longfin and Seeks Reg A Qualification from the SEC*

39.    On February 1, 2017, Longfin was incorporated in the State of Delaware. Meenavalli, Meenavalli's wife, and another Longfin corporate officer were the initial members of the board of directors.  That day, the board of directors unanimously agreed to authorize a share exchange with Stampede and to pursue a Regulation A offering.

40.    Also on February 1, 2017, Longfin entered into an agreement with Altahawi's company, Adamson Brothers, to "assist the company for the sole purpose of filing Reg 'A' tier II qualification statement with the SEC."  The term of the Agreement was for 12 months.  Under

the agreement, Altahawi would arrange for a direct public offering ("DPO") of Longfin shares "for up to $50 million."  Altahawi's compensation consisted of the following: (*i*) a $25,000 cash deposit at the time the Agreement was signed; (*ii*) $25,000 cash within 60 days of signing the Agreement; (*iii*) $15,000 cash to be paid after qualification by the SEC; and (*iv*) an award of stock equal to 3 percent of Longfin's outstanding pre-offering shares.

41.     On March 13, 2017, Longfin filed its first offering statement on Form 1-A with the Commission.  The Form 1-A disclosed that Longfin had entered into an agreement with Altahawi for a Regulation A Tier 2 offering and that Altahawi would charge as a fee 3% of issued shares, as determined after the share swap with Stampede and "after the successful completion of fund raising."  Longfin stated that Altahawi was not affiliated with the company or its officers or directors.  Longfin repeated these disclosures about Altahawi in amended Forms 1-A filed on April 18, May 12, and May 24, 2017.

42.     In its March 13, 2017 Form 1-A, Longfin disclosed its intent to offer up to 20 million shares of its common stock on a "best efforts" basis beginning two days after its offering statement was qualified by the SEC.  Longfin further disclosed that it had entered into an agreement to acquire a Singaporean company, Stampede Tradex—a company that purportedly operated an electronic platform for trading commodities and securities—through a "share swap."  Longfin described Stampede Tradex as a "global trade finance technology solution provider" that had been operating since 2014 and had experienced "significant" growth in its business.  Longfin's "core business plan" was to extend Stampede Tradex's business model from the Asia Pacific region to markets in the Americas, Europe, and Africa.  Stampede Tradex was 55% owned by Stampede Capital Limited and 45% owned by Meenavalli.  Longfin's financial statements for the period ending February 28, 2017, contained in the Form 1-A, reported (*i*) total

assets of $298,861 (consisting almost entirely of trade receivables); (*ii*) total liabilities of $293,827 (consisting almost entirely of trade payables); (*iii*) no fixed assets; and (*iv*) cash of $75.

43.     On May 24, 2017, Longfin filed a Form 1-A/A (amended Form 1-A) with the Commission.  Longfin stated that it would offer up to 10 million shares at $5 per share.

44.     While it was seeking a Regulation A qualification from the SEC, Longfin opened bank accounts and leased office space in New York City.  On May 15, 2017, the board of directors authorized the opening of bank accounts with Meenavalli and Altahawi's daughter as signatories.

45.     In June 2017, on behalf of Longfin, Altahawi's daughter arranged a lease of Office 16-017 at 85 Broad Street, New York, NY through WeWork, a provider of shared office spaces.

46.     Altahawi's daughter also established bank accounts for Longfin at TD Bank. According to the account opening forms, Longfin was in the business of leasing residential buildings, had been in business for more than two years, had annual sales of approximately $500,000 to $1 million, had four employees, and required banking services for domestic and international wires.  Meenavalli and Altahawi's daughter were designated as signatories on the accounts.

47.     On June 15, 2017, Altahawi, in his capacity as officer of Longfin and corporate Secretary, executed Longfin's Amended Bylaws and submitted board minutes authorizing the reclassification of Longfin's common stock into Class A, Class B, and Class C shares.

48.     On June 16, 2017, the SEC notified Longfin that it was qualified, under Regulation A, to issue up to 10 million shares of Class A common stock at a price of $5 per share in accordance with the May 24, 2017 Form 1-A/A.

49.     On June 19, 2017, Longfin completed its share swap with Stampede Tradex. After the acquisition, Longfin recorded an increase to its net assets of more than $16 million.

50.     In a July 6, 2017 Offering Circular, Longfin disclosed that "Mr. Altahawi became … affiliated with the company and he is being considered to be part of our management team."

