Kevin C. Lombardi
Stephan S. Schlegelmilch
**SECURITIES AND EXCHANGE COMMISSION**
**100 F Street, NE**
**Washington, DC  20549**
Telephone:  (202) 551-8753 (Lombardi)

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x
             :

**SECURITIES AND EXCHANGE COMMISSION,**   :
             :    **SECOND AMENDED**
          **Plaintiff,**    :    **COMPLAINT**
             :
       – against –       :
             :    **No. 1:18-cv-02977 (DLC)**
**ANDY ALTAHAWI,**           :
             :
         **Defendant.**    :
             :
-----------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission (the "SEC" or the "Commission"), for its Complaint against Defendant Andy Altahawi ("Altahawi"), alleges as follows:

## SUMMARY

1.     Defendant Altahawi ("Altahawi") participated in a scheme though which Longfin obtained a fraudulent listing on the Nasdaq Stock Market, LLC (the "NASDAQ") after a public offering.  By the scheme, Longfin Corp. ("Longfin"), and Venkata S. Meenavalli ("Meenavalli") distributed over 400,000 shares—over one-third of the total shares reportedly sold by Longfin in the offering—to insiders and affiliates to make it appear that Longfin's public float satisfied NASDAQ listing requirements, when in fact it did not.  Moreover, none of the individuals paid for their shares. Altahawi knew or recklessly disregarded that the shareholders who received over 400,000 shares were company insiders or Meenavalli affiliates who were provided shares in order for Longfin to improperly meet NASDAQ listing requirements.  As a result, Altahawi, acting on behalf of Longfin

and Meenavalli, fraudulently misrepresented to NASDAQ the numbers of qualifying shareholders and shares sold in the offering.   In addition, Altahawi illegally distributed over $29 million in unregistered Longfin securities in violation of Section 5 of the Securities Act of 1933 ("Securities Act") [*15 U.S.C. § 77e*].

2.      Before the NASDAQ listing scheme, Longfin, Meenavalli, and Altahawi obtained a qualification to conduct an offering under SEC Regulation A [*Regulation A —Conditional Small Issues Exemption, 17 C.F.R. §§ 230.251 – 263*], a set of rules that allow issuers to publicly sell securities under procedures that are less burdensome than those that apply where the sales are registered under Section 5.  On June 16, 2017, Longfin received a qualification from the SEC for its Regulation A offering.  The SEC's qualification was limited to sales of Longfin securities at a price of $5 per share.

3.      On September 15, 2017, Longfin issued 2,025,000 Class A common shares to Altahawi in consideration of legal and business consulting services he had performed for the company (the "Consulting Shares").  The Consulting Shares were restricted securities that could not be resold, except under limited circumstances.

4.      By early December 2017, Longfin had not sold enough shares to meet NASDAQ listing criteria.  Longfin and Meenavalli thereafter distributed shares to insiders and affiliates to to proceed with a listing under false pretenses.  Altahawi knew or recklessly disregarded that the shares distributed to insiders and affiliates were provided those shares in order for Longfin to improperly meet NASDAQ listing requirements.  As a result, on December 13, 2017, Longfin's Class A shares began publicly trading on the NASDAQ by false pretenses.

5.      In connection with its Longfin's voluntary NASDAQ listing, the company was required to register its shares pursuant to Section 12(b) of the Securities Exchange Act of 1934 ("Exchange Act") [*15 U.S.C. § 78l(b)*].  Longfin's Section 12(b) registration required the company to

comply with the periodic reporting requirements of the Exchange Act, including the requirement to file quarterly reports on Form 10-Q under Exchange Act Rule 13a-13 [*17 C.F.R. § 240.13a-13*]. Having registered its securities under Section 12(b) of the Exchange Act, Longfin was required, on or before January 8, 2018, to file a quarterly report with the Commission for the quarter ended September 30, 2017.  The Form 10-Q for September 30, 2017 remained delinquent from January 9, 2018 until May 4, 2018, when Longfin filed it with the Commission.

6.        Between January 31, 2018 and March 6, 2018, Altahawi acquired 121,000 additional restricted shares of Longfin from ten of the December 6 Shareholders (the "Private Transaction Shares").  Altahawi's agreements with the ten shareholders were memorialized in a single stock purchase agreement, dated January 12, 2018, even though the ten individuals from whom Altahawi purchased were located in multiple locations.  Altahawi agreed to purchase the 121,000 shares at a price of $30 per share, well below the market price for Longfin shares on January 12.

7.        Between February 8, 2018 and March 23, 2018, Altahawi sold 475,751 shares of Longfin in the public market, comprised of portions of the Consulting Shares and the 121,000 additional shares he acquired from the December 6 Shareholders.  No registration statement was filed or in effect for these sales, and no Securities Act exemption applied to them. Altahawi reaped profits of almost $25.6 million from these sales.