51.     On or about August 7, 2017, Longfin issued a press release announcing its Regulation A offering "with the aim to raise $50 Million at $5.00 per share … by way of sale of 10 Million Class A shares of its common stock.  Longfin is expecting to list the shares on NASDAQ Main Board upon closing."

52.     On September 14, 2017, Altahawi, as corporate Secretary and "a member of Longfin's board of advisors," signed a Certificate of Corporate Resolution granting Longfin's Chief Financial Officer and Altahawi 3,375,000 and 2,025,000 shares of Longfin stock, respectively.  The resolution was also signed by Meenavalli and the Chief Financial Officer. Longfin's transfer agent issued those shares the following day.

53.     On October 11, 2017, based on a Form 1-A/A, Longfin received a second notice of qualification from the SEC, which again qualified Longfin to issue up to 10 million shares of Class A common stock at a price of $5 per share.  Longfin's Form 1-A/A stated that Longfin stock would not commence trading on NASDAQ until Longfin could meet listing requirements, including: (*i*) at least 1,000,000 publicly-held shares of common stock outstanding; (*ii*) held in the aggregate by at least 300 round lot holders; (*iii*) a market value of the publicly-held shares of at least $5 million; and (*iv*) stockholders' equity after the offering of at least $4 million.

54.     On November 22, 2017, following additional amendments to Longfin's Form 1-A offering statement, the SEC issued a third notice of qualification to Longfin to issue 10 million shares of Class A common stock at a price of $5 per share.  Also on November 22, 2017, as a

precondition to trading on NASDAQ, Longfin registered its shares with the SEC under Section 12(b) of the Exchange Act.  Longfin's Exchange Act registration was effective on November 24, 2017.

### *Longfin Issues Shares During the IPO and Pursues Listing on NASDAQ*

55.     On August 11, 2017, Longfin submitted an application to NASDAQ to list its stock on the exchange.  NASDAQ's initial listing requirements generally require approximately 300 individual shareholders and 1 million total publicly held shares (known as the "public float").  Shares owned by officers, directors, and shareholders holding more than 10% of total outstanding shares are excluded from the public float calculation.

56.     Previously, Longfin arranged with Altahawi to market its shares on www.ipoflow.com, a website owned by Adamson Brothers, for "no additional compensation."

57.     On September 1, 2017, Longfin began issuing shares, purportedly using its Regulation A exemption, to individual purchasers in small increments.  On that day, Longfin issued 31,775 shares to 36 individual purchasers.  Meenavalli informed Longfin's transfer agent that these individual purchasers were "all employees."

58.     Between October 16 and December 6, 2017, Longfin issued 35,950 additional shares to 225 additional individual purchasers.  Longfin issued these shares purportedly under the Regulation A exemption.

59.     On November 13, 2017, a NASDAQ representative sent an email to Altahawi, copying Meenavalli, asking whether Longfin expected to have 300 roundlot shareholders before listing and requesting a list of shareholders and their holdings as of the closing of the offering. Altahawi responded that Longfin was "expecting 300 roundlot shareholders before listing" and copied Meenavalli on his response.

60.     On November 15, 2017, NASDAQ approved Longfin's listing.  NASDAQ noted that its approval was based upon information provided by the company to NASDAQ and contained in its SEC filings.  NASDAQ informed Longfin of its obligation to provide updates for any material changes.

61.     On November 29, 2017, Altahawi informed NASDAQ by email, on which he copied Meenavalli and others, that Longfin intended to close its offering on December 6, 2017 and to list its stock on December 11, 2017.

62.     Between 3:19 p.m. and 7:07 p.m. on December 6, 2017, Altahawi and Meenavalli arranged and oversaw the issuance of 409,360 new shares (the "December 6 Shares") to 24 individuals (the "December 6 Shareholders"), to meet NASDAQ's listing requirement of 1 million shares:

    (a)    At 3:19 p.m., Altahawi emailed a representative of Longfin's transfer agent, copying Meenavalli, asking for a telephone call because Altahawi needed to submit 24 subscriptions as of that day.

    (b)    At 3:33 p.m., Altahawi sent the transfer agent subscription agreements for eleven individuals.

    (c)    At 4:09 p.m., Altahawi sent the transfer agent subscription agreements for an additional thirteen individuals.

    (d)    At 4:30 p.m., Altahawi sent the transfer agent a spreadsheet listing the 24 individuals and the shares to be issued to each of them.