8.        Between March 21, 2018 and March 29, 2018, Altahawi sold an additional 60,352 shares of Longfin in the public market in unregistered transactions, profiting by over $3.4 million. No registration statement was filed or in effect for these sales, and no exemption from registration applied to Altahawi's transactions.

9.        By engaging in the illegal conduct described in this Complaint, Altahawi violated and, unless restrained and enjoined, will continue to violate the antifraud provisions of Sections 5 and 17(a) of the Securities Act [15 U.S.C. § 77e, 77q(a)] and Section 10(b) and Rule 10b-5 thereunder

of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b); 17 C.F.R.

§ 240.10b-5].

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of

the Securities Act [*15 U.S.C. §§ 77t(b), 77v(a)*] and Sections 21(d)-(e) and 27 of the Exchange Act [*15

U.S.C. §§ 78u(d)-(e), 78aa*].

11.     Venue in this district is proper under Section 22(a) of the Securities Act [*15 U.S.C. §

77v(a)*] and Section 27 of the Exchange Act [*15 U.S.C. § 78aa*] because certain of the transactions,

acts, practices, and courses of business constituting the violations alleged herein occurred within the

Southern District of New York.  During relevant times, Longfin purported to operate its principal

place of business in the City of New York, and its shares were traded on the NASDAQ, which is

located within this district.

12.     Altahawi made use of the means, instruments, or instrumentalities of transportation

or communication in interstate commerce, or of the mails, or the facilities of a national securities

exchange in connection with the transactions, acts, practices, and courses of business described in

this Complaint.

## DEFENDANT

13.     **Andy Altahawi** ("Altahawi"), age 54, is a resident of Sunny Isles Beach, Florida.  He

is the president of Adamson Brothers Corp., which operates ipoflow.com, a website purporting to

be "a leading equity Reg A+ offerings platform opening up the IPO access to everyone."  Altahawi

sought to register Adamson Brothers as a broker-dealer in early 2018 and later withdrew the

application.  Altahawi was previously associated with a number of broker-dealers registered with the

SEC, including during the period July 27, 2017 through December 1, 2017.

## OTHER RELEVANT ENTITIES AND INDIVIDUALS

14.     **Longfin Corp.** ("Longfin") is a Delaware corporation that, at relevant times, was headquartered in New York, New York and Lyndhurst, New Jersey.  Longfin's Class A common stock was previously registered with the Commission pursuant to Section 12(b) of Exchange Act. Between December 13, 2017 and its voluntary delisting from NASDAQ in May 2018, Longfin's Class A common stock traded on NASDAQ under the symbol "LFIN."  On May 24, 2018, Longfin's Class A common began trading over the counter.  On November 21 and November 27, 2018, Longfin filed Forms 8-K, signed by Meenavalli, announcing that the company had entered into an Assignment for the Benefit of Creditors on November 14, 2018 in New Jersey state court and, as a result, had terminated all of its employees and disbanded its Board of Directors.

15.     **Venkata S. Meenavalli** ("Meenavalli") founded Longfin and was its Chairman and Chief Executive Officer at all relevant times.  Meenavalli individually controls over 20% of Longfin's Class A shares and over 50% of Longfin's total voting equity.  Meenavalli and his wife own approximately 17% of the voting stock of Stampede Capital Limited, a publicly listed company in India that owns approximately 27.6% of the voting stock of Longfin.  Meenavalli is the Chairman and founder of Stampede Capital Limited.  Meenavalli currently resides in India.

16.     **Stampede Capital Limited** ("Stampede") is a publicly listed company in India whose voting stock is approximately 17%-owned by Meenavalli and his wife.  Stampede is one of the largest shareholders of Longfin with ownership of 27.5 million shares, representing approximately 27.6% of Longfin's total shares outstanding.

17.     **Stampede Tradex Pte. Ltd.** ("Stampede Tradex") was incorporated in the Republic of Singapore and became a subsidiary of Longfin on June 19, 2017 after an acquisition by Longfin. Stampede Tradex subsequently changed its name to Longfin Tradex Pte. Ltd.

18.     **Suresh Tammineedi** ("Tammineedi") is a citizen of India residing in Hyderabad, India.  Tammineedi is affiliated with Meenavalli through several entities, including as a director of Stampede Capital Limited, which owns approximately 27.6% of the outstanding shares of Longfin. Tammineedi and Meenavalli have been involved as directors of several other entities, including Kling Enterprises India Ltd. and SpaceNet Enterprises India Ltd.

19.     **Dorababu Penumarthi** ("Penumarthi") is a citizen and resident of the United Kingdom.  Penumarthi is affiliated with Meenavalli through Smartahead Solutions Limited, a United Kingdom-based entity, for which Penumarthi and Meenavalli serve as directors.