    (e)    At 6:30 p.m., a representative of the transfer agent stated in an email to Altahawi, "I have completed the issuance request for you and the statements are attached.  Can you please review and advise if we are

approved to send statements to the shareholders." The representative attached account statements for the 24 individuals showing the Longfin restricted share issuances.

(f)     At 7:40 p.m., Altahawi informed NASDAQ that Longfin would close on the offering the next day and asked to schedule a bell-ringing ceremony for December 13.

(g)     The following day, December 7, 2017 at 9:15 a.m., Longfin's underwriter asked Altahawi to confirm "the list of people that invested in the raise before our deal and proof of Funds received." Altahawi, on behalf of Longfin, forwarded the underwriter a shareholder list that included the 24 individuals who received the December 6 Shares, including Tammineedi and Penumarthi, and provided the underwriter with bank statements for June through September 2017 purporting to contain payment information.

63.     On December 11, 2017, Altahawi represented the following to NASDAQ: (*i*) Longfin had sold 1,140,989 shares in the Regulation A offering at $5 per share; (*ii*) the total number of shares outstanding after closing was 44,040,898; and (*iii*) there were 364 shareholders in total, each holding at least 100 shares. Altahawi also sent NASDAQ a final list of shareholders, their addresses, and the quantity of shares each held in book entry.

64.     On December 11, 2017, after reviewing Longfin's documentation, NASDAQ sent Altahawi an email, copying Meenavalli, asking several follow up questions about the offering, including requesting additional information about the over 200 shareholders who received exactly 100 shares.

65.     In Altahawi's response to NASDAQ, on which he copied Meenavalli, Altahawi stated that Longfin's direct public offering had been promoted heavily in India on "IPOFLOW," which has a minimum participation requirement of 100 shares at $5 per share, that the shares were sold and issued as part of Longfin's best efforts offering, and that the shareholders in question did not have relationships with Longfin prior to purchase.

### Longfin Starts Trading, Its CFO and COO Resign, and Longfin Announces the Ziddu.com Acquisition

66.     Sometime in November 2017, Longfin's then-Chief Financial Officer stopped performing services for Longfin, and informed Longfin's transfer agent that it should no longer communicate with him via his company email.  On December 4, 2017, a NASDAQ representative emailed Altahawi, asking him to confirm, on behalf of Longfin, that Longfin's board membership had not changed.  Altahawi responded that there had been no change in Longfin's board, but did not inform NASDAQ that Longfin's CFO had stopped working for the company.

67.     Longfin's board of directors voted to accept the resignations of the CFO and Longfin's Chief Operating Officer on December 11, 2017.  Despite frequent communications with NASDAQ during this time, its duty to inform NASDAQ of material changes, and the imminence of Longfin's public listing, the Longfin Defendants did not disclose the board's vote to NASDAQ or the public at any time before December 15.

68.     On December 13, 2017, Longfin Class A common stock started trading on NASDAQ under the stock symbol "LFIN."  The shares opened at $6.94 per share and closed at $5.17 per share, on a trading volume of 297,400 shares.

69.     On December 14, 2017, Longfin's shares closed at a price of $5.39 per share, on a trading volume of 185,386 shares.

70.     On or about December 14, 2017, Longfin issued a press release announcing that, on December 11, 2017, it had acquired Ziddu.com.  According to Longfin, Ziddu was a "blockchain-empowered solutions provider," which "offers a variety of sources, including microfinance lending against collateralized warehouse receipts in the shape of Ziddu coins." Longfin publicly represented that Ziddu had expertise in blockchain and cryptocurrency technology.  It stated that Ziddu was "a Blockchain technology empowered solutions provider that offers Microfinance Lending against Collateralized Warehouse Receipts in the form of Warehouse Coins to small and medium enterprises (SMEs), processors, manufacturers, importers and exporters using crypto currencies across continents."

71.     On December 15, 2017, Longfin filed a current report with the Commission on Form 8-K, the form used to report significant corporate events.  The Form 8-K attached a press release, dated December 14, 2017, announcing the Ziddu.com acquisition.  Separately, Longfin filed a Form 8-K in which it disclosed that its Chief Financial Officer and Chief Operating Officer had resigned on December 11, 2017.

72.     Before Longfin's acquisition, the Ziddu.com website had no ascertainable value. The website produced no revenue.  Longfin did not acquire any physical facilities, employees, market distribution systems, or production techniques through the acquisition.