## BACKGROUND

20.     Under Section 5 of the Securities Act, a company (an "issuer") or any other person selling stock may only do so if it (1) registers the transaction pursuant to a valid registration statement that applies to that specific offering of stock or (2) sells the stock in a transaction that is specifically exempt from the registration requirements of Section 5.  Section 5 applies to both the issuer and its "affiliates," which are generally persons that the issuer controls, that control the issuer, or that are under common control with the issuer.

21.     To prevent an issuer and its affiliates from circumventing the registration requirements, stock acquired directly from the issuer or indirectly through another affiliate is restricted and generally cannot be sold without registration.  To evidence this, the stock certificate usually carries a restrictive legend that prohibits the stock from being further sold to the public unless and until the registration requirements of Section 5 are met or the sale is otherwise exempt. A "transfer agent," a person with specific responsibilities under the Exchange Act, which include issuing securities to bona fide shareholders at the direction of the issuer, may remove the restrictive legend when presented with evidence that the stock is no longer restricted.  Once the stock is no longer restricted, it may be sold to the public without further registration.

22.     Section 4(a)(1) of the Securities Act [*15 U.S.C. § 77d(a)(1)*] provides an exemption from registration for transactions "by any person other than an issuer, underwriter, or dealer." An "underwriter," as defined in Section 2(a)(11) of the Securities Act [*15 U.S.C. § 77b(a)(11)*], includes any person who (1) purchases a security from an issuer with a view to distribution of the security or (2) who directly or indirectly participates in that distribution.

23.     SEC Rule 144 [*17 C.F.R. § 230.144*] provides a safe harbor for the sale of securities under the Section 4(a)(1) exemption. A person who satisfies Rule 144's applicable requirements is deemed not to be an "underwriter" in determining whether the Section 4(a)(1) exemption for the sale otherwise applies. Rule 144 contains different rules for affiliates and non-affiliates of the issuer.

(a)     If a person is an affiliate of the issuer or was an affiliate of the issuer within the previous 90 days, then the person must not sell securities of the issuer, whether or not those securities are restricted, if the issuer (1) has been subject to periodic reporting requirements under Section 13 or 15(d) of the Exchange Act [*15 U.S.C. §§ 78m, 78o(d)*] for at least 90 days immediately before the sale; and (2) is non-compliant with those requirements at the time of sale. Moreover, if the issuer has <u>not</u> been subject to periodic reporting requirements for at least 90 days before the sale, then the person must not sell securities of the issuer, whether or not they are restricted, unless there is certain public information available about the issuer, including, but not limited to, the issuer's most recent balance sheet, profit and loss, and retained earnings statements and similar information for the prior two fiscal years of the issuer's existence.

(b)     If a person is not an affiliate of the issuer, the issuer has been subject to periodic reporting requirements for at least 90 days before the sale, and the

issuer is not compliant with those requirements, then the person must not

sell restricted securities of an issuer unless at least one year has passed since

the person acquired the securities from the issuer or an affiliate.  A one-year

holding period also applies to restricted securities held by such person if the

issuer has not been subject to periodic reporting requirements for at least

90 days before the sale.

24.     An offering by a qualifying issuer pursuant to SEC Regulation A is exempt from

Section 5 registration.  On March 25, 2015, the Commission amended Regulation A pursuant to

Section 401 of the Jumpstart Our Business Startups (JOBS) Act of 2012 [*15 U.S.C. § 77c(b)(2)-(5)*].

Section 401 directed the SEC to adopt rules expanding the previous Regulation A by, among other

things, exempting public offerings of up to $50 million annually (Regulation A, as amended, is

commonly known as "Regulation A+" or "Reg A+").

25.     Under Regulation A, issuers must comply with different regulatory requirements

depending on whether the offering is a Tier 1 offering for up to $20 million in proceeds or a Tier 2

offering for up to $50 million.  In either case, no sale of a security may occur under Regulation A

until (1) the issuer has filed an offering statement on Form 1-A with the Commission and (2) the

Commission has issued a notice of qualification.  Assuming all requirements of Regulation A are

satisfied, purchasers in the Regulation A offering acquire unrestricted securities that may be resold

without further registration.

26.     In December 2017, Longfin completed a Tier 2 offering under Regulation A for up to

10,000,000 of Longfin's Class A shares at a price of $5 per share.  Over the course of the offering,

which was first qualified in June 2017, Longfin issued a total of 1,140,989 shares purportedly sold

pursuant to the Regulation A exemption.  Longfin has never registered the offer or sale of any

security to the public under the Securities Act.

27.     The Regulation A exemption for Longfin qualified by the SEC only allowed *sales* of Longfin shares at $5 per share.  In other words, if, for example, Longfin as transferor issued shares to a transferee-shareholder for no value, that transferee, unless another exemption from registration applied, would hold restricted shares.  Regulation A does not extend to transfers of securities outside the scope of the qualification granted by the SEC.