73.     Rather, through the acquisition, Longfin acquired only the rights to use the Ziddu.com website and trade name.  As of the date of acquisition, Longfin assigned a value of zero to Ziddu.

74.     During Longfin's Regulation A qualification process with the Commission, the company did not disclose any intent to acquire Ziddu.com, nor did it reveal any plans to enter the cryptocurrency business.  Longfin did not disclose to NASDAQ, at any time before its

20

December 15 Form 8-K, its intent to acquire Ziddu.com, despite the fact that the acquisition was approved by Longfin's board of directors on December 10 and closed on December 11.

75.     After the filing of Longfin's Form 8-K on December 15, 2017, Longfin's share price and trading volume rose significantly.  Longfin's stock price opened at $9.76 per share and closed at $22.01 per share, up four-fold from the previous day's closing price of $5.39.  On December 18, 2017, the next trading day, Longfin's stock price rose during trading to a high of $142.82 per share, which was an increase of more than 548% from the prior day's closing price and approximately 2,662% above Longfin's closing price on its first day of trading just three days earlier.

### The Longfin Defendants' and Altahawi's Statements to Longfin's Transfer Agent and Underwriter, NASDAQ, and the Public

76.     Longfin did not receive payment of $5 per share from the December 6 Shareholders for the December 6 Shares.  Longfin instead issued these shares outside of the Regulation A offering qualified by the SEC.  Therefore, the December 6 Shares were restricted securities that could not be sold to the public absent registration or an applicable exemption.

77.     In December 2017, Altahawi represented to NASDAQ that Longfin had sold 1,014,989 shares in its Regulation A offering.  This number includes the December 6 Shares, which were received outside Longfin's Regulation A offering, and for which payment was not made to Longfin's escrow agent.

78.     Longfin's Form 10-K filed with the SEC on April 2, 2018 and signed by Meenavalli repeated the statement that Longfin had sold 1.14 million shares in its Regulation A offering:

> In December 2017, the Company completed the initial public offering of its Class A Common Stock, par value $0.00001 per share to investors at a public offering price of $5.00 per share pursuant to the exemption afforded under Regulation A

promulgated under the Securities Act.  A total of 1,140,989 shares
of Class A Common Stock were issued in the offering.

## THE LONGFIN DEFENDANTS' AND THE INDIVIDUAL DEFENDANTS' VIOLATIONS OF SECTION 5

### *Altahawi Unlawfully Sells Longfin Shares for Profits Exceeding $29 Million with the Facilitation and Participation of the Longfin Defendants*

79.     At all relevant times through at least March 2018, Altahawi was an affiliate of

Longfin:

(a)     Altahawi designed and managed the DPO (direct public offering) for

Longfin, creating a public market for Longfin's shares that had not

previously existed.  Altahawi later dominated that market.  In March 2018,

Altahawi controlled approximately 60% of the public float of Longfin.

(b)     Altahawi was Longfin's corporate Secretary until at least September 2017.

As Secretary, Altahawi signed the resolutions, approved by Meenavalli,

adopting Longfin's corporate bylaws and transferring 3% of Longfin's

shares to himself.

(c)     Altahawi used the email address andy@longfin.com to conduct business

on behalf of the company and was listed as a director of Longfin in an

August 2017 roadshow presentation.

(d)     Altahawi marketed the DPO on his website, ipoflow.com, and represented

Longfin in December 2017 before NASDAQ to get Longfin registered on

the exchange.  Altahawi managed the issuance of the December 6 Shares

and then agreed to acquire a substantial portion of those shares for himself

less than a month later at a discount.

      (e)     Altahawi communicated with the SEC staff from late December 2017

through early February 2018 on behalf of Longfin, seeking guidance on

matters such as increasing the size of Longfin's offering and Longfin's

Exchange Act registration statement.

      (f)     Finally, Altahawi gave share issuance instructions to the transfer agent on

behalf of Longfin in late December 2017 in connection with the

Ziddu.com transaction.

80.     On September 15, 2017, the Longfin Defendants issued to Altahawi 2,025,000 of the company's Class A shares in accordance with the February 1, 2017 consulting agreement (the "Consulting Shares").

81.     Because Altahawi received the Consulting Shares directly from Longfin in an unregistered transaction, they were restricted securities that Altahawi could not sell into the market unless registered or pursuant to an exemption from registration under the Securities Act.