28.     NASDAQ Capital Market listing standards required, among other things, that at least 1 million of Longfin's shares be held by unaffiliated, public shareholders with a market value of at least $5 million.  Therefore, for Longfin to obtain a NASDAQ listing, the company had to sell 1 million shares at the price of $5 per share pursuant to its Regulation A offering.

## STATEMENT OF FACTS

*Meenavalli Forms Longfin, and Longfin Obtains a Regulation A Qualification from the SEC*

29.     On February 1, 2017, Longfin was incorporated in the State of Delaware. Meenavalli, Meenavalli's wife, and another Longfin corporate officer were the initial members of the board of directors.  That day, the board of directors unanimously agreed to authorize a share exchange with Stampede and to pursue a Regulation A offering.

30.     Also on February 1, 2017, Longfin entered into an agreement with Altahawi's company, Adamson Brothers, to "assist the company for the sole purpose of filing Reg 'A' tier II qualification statement with the SEC."  The term of the Agreement was for 12 months.  Under the agreement, Altahawi would arrange for a direct public offering ("DPO") of Longfin shares "for up to $50 million."  Altahawi's compensation consisted of the following: (*i*) a $25,000 cash deposit at the time the Agreement was signed; (*ii*) $25,000 cash within 60 days of signing the Agreement; (*iii*) $15,000 cash to be paid after qualification by the SEC; and (*iv*) an award of stock equal to 3 percent of Longfin's outstanding pre-offering shares.

31.     On March 13, 2017, Longfin filed its first offering statement on Form 1-A with the Commission.  The Form 1-A disclosed that Longfin had entered into an agreement with Altahawi for a Regulation A Tier 2 offering and that Altahawi would charge as a fee 3% of issued shares, as determined after the share swap with Stampede and "after the successful completion of fund raising."  Longfin stated that Altahawi was not affiliated with the company or its officers or directors.  Longfin repeated these disclosures about Altahawi in amended Forms 1-A filed on April 18, May 12, and May 24, 2017.

32.     In its March 13, 2017 Form 1-A, Longfin disclosed its intent to offer up to 20 million shares of its common stock on a "best efforts" basis beginning two days after its offering statement was qualified by the SEC.  Longfin further disclosed that it had entered into an agreement to acquire a Singaporean company, Stampede Tradex—a company that purportedly operated an electronic platform for trading commodities and securities—through a "share swap."  Longfin described Stampede Tradex as a "global trade finance technology solution provider" that had been operating since 2014 and had experienced "significant" growth in its business.  Longfin's "core business plan" was to extend Stampede Tradex's business model from the Asia Pacific region to markets in the Americas, Europe, and Africa.  Stampede Tradex was 55% owned by Stampede Capital Limited and 45% owned by Meenavalli.  Longfin's financial statements for the period ending February 28, 2017, contained in the Form 1-A, reported (*i*) total assets of $298,861 (consisting almost entirely of trade receivables); (*ii*) total liabilities of $293,827 (consisting almost entirely of trade payables); (*iii*) no fixed assets; and (*iv*) cash of $75.

33.     On May 24, 2017, Longfin filed a Form 1-A/A (amended Form 1-A) with the Commission.  Longfin stated that it would offer up to 10 million shares at $5 per share.

34.     On June 15, 2017, Altahawi, in his capacity as officer of Longfin and corporate Secretary, executed Longfin's Amended Bylaws and submitted board minutes authorizing the reclassification of Longfin's common stock into Class A, Class B, and Class C shares.

35.     On June 16, 2017, the SEC notified Longfin that it was qualified, under Regulation A, to issue up to 10 million shares of Class A common stock at a price of $5 per share in accordance with the May 24, 2017 Form 1-A/A.

36.     On June 19, 2017, Longfin completed its share swap with Stampede Tradex.  After the acquisition, Longfin recorded an increase to its net assets of more than $16 million.

37.     In a July 6, 2017 Offering Circular, Longfin disclosed that "Mr. Altahawi became … affiliated with the company and he is being considered to be part of our management team."

38.     On or about August 7, 2017, Longfin issued a press release announcing its Regulation A offering "with the aim to raise $50 Million at $5.00 per share … by way of sale of 10 Million Class A shares of its common stock.  Longfin is expecting to list the shares on NASDAQ Main Board upon closing."

39.     On September 14, 2017, Altahawi, as corporate Secretary and "a member of Longfin's board of advisors," signed a Certificate of Corporate Resolution granting Longfin's Chief Financial Officer and Altahawi 3,375,000 and 2,025,000 shares of Longfin stock, respectively.  The resolution was also signed by Meenavalli and the Chief Financial Officer.  Longfin's transfer agent issued those shares the following day.