82.     After Longfin registered its common stock under Section 12(b) of the Exchange Act, it voluntarily assumed the obligation to submit periodic reports under the Exchange Act. Pursuant to Rule 13a-13 [*17 C.F.R. § 240.13a-13*], and on or before January 8, 2017, Longfin was required to file a quarterly report on Form 10-Q for the quarter ended September 30, 2017. The Longfin Defendants failed to ensure that the company did so.  Longfin was thus out of compliance with its Exchange Act periodic reporting obligations beginning on January 9, 2018 and continuing throughout the time period of the sales at issue in this Complaint, all of which occurred before March 31, 2018.

83.     Between January 31, 2018 and March 6, 2018, pursuant to a January 12, 2018 stock purchase agreement, Altahawi purported to acquire in private transactions a total of

121,000 Longfin shares from ten individuals, each of whom was a December 6 Shareholder (the "Private Transaction Shares"). The individuals from whom Altahawi purchased included Longfin's Chief Investment Officer, two members of the CFO's household, and two directors of Stampede Capital, which owns over 27% of Longfin's common stock.

84.     Altahawi agreed to pay $30 per share under the terms of the stock purchase agreement. On January 12, 2018, when the stock purchase agreement was executed, Longfin closed at a price of $42.65/share, substantially above the $30 stated contract price between Altahawi and the ten individuals.

85.      Because the December 6 Shareholders acquired their securities from Longfin outside of the Regulation A offering, Altahawi acquired restricted shares that he could not resell into the public market without an exemption from registration. No exemption applied.

86.     On January 30, 2018, representative of the transfer agent emailed Meenavalli and stated, "Andy [Altahawi] is transferring some shares to his name from a few people in India that he has an agreement with. Ordinarily Colonial [the transfer agent] requires either originally signed documents or a Medallion Signature Guarantee."

87.     A Medallion signature guarantee is one in which a financial institution accepts the genuineness of a signature and any liability for forgery. The transfer agent asked Meenavalli and Longfin for authorization to forego the requirement of a Medallion signature guarantee so that Altahawi could obtain the Private Transaction Shares. The Longfin Defendants, through Meenavalli, authorized waiver of the guarantee on behalf of Longfin.

88.     Longfin's waiver of the Medallion signature guarantee, with Meenavalli's authorization, was a necessary step before Altahawi could engage in his unlawful distributions of the Private Transaction Shares.

89.     Between February 7, 2018 and March 9, 2018, Altahawi deposited 111,000 of Private Transaction Shares into his Merrill Lynch account.

90.     Because Altahawi's Consulting Shares were restricted, he needed the transfer agent to remove the restrictive legends before a broker would accept the shares for deposit and then sell them on his behalf to public investors.

91.     Altahawi represented to Merrill Lynch that his Consulting Shares were fully earned as of February 1, 2017, the day of the consulting agreement with Longfin and before Altahawi had provided any services under that agreement.  Moreover, Altahawi stated that he was not an affiliate of Longfin nor had he been an affiliate within the last 90 days.

92.     On March 6, 2018, Meenavalli represented to a representative of the transfer agent that Altahawi had fully earned the Consulting Shares on February 1, 2017.  In response to a question from the representative, Meenavalli stated, "Please kindly remove the restricted legend on Certificate 900037*2025000 n/o Andy Altahawi.  The shares are fully earned and authorize you to remove the legend."

93.     In fact, Altahawi had not fully earned his shares as of February 1, 2017 because he had not yet performed the obligated services under the consulting agreement.

94.     Meenavalli's direction to the transfer agent to remove the restrictive legend from Altahawi's Consulting Shares was a necessary step before Altahawi could publicly sell his shares.  By this act, Meenavalli placed over 60% of the public float for Longfin's Class A common stock under Altahawi's control.

95.     On March 14, 2018, Altahawi transferred the majority of the Consulting Shares into his Merrill Lynch account.  He transferred the remaining 10,000 Private Transaction Shares into two of his brokerage accounts.

96.     Between February 8, 2018 and March 23, 2018, Altahawi sold 475,751 shares of Longfin in the public market for a profit of approximately $25,591,127.10.  These funds were deposited into Altahawi's account at Merrill Lynch.

97.     Between March 21, 2018 and March 29, 2018 Altahawi sold 60,352 additional shares of Longfin for a profit of approximately $3,425,029.24.  These funds were deposited into Altahawi's account at Interactive Brokers.