40.     On September 15, 2017, the Longfin Defendants issued to Altahawi 2,025,000 of the company's Class A shares in accordance with the February 1, 2017 consulting agreement (the "Consulting Shares").  Because Altahawi received the Consulting Shares directly from Longfin in an unregistered transaction, they were restricted securities that Altahawi could not sell into the market unless registered or pursuant to an exemption from registration under the Securities Act.

*Longfin and Altahawi Pursue a Fraudulent NASDAQ Listing*

41.     On October 4, 2017, Longfin disclosed in a post-qualification offering circular filed with the SEC and signed by Meenavalli that the company had applied to list its common stock on the NASDAQ Capital Market under the symbol "LFIN."  As disclosed in the offering circular, Longfin needed to raise offering proceeds of $5 million (one million shares at a price of $5 per share) to meet NASDAQ listing criteria.

42.     On October 11, 2017, based on a Form 1-A/A, Longfin received a second notice of qualification from the SEC, which again qualified Longfin to issue up to 10 million shares of Class A common stock at a price of $5 per share.  Longfin's Form 1-A/A stated that Longfin stock would not commence trading on NASDAQ until Longfin could meet listing requirements, including: (*i*) at least 1,000,000 publicly-held shares of common stock outstanding; (*ii*) held in the aggregate by at least 300 round lot holders; (*iii*) a market value of the publicly-held shares of at least $5 million; and (*iv*) stockholders' equity after the offering of at least $4 million.

43.     On November 22, 2017, following additional amendments to Longfin's Form 1-A offering statement, the SEC issued a third notice of qualification to Longfin to issue 10 million shares of Class A common stock at a price of $5 per share.  Also on November 22, 2017, as a precondition to trading on NASDAQ, Longfin registered its shares with the SEC under Section 12(b) of the Exchange Act.  Longfin's Exchange Act registration was effective on November 24, 2017.

44.     By early December 2017, Longfin, Meenavalli and Altahawi knew that Longfin had not sold the one million shares at $5 per share required for a NASDAQ listing.  Longfin's underwriter (the "Underwriter") notified Meenavalli and Altahawi that Longfin had sold only 731,629 shares.  The Underwriter further requested confirmation that Longfin had "received 350k from these investors to count towards the 5mm offering."

45.      Beginning within two days after the Underwriter informed Longfin, Meenavalli, and Altahawi of the shortfall in the number of shares sold, they took a series of steps resulting in hundreds of thousands of shares distributed to 24 individuals on December 6.  Altahawi knew or recklessly disregarded that the shareholders who received the shares were company insiders or Meenavalli affiliates.

46.      On December 6, 2017, Altahawi directed, on behalf of Longfin and Meenavalli, that Longfin's transfer agent issue 409,360 shares (the "December 6 Shares") to 24 individuals (the "December 6 Shareholders").  The same day, in connection with these share issuances, the following communications took place:

> (a)      At 3:19 p.m., Altahawi emailed Longfin's transfer agent, copying Meenavalli, asking for a telephone call because Altahawi needed to submit 24 subscriptions that day.

> (b)      At 3:33 p.m., Altahawi sent the transfer agent subscription agreements for 11 individuals.

> (c)      At 4:09 p.m., Altahawi sent the transfer agent subscription agreements for an additional 13 individuals.

> (d)      At 4:30 p.m., Altahawi sent the transfer agent a spreadsheet listing the December 6 Shareholders and the shares to be issued to each, which shareholders included Longfin's Chief Financial Officer, K.S.; a director of Longfin; two affiliates of Longfin; Penumarthi and Tammineedi; and other directors or employees of parties associated with Longfin and Meenavalli, including Stampede Capital and Stampede Enterprises India.

> (e)      At 6:31 p.m., a representative of the transfer agent stated in an email to Altahawi, "I have completed the issuance request for you and the statements

are attached.  Can you please review and advise if we are approved to send statements to the shareholders."  The representative attached account statements for the December 6 Shareholders showing the Longfin restricted share issuances.

(f)    At 7:08 pm, at Altahawi's direction, the transfer agent sent out customer statements reflecting the share transfer, but with the shares no longer marked as restricted.

(g)    At 7:40 p.m., Altahawi sent an email to a NASDAQ representative, with a copy to Meenavalli, stating that Longfin would close the offering on the next day and requesting a bell-ringing ceremony for December 13, 2017.

47.    Altahawi knew or recklessly disregarded that the list of December 6 Shareholders provided to the transfer agent included insiders and affiliates associated with Longfin and Meenavalli and that such transfers could not be included in the minimum public float required to meet NASDAQ's listing criteria.