98.     Altahawi's sales of Longfin stock were not exempt from registration, nor were they made pursuant to an effective registration statement.  Altahawi's sales violated Section 5 of the Securities Act.  Purchasers of those shares did not have the benefit of the company's current information as required by the reporting requirements of the Exchange Act, nor did they have the information that would have been provided in a registration statement.

99.     As described above, the Longfin Defendants were necessary participants in Altahawi's unlawful distributions in violation of Section 5.

### *Tammineedi Unlawfully Sells Longfin Shares for Profits Exceeding $2.8 Million with the Facilitation and Participation of the Longfin Defendants*

100.    At all relevant times, Tammineedi was an affiliate of Longfin:

(a)     Until February 2018, Tammineedi served as a director of Stampede, a company founded by Meenavalli and a 27.6% shareholder of Longfin.

(b)     Until February 2018, Tammineedi was a director of Longhash Commodity Trading Pte. Ltd. ("Longhash") and had been a founding subscriber, alongside Longfin, when Longhash's Articles of Association were signed on January 4, 2018.  Longhash, which changed its name to Longcom India Pte. Ltd., is a 100% subsidiary of Longfin.

(c)     In addition, Tammineedi and Meenavalli had been involved as directors of several related entities, including Kling Enterprises India Ltd. and SpaceNet Enterprises India Ltd.

(d)     Tammineedi copied Longfin on confidential Source Media brokerage account opening statements in December 2017.

(e)     Tammineedi and Meenavalli are frequent business colleagues and close associates.

101.    Longfin issued Tammineedi 30,000 Longfin shares on December 6, 2017, but Tammineedi did not transfer funds to Longfin's escrow agent in accordance with his subscription agreement.  Tammineedi did not otherwise pay $5 per share for the 30,000 shares and thus acquired them outside of Longfin's Regulation A offering.  The 30,000 shares were thus restricted securities that Tammineedi could not resell to the public absent registration or an applicable exemption.

102.    On December 21, 2017, in connection with requests by Tammineedi, Penumarthi, and five other December 6 Shareholders to open brokerage accounts, Longfin's underwriter sent an email to Longfin asking for confirmation that these individuals had paid for their shares.  In response, Longfin provided the underwriter with Longfin bank statements, purporting to show "amounts received by the company directly," and asked whether it would be helpful for the company to send a letter directly indicating funds were received.

103.    On January 2, 2018, Longfin provided a letter, signed by Meenavalli and copying Adamson Brothers, confirming "receipt of those funds to [Longfin's] corporate account." Despite the Longfin Defendants' express representation to its underwriter that these individuals had paid for their shares, they in fact had not done so.

104.    By, among other misconduct, incorrectly informing Longfin's transfer agent that Tammineedi purchased 30,000 shares of Longfin in its Regulation A offering, the Longfin Defendants caused Longfin's transfer agent to issue the shares to Tammineedi on an unrestricted basis.  The Longfin Defendants also incorrectly told Longfin's underwriter that Tammineedi had paid for these shares.

105.    Tammineedi tried to deposit the 30,000 shares acquired on December 6, 2017 into a Source Media brokerage account, but the brokerage firm refused to accept the shares.

106.    On December 13 and 14, 2017, the first two days that Longfin's shares traded on NASDAQ, Source Media bought 67,000 shares of Longfin at an average price of $5.48 per share.  Between December 15, 2017 and February 6, 2018, these shares were sold for approximately $2.7 million in profits, with a majority of the sales occurring in the days immediately following Longfin's December 14 announcement that it had acquired Ziddu.com. Tammineedi caused most of the sales proceeds to be wired to a bank account in Singapore.

107.    In February and March 2018, Tammineedi sold 2,200 of the 30,000 shares received from Longfin in the December 6 issuance into the public market, making a profit of $127,335.

108.    Tammineedi, both in his personal capacity and through Source Media, realized unlawful profits totaling over $2.8 million from unlawful sales of Longfin stock between December 2017 and March 2018.  No exemption from registration applied to Tammineedi's sales, which were in violation of Section 5 of the Securities Act.

109.    As described above, the Longfin Defendants were necessary participants in Tammineedi's unlawful distributions in violation of Section 5.