48.    On December 7, 2017 at 9:15 a.m., Underwriter asked Altahawi to confirm "the list of people that invested in the raise before our deal and proof of Funds received."  In furtherance of the scheme to deceive NASDAQ, while acting on behalf of Longfin and Meenavalli, Altahawi forwarded the underwriter a shareholder list that included the December 6 Shareholders, including Tammineedi and Penumarthi.  Altahawi knew or recklessly disregarded that the list of December 6 Shareholders included insiders and affiliates of Longfin and Meenavalli whose purported investments did not satisfy NASDAQ listing criteria.

49.    The December 6 Shares were restricted shares in the hands of the December 6 Shareholders.  In fact, these shareholders never paid for their shares.  As a result, the share transfers were unregistered distributions outside the Regulation A offering qualified by the SEC.  These

shares were not eligible to be included in the public float number and market value of publicly held shares for NASDAQ listing purposes.

50.     On December 8, 2017, Longfin closed its Regulation A offering.

51.     On December 11, 2017, Altahawi falsely reported to NASDAQ that Longfin had sold a total of 1,140,989 shares at $5 per share in the offering.  Altahawi represented that (*i*) Longfin had sold 1,140,989 shares in the Regulation A offering at $5 per share; (*ii*) the total number of shares outstanding after closing was 44,040,898; and (*iii*) there were 364 shareholders in total, each holding at least 100 shares.  Altahawi also sent NASDAQ a final list of shareholders, their addresses, and the quantity of shares each held in book entry.  Altahawi knew or recklessly disregarded that the December 6 Shareholders were company insiders or Meenavalli affiliates who were provided shares in order for Longfin to improperly meet NASDAQ listing requirements.  The December 6 Shareholders included insiders and affiliates, such as Tammineedi, who received 30,000 shares; Penumarthi, who received 40,000 shares; and E.D., Longfin's Chief Investment Officer and a Stampede director, who received 20,000 shares.

52.     Also on December 11, 2017, after reviewing Longfin's documentation, NASDAQ requested additional information from Altahawi about the over 200 shareholders who received exactly 100 shares.  In Altahawi's response to NASDAQ, on which he copied Meenavalli, Altahawi stated that Longfin's direct public offering had been promoted heavily in India on "IPOFLOW," which had a minimum participation requirement of 100 shares at $5 per share, that the shares were sold and issued as part of Longfin's best efforts offering, and that the shareholders in question did not have relationships with Longfin prior to purchase.  Altahawi knew or recklessly disregarded that these shareholders in fact had relationships with Longfin and Meenavalli prior to their purchases.

*Longfin Starts Trading and Announces the Ziddu.com Acquisition*

53. On December 13, 2017, Longfin Class A common stock started trading on NASDAQ under the stock symbol "LFIN."  The shares opened at $6.94 per share and closed at $5.17 per share, on a trading volume of 297,400 shares.

54. On December 14, 2017, Longfin's shares closed at a price of $5.39 per share, on a trading volume of 185,386 shares.

55. On or about December 14, 2017, Longfin issued a press release announcing that, on December 11, 2017, it had acquired Ziddu.com.  According to Longfin, Ziddu was a "blockchain-empowered solutions provider," which "offers a variety of sources, including microfinance lending against collateralized warehouse receipts in the shape of Ziddu coins."  Longfin publicly represented that Ziddu had expertise in blockchain and cryptocurrency technology.  It stated that Ziddu was "a Blockchain technology empowered solutions provider that offers Microfinance Lending against Collateralized Warehouse Receipts in the form of Warehouse Coins to small and medium enterprises (SMEs), processors, manufacturers, importers and exporters using crypto currencies across continents."

56. On December 15, 2017, Longfin filed a current report with the Commission on Form 8-K, the form used to report significant corporate events.  The Form 8-K attached a press release, dated December 14, 2017, announcing the Ziddu.com acquisition.  Separately, Longfin filed a Form 8-K in which it disclosed that its Chief Financial Officer and Chief Operating Officer had resigned on December 11, 2017.

57. Before Longfin's acquisition, the Ziddu.com website had no ascertainable value.  The website produced no revenue.  Longfin did not acquire any physical facilities, employees, market distribution systems, or production techniques through the acquisition.

58.     Rather, through the acquisition, Longfin acquired only the rights to use the Ziddu.com website and trade name.  As of the date of acquisition, Longfin assigned a value of zero to Ziddu.

59.     After the filing of Longfin's Form 8-K on December 15, 2017, Longfin's share price and trading volume rose significantly.  Longfin's stock price opened at $9.76 per share and closed at $22.01 per share, up four-fold from the previous day's closing price of $5.39.  On December 18, 2017, the next trading day, Longfin's stock price rose during trading to a high of $142.82 per share, which was an increase of more than 548% from the prior day's closing price and approximately 2,662% above Longfin's closing price on its first day of trading just three days earlier.