***Penumarthi Unlawfully Sells Longfin Shares for Profits Exceeding $1.5
Million with the Facilitation and Participation of the Longfin Defendants***

110.    At all relevant times, Penumarthi was an affiliate of Longfin:

(a)    Penumarthi represented on his Facebook page that he was the head of
Longfin's United Kingdom operations.

(b)    Penumarthi and Meenavalli were both directors of Smartahead.

(c)    Penumarthi copied Meenavalli on confidential personal and Smartahead
brokerage account opening statements in December 2017.

(d)    Penumarthi has known Meenavalli since childhood, having grown up with
him in India.

111.    Longfin issued Penumarthi 40,000 Longfin shares on December 6, 2017, but
Penumarthi did not transfer funds to Longfin's escrow agent in accordance with his subscription
agreement.  Penumarthi did not otherwise pay $5 per share for the 40,000 shares and thus
acquired them outside of the Regulation A offering.  The 40,000 shares were thus restricted
securities that Penumarthi could not resell to the public absent registration or an applicable
exemption.

112.    By, among other misconduct, incorrectly informing Longfin's transfer agent that
Penumarthi purchased 40,000 shares of Longfin in its Regulation A offering, the Longfin
Defendants caused Longfin's transfer agent to issue the shares to Penumarthi on an unrestricted
basis.  The Longfin Defendants also incorrectly told Longfin's underwriter that Penumarthi had
paid for these shares.

113.    Approximately one month after the Ziddu.com announcement, on January 23,
2018, Penumarthi sold 4,000 Longfin shares for a profit of approximately $169,495.  Penumarthi

sold an additional 35,800 shares for approximately $1,361,692.39. No exemption applied to these unregistered sales by Penumarthi, which violated Section 5 of the Securities Act.

114.    As described above, the Longfin Defendants were necessary participants in Tammineedi's unlawful distributions in violation of Section 5.

## CLAIM FOR RELIEF

### Violations of Securities Act Section 5

115.    As to the Longfin Defendants, the Commission realleges and reincorporates paragraphs 1 through 114 as if fully set forth herein.

116.    As to Altahawi, the Commission realleges and incorporates paragraphs 1 through 6, 9 through 12, 15 through 23, and 26 through 28, and 32 through 99 as if fully set forth herein.

117.    As to Tammineedi, the Commission realleges and reincorporates paragraphs 1 through 3, 5 through 8, 10, 13, 15 through 22, 24, 26 through 30, 33 through 38, 61 through 62, 76 through 77, and 100 through 109 as if fully set forth herein.

118.    As to Penumarthi, the Commission realleges and reincorporates paragraphs 1 through 3, 5, 7, 10, 14 through 22, 25 through 28, 31, 33 through 38, 61 through 62, 76 through 77, and 110 through 114 as if fully set forth herein.

119.    Between approximately December 2017 through approximately March 2018, Defendants, directly or indirectly, and without an applicable exemption: (a) made use of the means and instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (b) for the purpose of delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means and instruments of transportation, securities as to which no registration statement was in effect; and (c) made use of

30

means and instruments of transportation or communication in interstate commerce or of the

mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to

which no registration statement had been filed.

120.    By reason of the actions alleged herein, Defendants violated Section 5 of the

Securities Act [15 U.S.C. § 77e] and, unless restrained and enjoined, will continue to do so.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectively requests that the Court enter:

(i)    An order finding that the Defendants violated Section 5 of the Securities

Act [*15 U.S.C. § 77e*];

(ii)    An order permanently enjoining Defendants from future violations of

Section 5 of the Securities Act [*15 U.S.C. § 77e*];

(iii)    An order for the Defendants to disgorge, with prejudgment interest, all of

the ill-gotten gains derived from the unlawful stock transactions described in this Complaint;

(iv)    An order for the Defendants to pay civil penalties pursuant to

Section 20(d) of the Securities Act [*15 U.S.C. § 77t(d)*]; and

(v)    An order granting such other relief as this Court may deem just and

proper.

Dated:  May 25, 2018                    Respectfully submitted,


                                        By:    _____
                                                Sarah Heaton Concannon
                                                Kevin C. Lombardi
                                                Securities and Exchange Commission
                                                100 F Street, N.E.

Washington, D.C. 20549
Telephone:  (202) 551-5361 (Concannon)
ConcannonS@sec.gov (Concannon)

*Attorneys for Plaintiff Securities and Exchange
Commission*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S AMENDED COMPLAINT filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.