*Altahawi Unlawfully Sells Longfin Shares for Profits Exceeding $25.5 Million*

60.     At all relevant times through at least March 2018, Altahawi was an affiliate of Longfin:

(a)     Altahawi designed and managed the DPO (direct public offering) for Longfin, creating a public market for Longfin's shares that had not previously existed.  Altahawi later dominated that market.  In March 2018, Altahawi controlled approximately 60% of the public float of Longfin.

(b)     Altahawi was Longfin's corporate Secretary until at least September 2017.  As Secretary, Altahawi signed the resolutions, approved by Meenavalli, adopting Longfin's corporate bylaws and transferring 3% of Longfin's shares to himself.

(c)     Altahawi used the email address andy@longfin.com to conduct business on behalf of the company and was listed as a director of Longfin in an August 2017 roadshow presentation.

(d)     Altahawi marketed the DPO on his website, ipoflow.com, and represented Longfin in December 2017 before NASDAQ to get Longfin registered on the exchange.  Altahawi managed the issuance of the December 6 Shares and then agreed to acquire a substantial portion of those shares for himself less than a month later at a discount.

(e)     Altahawi communicated with the SEC staff from late December 2017 through early February 2018 on behalf of Longfin, seeking guidance on matters such as increasing the size of Longfin's offering and Longfin's Exchange Act registration statement.

(f)     Finally, Altahawi gave share issuance instructions to the transfer agent on behalf of Longfin in late December 2017 in connection with the Ziddu.com transaction.

61.     After Longfin registered its common stock under Section 12(b) of the Exchange Act, it voluntarily assumed the obligation to submit periodic reports under the Exchange Act.  Pursuant to Rule 13a-13 [*17 C.F.R. § 240.13a-13*], and on or before January 8, 2017, Longfin was required to file a quarterly report on Form 10-Q for the quarter ended September 30, 2017.  Longfin did not do so and was thus out of compliance with its Exchange Act periodic reporting obligations beginning on January 9, 2018 and continuing through at least May 4, 2018, when Longfin filed the Form 10-Q. All of Altahawi's sales at issue in this Complaint occurred before March 31, 2018.

62.     Between January 31, 2018 and March 6, 2018, pursuant to a January 12, 2018 stock purchase agreement, Altahawi purported to acquire in private transactions a total of 121,000 Longfin shares from ten individuals, each of whom was a December 6 Shareholder (the "Private Transaction Shares").  The individuals from whom Altahawi purchased included Longfin's Chief Investment

Officer, two members of the CFO's household, and two directors of Stampede Capital, which owns over 27% of Longfin's common stock.

63.     Altahawi agreed to pay $30 per share under the terms of the stock purchase agreement.  On January 12, 2018, when the stock purchase agreement was executed, Longfin closed at a price of $42.65 per share, substantially above the $30 stated contract price between Altahawi and the ten individuals.

64.      Because the December 6 Shareholders acquired their securities from Longfin outside of the Regulation A offering, Altahawi acquired restricted shares that he could not resell into the public market without an exemption from registration.  No exemption applied, and his subsequent resales did not comply with the Rule 144 safe harbor.

65.     On January 30, 2018, representative of the transfer agent emailed Meenavalli and stated, "Andy [Altahawi] is transferring some shares to his name from a few people in India that he has an agreement with.  Ordinarily Colonial [the transfer agent] requires either originally signed documents or a Medallion Signature Guarantee."

66.     A Medallion signature guarantee is one in which a financial institution accepts the genuineness of a signature and any liability for forgery.  The transfer agent asked Meenavalli and Longfin for authorization to forego the requirement of a Medallion signature guarantee so that Altahawi could obtain the Private Transaction Shares.  The Longfin Defendants, through Meenavalli, authorized waiver of the guarantee on behalf of Longfin.

67.     Longfin's waiver of the Medallion signature guarantee, with Meenavalli's authorization, was a necessary step before Altahawi could engage in his unlawful distributions of the Private Transaction Shares.

68.     Between February 7, 2018 and March 9, 2018, Altahawi deposited 111,000 of Private Transaction Shares into his Merrill Lynch account.

69.     Because Altahawi's Consulting Shares were restricted, he needed the transfer agent to remove the restrictive legends before a broker would accept the shares for deposit and then sell them on his behalf to public investors.

70.     Altahawi represented to Merrill Lynch that his Consulting Shares were fully earned as of February 1, 2017, the day of the consulting agreement with Longfin and before Altahawi had provided any services under that agreement.  Moreover, Altahawi stated that he was not an affiliate of Longfin nor had he been an affiliate within the last 90 days.

71.     On March 6, 2018, Meenavalli represented to a representative of the transfer agent that Altahawi had fully earned the Consulting Shares on February 1, 2017.  In response to a question from the representative, Meenavalli stated, "Please kindly remove the restricted legend on Certificate 900037*2025000 n/o Andy Altahawi.  The shares are fully earned and authorize you to remove the legend."

72.     In fact, Altahawi had not fully earned his shares as of February 1, 2017 because he had not yet performed the obligated services under the consulting agreement.

73.     On March 14, 2018, Altahawi transferred the majority of the Consulting Shares into his Merrill Lynch account.  He transferred the remaining 10,000 Private Transaction Shares into two of his brokerage accounts.

74.     Between February 8, 2018 and March 23, 2018, Altahawi sold 475,751 shares of Longfin in the public market for a profit of approximately $25,591,127.  These funds were deposited into Altahawi's account at Merrill Lynch.

75.     Between March 21, 2018 and March 29, 2018 Altahawi sold 60,352 additional shares of Longfin for a profit of approximately $3,425,029.  These funds were deposited into Altahawi's account at Interactive Brokers.

76.     Altahawi's sales of Longfin stock were not exempt from registration, nor were they made pursuant to an effective registration statement.  He held restricted securities.

77.     Altahawi's resales did not comply with the Rule 144 safe harbor and violated Section 5 of the Securities Act.  Purchasers of those shares did not have the benefit of the company's current information as required by the reporting requirements of the Exchange Act, nor did they have the information that would have been provided in a registration statement.

## FIRST CLAIM FOR RELIEF

### Fraudulent NASDAQ Listing Scheme in Violation of Securities Act Section 17(a) [15 U.S.C. § 77q(a)]

78.     The Commission realleges and reincorporates paragraphs 1 through 77 as if fully set forth herein.

79.     Defendant Altahawi, with scienter, by use of the means or instruments of transportation or communication in interstate commerce or by use the mails, in the offer or sale of securities, directly or indirectly:

(a)     employed devices, schemes, or artifices to defraud;

(b)      obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)      engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchaser.

80.     By reason of the actions alleged herein, Altahawi violated Section 17(a) of the Securities Act [*15 U.S.C. § 77q(a)*] and, unless restrained and enjoined, will continue to do so.

## SECOND CLAIM FOR RELIEF

### Fraudulent NASDAQ Listing Scheme in Violation of
### Exchange Act Section 10(b) and Rule 10b-5 [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5]

81.     The Commission realleges and reincorporates paragraphs 1 through 77 as if fully set forth herein.

82.     Defendant Altahawi, with scienter, by use of the means or instrumentalities of interstate commerce or of the mails or of any facility of any national securities exchange, in connection with the purchase or sale of securities, directly or indirectly:

        (a)     employed devices, schemes, or artifices to defraud;

        (b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

        (c)     engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit.

83.     By reason of the actions alleged herein, Altahawi violated Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*] and, unless restrained and enjoined, will continue to do so

## THIRD CLAIM FOR RELIEF

### Unregistered Distributions of Securities in Violation of
### Securities Act Section 5 [15 U.S.C. § 77e]

84.     The Commission realleges and reincorporates paragraphs 1 through 77 as if fully set forth herein.

85.     Between approximately December 2017 through approximately March 2018, Defendant Altahawi, directly or indirectly, and without an applicable exemption:  (a) made use of the

means and instruments of transportation or communication in interstate commerce or of the mails

to sell, through the use or medium of a prospectus or otherwise, securities as to which no

registration statement was in effect; (b) for the purpose of delivery after sale, carried or caused to be

carried through the mails or in interstate commerce, by means and instruments of transportation,

securities as to which no registration statement was in effect; and (c) made use of means and

instruments of transportation or communication in interstate commerce or of the mails to offer to

sell, through the use or medium of a prospectus or otherwise, securities as to which no registration

statement had been filed.

86.     By reason of the actions alleged herein, Altahawi violated Section 5 of the Securities

Act [15 U.S.C. § 77e] and, unless restrained and enjoined, will continue to do so.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectively requests that the Court:

(i)     Permanently enjoin Altahawi from violating Sections 5 and 17(a) of the

Securities Act [15 U.S.C. §§ 77e, 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C.

§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(ii)    Order Altahawi to pay civil penalties pursuant to Section 20(d) of the

Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)] in

amounts to be determined by the Court;

(iii)   Order that Altahawi be barred from acting as an officer or director of any

issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15

U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15

U.S.C. § 78o(d)];

(iv)    Order that Altahawi disgorge, with prejudgment interest, all of the ill-gotten

gains derived from the misconduct described in this Complaint; and

(v)   Order such other relief as the Court may deem just and proper.

Respectfully submitted,

Dated: June 5, 2019

s/Kevin C. Lombardi
Kevin C. Lombardi, DC Bar No. 474114
Tel:  (202) 551-8753
Email:  lombardik@sec.gov
Stephan S. Schlegelmilch
Tel:  (202) 551-4935
Email:  schlegelmilchs@sec.gov
SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC  20549
Facsimile:  (202) 772-9282

Of counsel:
Anita B. Bandy
Adam B. Gottlieb
Ernesto Amparo
SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, DC  20549